Cause No. D-1-GN-12-002522

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK, | § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| ALLY SECURITIES LLC; GOLDMAN, SACHS & CO.; DEUTSCHE BANK SECURITIES INC.; J.P. MORGAN SECURITIES LLC; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; and THE BEAR STEARNS COMPANIES LLC, | § § § § § § § § | |
| Defendants. | § § § | 200¹ᴴ JUDICIAL DISTRICT |

## PLAINTIFF'S AMENDED PETITION

Pursuant to Rule 63 of the Texas Rules of Civil Procedure, Plaintiff Federal Deposit Insurance Corporation as Receiver for Guaranty Bank, for its Amended Petition (**Petition**) against Ally Securities LLC (formerly known as Residential Funding Securities, LLC and doing business as GMAC RFC Securities, and referred to in this Petition as **GMAC**); Goldman, Sachs & Co. (**Goldman**); Deutsche Bank Securities Inc. (**Deutsche**); J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc. and referred to in this Petition as **Bear Stearns**); Structured Asset Mortgage Investments II Inc. (**SAMI**); and The Bear Stearns Companies LLC (formerly known as The Bear Stearns Companies Inc. and referred to in this Petition as **Bear Stearns Companies**), alleges as follows:

## DISCOVERY

1.     Plaintiff intends that discovery be conducted under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

## NATURE OF THIS ACTION

2.     This is an action for damages caused by violation of the Texas Securities Act (**TSA**) and the Securities Act of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued, underwrote, or sold eight securities known as "certificates," which were backed by collateral pools of residential mortgage loans. Guaranty Bank (**Guaranty**) paid approximately $1.8 billion for the eight certificates. When they issued, underwrote, or sold the certificates, the defendants made numerous statements of material fact about the certificates and, in particular, about the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements or omitted important information about such material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

3.     The allegations in this Petition are based on an investigation by Plaintiff. That investigation included, for example: (i) review and analysis of the offering materials for the certificates; (ii) review and analysis of thousands of pages of documents and deposition testimony relating to, among other things, the purchase of the certificates by Guaranty; (iii)

review and analysis of media reports, congressional testimony, court filings, and other publicly available information about the practices of the defendants and of the originators of the mortgage loans that backed the certificates; and (iv) review and analysis of performance, rating, and pricing data about the securitizations involved in this Petition.

4.     Plaintiff's investigation also included a forensic analysis of a random sample of loans in the securitization to determine whether the statements in the prospectus supplements about the mortgage loans backing the certificates were accurate. As part of that forensic review, Plaintiff purchased from a leading vendor data relating to the loans underlying the securitizations. Plaintiff's analysis of that data showed that the defendants made such untrue or misleading statements about at least the following numbers of loans.

| Securitization No. | Number of Loans about Which Defendants Made Material Untrue or Misleading Statements[1] | Number of Loans that Backed the Certificates | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 509 | 678 | 75.1% |
| 2 | 1,058 | 1,454 | 72.8% |
| 3 | 967 | 1,245 | 77.7% |
| 4 | 1,025 | 1,708 | 60.0% |
| 5 | 2,427 | 3,734 | 65.0% |
| 6 | 1,270 | 2,208 | 57.5% |
| 7 | 358 | 641 | 55.9% |
| 8 | 2,192 | 3,194 | 68.6% |

5.     The certificates are "securities" within the meaning of the TSA and the 1933 Act.

---

[1] The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5.6% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5.6% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which GMAC, which underwrote and sold to Guaranty the certificate in Securitization No. 1, made untrue or misleading statements or omissions is within 5.6% of 509, that is, between 480 and 538. The same margin of error should be applied to all information in this Petition and accompanying Schedules that is based on a random sample of loans in a collateral pool.

6.     The defendants are liable under the following provisions of the TSA and the 1933 Act:

*As issuer:* SAMI is liable as an "issuer" under Section 11 of the 1933 Act in connection with issuing one certificate that Guaranty purchased.

*As underwriters:* The following defendants, which underwrote certain of the certificates that Guaranty purchased, are liable as "underwriters" under Section 11 of the 1933 Act: Bear Stearns, which is liable in connection with underwriting one certificate; and GMAC, which is liable in connection with underwriting two certificates.

*As sellers:* The following defendants, which sold the certificates that Guaranty purchased when they were initially offered to the public, are liable as "sellers" under Article 581-33 of the TSA: Bear Stearns, which sold two certificates; Deutsche, which sold three certificates; GMAC, which sold two certificates; and Goldman, which sold one certificate.

The following defendants are also liable as sellers under Section 12(a)(2) of the 1933 Act: Bear Stearns, which is liable in connection with selling one certificate that Guaranty purchased when it was initially offered to the public; and GMAC, which is liable in connection with selling two certificates that Guaranty purchased when they were initially offered to the public.

SAMI is also liable as a seller under Section 12(a)(2) of the 1933 Act in connection with issuing one certificate that Guaranty purchased when it was initially offered to the public.

*As control person:* Bear Stearns Companies is liable as a "controlling person" of SAMI under Section 15 of the 1933 Act.

## PARTIES

7.     The Federal Deposit Insurance Corporation (**FDIC**) is a corporation organized and existing under the laws of the United States of America. Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed depository institutions. On August 21, 2009, the FDIC was duly appointed the receiver for Guaranty. Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Guaranty has authority to pursue claims held by Guaranty, including the claims made against the defendants in this action.

8.     Defendant Bear Stearns is a limited liability company organized under the laws of Delaware and is authorized to do business in Texas. Bear Stearns may be served through its registered agent, CT Corporation, 350 North Saint Paul Street, Suite 2900, Dallas, Texas, 75201.

9.     Defendant Bear Stearns Companies is a limited liability company organized under the laws of Delaware. Bear Stearns Companies may be served through the Texas Secretary of State because it is a nonresident corporation, it engaged in business in Texas but did not maintain a regular place of business in Texas nor a designated agent in Texas for service of process, this proceeding arises out of the business conducted in Texas, and Bear Stearns Companies is a party to this proceeding. The Secretary of State may serve Bear Stearns Companies through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

10.    Defendant Deutsche is a corporation organized under the laws of Delaware and is authorized to do business in Texas. Deutsche may be served through its registered agent, CT Corporation, 350 North Saint Paul Street, Suite 2900, Dallas, Texas, 75201.

5

11.     Defendant GMAC is a limited liability company organized under the laws of Delaware. GMAC may be served through the Texas Secretary of State because it is a nonresident corporation, it engaged in business in Texas but did not maintain a regular place of business in Texas nor a designated agent in Texas for service of process, this proceeding arises out of the business conducted in Texas, and GMAC is a party to this proceeding. The Secretary of State may serve GMAC through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

12.     Defendant Goldman is a corporation organized under the laws of New York and is authorized to do business in Texas. Goldman may be served through its registered agent, CT Corporation, 350 North Saint Paul Street, Suite 2900, Dallas, Texas, 75201.

13.     Defendant SAMI is a corporation organized under the laws of Delaware. SAMI may be served through the Texas Secretary of State because it is a nonresident corporation, it engaged in business in Texas but did not maintain a regular place of business in Texas nor a designated agent in Texas for service of process, this proceeding arises out of the business conducted in Texas, and SAMI is a party to this proceeding. The Secretary of State may serve SAMI through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

### JURISDICTION AND VENUE

14.     Venue is proper in the District Court, Travis County, Texas under Section 15.002(a)(4) of the Texas Civil Practice & Remedies Code because Travis County was the principal residence of Guaranty at the time the claims accrued.

6

## SECURITIZATION OF MORTGAGE LOANS

15.     The securities that Guaranty purchased are so-called **residential mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards**.

16.     In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

17.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as Guaranty. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

18.     In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

19.     In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into

different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

20.     One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

21.     The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated AAA are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average. All of the certificates referred to in this Petition were rated triple-A when Guaranty purchased them.

22.     Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

23.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

24.     **Securities underwriters**, like Bear Stearns and GMAC, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

25.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the

loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

26.   Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission.

27.   As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## THE SALES OF THE CERTIFICATES

28.   Guaranty purchased certificates in eight securitizations (referred to in this Petition as Securitizations Nos. 1 through 8). Details of each securitization and each certificate are stated in Item 28 of Schedules 1 through 8 of this Petition, attached to this Petition as Exhibit 1, which correspond to Securitizations Nos. 1 through 8. Plaintiff incorporates into this paragraph 28, and alleges as though fully set forth in this paragraph, the contents of Item 28 of the Schedules.

29.   Bear Stearns sold two certificates directly to Guaranty; Deutsche sold three certificates directly to Guaranty; GMAC sold two certificates directly to Guaranty; and Goldman

sold one certificate directly to Guaranty. For each of the eight certificates, the defendants sent documents to Guaranty in Texas. These documents included one or more of the following: a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, the defendants made statements of material fact about the certificate that they offered and sold to Guaranty.

### DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

30.     The prospectus supplement for each of the eight securitizations is available from the SEC's website. A URL for each prospectus supplement is included in Item 28 of the Schedules. The prospectus supplements are incorporated into this Petition by reference.

31.     In general, Plaintiff drew and analyzed a random sample of 400 loans from the collateral pools of each securitization in which Guaranty purchased a certificate.[2]

32.     Many of the statements of material fact that the defendants made in the prospectus supplements were untrue or misleading. These untrue or misleading statements included the following.

#### A.     Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools

##### 1.     LTVs

###### (a)     The materiality of LTVs

33.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the

---

[2] For the group of loans that backed the certificate that Guaranty purchased in Securitization No. 3, the sample size was 246 loans.

mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

34.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

35.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Guaranty purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

36.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect denominator understates the risk of the loan.

37.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

### (b)     Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

38.     In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 38 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 38, and alleges as though fully set forth in this paragraph, the contents of Item 38 of the Schedules.

39.     The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Guaranty did understand the statements about the LTVs as statements of fact. Guaranty had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

### (c)     An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.

40.     The stated LTVs of many of the mortgage loans in the securitizations were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

41.     Using data that it purchased from a leading vendor, Plaintiff performed a forensic review of the mortgage loans underlying the certificates to determine whether statements in the prospectus supplements about the LTVs of those mortgage loans were accurate. The forensic review used, among other things, a comprehensive, industry-standard automated valuation model (**AVM**), by which it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs are routinely used by mortgage lenders, including the defendants. Indeed, the firm that provides this AVM currently provides this and other AVMs to 18 of the 20 largest mortgage lenders in the United States. The AVM on which Plaintiff's allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models. Indeed, between the first quarter of 2010 and the second quarter of 2012, the model's mean error rate, on a national basis, was no more than 2.5%.

42.     To use an AVM, one must know the addresses of the properties on which the AVM is to be run. Until after August 21, 2008, however, it was not possible for an investor in a mortgage-backed security to know either the addresses of the mortgaged properties that backed that security or the names of the mortgagors. Those addresses and names were available only from loan files, servicing records, and similar documents, to which investors generally were not given access. (Although loan tapes sometimes are publicly filed at or near the time of the offering, they do not contain either the addresses of the mortgaged properties that backed the security or the names of the mortgagors.) Well after August 21, 2008, the same vendor that provided the AVM developed a method for cross-referencing information about the loans that backed a mortgage-backed security with information in its other proprietary databases of land and tax records. Only in this way was it possible to learn the addresses of those properties and

the names of those mortgagors and thereby to perform a forensic review of the mortgages on them.

43.     For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator[3] that was used in the disclosed LTV was 105% or more of the true market value as determined by the model as of the date on which each individual mortgage loan closed. (The model considered no transactions that occurred after that date.) In contrast, the model determined that the denominator that was used in the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

44.     For example, in Securitization No. 1, there were 678 mortgage loans that backed the certificate that Guaranty purchased. On 363 of the properties that secured those loans, the model determined that the denominator that was used in the disclosed LTV was 105% or more of the true market value, and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $39,584,959. The model determined that the denominator that was used in the disclosed LTV was 95% or less of true market value on only 24 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $2,974,847. Thus, the number of properties on which the value was overstated was more than 15 times the number on which the value was understated, and the aggregate amount overstated was more than 13 times the aggregate amount understated.

---

[3] The denominator in the LTVs stated in the prospectus supplements generally is the lesser of the appraised value or the purchase price of the property. References in this Petition to the denominator in the LTVs are to the value of the property that was used in the calculation of the LTV as stated in the prospectus supplement.

45.   On one of the loans in Securitization No. 1, the amount of the loan was $424,000 and the stated value of the property was $530,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $387,000, resulting in a true LTV of 109.6%. Thus, the stated value was higher than the true value by 37% and the stated LTV was lower than the true LTV by 29.6%. Both of these were huge discrepancies that were material to the credit quality of the loan.

46.   The overstated values of 363 properties in Securitization No. 1 made virtually every statement by GMAC, which underwrote and sold to Guaranty the certificate in Securitization No. 1, about the LTVs of the mortgage loans untrue or misleading. For example, GMAC stated that all mortgage loans had an LTV of 95% or less. In fact, 225 of the mortgage loans had LTVs of over 95%. GMAC also stated that the weighted-average LTV of the loans in the collateral pool was 76.70%. In fact, the weighted-average LTV of the loans was 100.8%. These differences were material for the reasons stated above.

47.   The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans that backed the certificate | 678 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 363 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $39,584,959 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 24 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $2,974,847 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 225 |
| Weighted-average LTV, as stated by the defendant | 76.70% |
| Weighted-average LTV, as determined by the model | 100.8% |

48.   The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item

48 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 48, and alleges as though fully set forth in this paragraph, the contents of Item 48 of the Schedules.

> **(d)     These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

49.     As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

50.     The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

51.     According to land records, many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[4] The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

52.     To take an example, of the 678 properties that secured the mortgage loans that backed the certificate that Guaranty purchased in Securitization No. 1, at least 186 were subject to liens in addition to the lien represented by the mortgage in the collateral pool. GMAC did not disclose in the prospectus supplement that those liens existed. GMAC stated that the weighted-average LTV of the properties was 76.70%, when, solely because of the additional liens on these 186 properties, the weighted-average combined LTV was 81.3%.[5] This is a significant difference.

53.     On one of the loans, the original balance of the mortgage loan was $168,000, the represented value of the property was $210,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $42,000. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

54.     Details of the undisclosed additional liens in the securitizations are stated in Item 54 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 54, and alleges as though fully set forth in this paragraph, the contents of Item 54 of the Schedules. Plaintiff is

---

[4] In order to ensure that this calculation did not include liens that were paid off but were not promptly removed from land records, the additional liens referred to in this Petition and the Schedules do not include liens that were originated on or before the date on which each mortgage loan in the pools was closed.

[5] The combined LTV is the ratio of all loans on a property to the value of the property.

informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

55.    Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

### 2.    Appraisals

56.    As discussed above in paragraph 36, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

57.    In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

> **(a)    The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

58.    The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties,

and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 40 through 48, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 15.3 | 13.3 |
| 2 | 11.1 | 12.7 |
| 3 | 1.6 | 1.7 |
| 4 | 1.8 | 2.3 |
| 5 | 4.7 | 6.3 |
| 6 | 2.7 | 3.3 |
| 7 | 5.3 | 4.8 |
| 8 | 16.3 | 9.5 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

59.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

> **(b)     The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

60.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

61.     USPAP includes the following provisions:

(a)      USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)      USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)      USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

(i)      develop an opinion of site value by an appropriate appraisal method or technique;

(ii)      analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

(iii)      analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

62.      The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

63.      In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 63 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 63, and alleges as though fully set forth in this paragraph, the contents of Item 63 of the Schedules.

21

64.     Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

65.     Each of the statements referred to in paragraph 63 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

66.     By each of the untrue and misleading statements referred to in paragraphs 38 and 63 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

**B.      Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.      The materiality of occupancy status**

67.     Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

68.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

### 2. Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations

69. In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, GMAC stated that, of the 678 mortgage loans that backed the certificate that Guaranty purchased, 531 were secured by primary residences and 147 were not. Details of each such statement in the securitizations are stated in Item 69 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 69, and alleges as though fully set forth in this paragraph, the contents of Item 69 of the Schedules.

70. These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

71. Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

72. A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

73. The forensic review performed by Plaintiff also tested the accuracy of the representations in the prospectus supplements about owner occupancy. After obtaining the

address of each property (which, as described above, was not available until well after August 21, 2008) it became possible to look up data about that property in proprietary databases owned by the same vendor. Those databases have information from local land and tax records and retrospective credit reports, among other sources.

74.     The forensic review showed that, with respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

75.     In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

76.     When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any

bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

77.     In Securitization No. 1, 61 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 85 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 78 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 170 of the 531 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 147, as GMAC stated, but at least 317, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 77 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 77, and alleges as though fully set forth in this paragraph, the contents of Item 77 of the Schedules.

78.     By each of the untrue and misleading statements referred to in paragraph 69, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

### C.     Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools

#### 1.     The materiality of underwriting standards and the extent of an originator's disregard of them

79.     Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans, and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the

extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

2.     **Untrue or misleading statements about the underwriting standards of originators of the mortgage loans**

80.     In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 80 of the Schedules of this Petition. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 80, and alleges as though fully set forth in this paragraph, the contents of Item 80 of the Schedules.

81.     Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

3.   **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

(a)   **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

82.   Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations, the originators of the loans in these securitizations disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

83.   The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

84.   Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator American Home Mortgage Corp., Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by American Home Mortgage Corp. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs

in loans originated by American Home Mortgage Corp. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



85. Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

28



86.     Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for some of them are presented in Figures 1 and 2 of Exhibits A through D of this Petition:

| Exhibit | Originator |
| --- | --- |
| A | Countrywide Home Loans, Inc. |
| B | First Horizon Home Loan Corporation |
| C | National City Mortgage Co. |
| D | Wells Fargo Bank, N.A. |

**(b)    The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

87.    As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 87 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the Schedules.

88.    A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 88 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 88, and alleges as though fully set forth in this paragraph, the contents of Item 88 of the Schedules.

89.    A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on March 31, 2012, are stated in Item 89 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 89, and alleges as though fully set forth in this paragraph, the contents of Item 89 of the Schedules.

90.     By each of the untrue and misleading statements referred to in paragraph 80 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

### (c)     Other evidence shows that the originators disregarded their underwriting standards.

91.     In addition to the statistical data cited above, other evidence shows that Countrywide Home Loans, Inc., which originated some of the loans in Securitization No. 3, did not follow its stated underwriting standards.

92.     Many loans that Countrywide originated were outside its already lax underwriting standards, because Countrywide frequently disregarded even those standards and made loans that borrowers could not afford to pay. *See* Petition at 4, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). In a memorandum dated December 13, 2007, the enterprise risk assessment officer at Countrywide stated that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity mortgage loans." *Id.* at 23-24. In an email dated June 1, 2006, Countrywide's Chairman and CEO Angelo Mozilo wrote that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage." *Id.* at 37.

93.     Moreover, Countrywide "viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them." Petition at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008). Indeed, "to increase market share, [Countrywide] dispensed with many standard underwriting guidelines . . . to place unqualified borrowers in loans which ultimately they could not afford." Petition at 5, *Washington v. Countrywide Financial Corp.*, No. 09-2-01690-6 (Wash. Super. 2009).

94.     Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not adhere to its own underwriting standards, but instead abandoned, ignored, or disregarded them. According to internal Countrywide documents, Mozilo admitted that loans "had been originated 'through our channels with disregard for process [and] compliance with guidelines.'" Petition at 20-21, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Moreover, Countrywide did whatever it took to sell as many loans as it could, as quickly as possible, including by disregarding its underwriting standards. *See* Petition at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008).

95.     Plaintiff is informed and believes, and based thereon alleges, that Countrywide made exceptions to its underwriting standards where no compensating factors existed, resulting in higher rates of default and used as "compensating factors" variables such as a borrower's credit score and LTV, which had already been used to determine that the loan did not fall within the guidelines. Petition at 20-21, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Such "compensating factors" did not actually compensate for anything and did not "offset" any risk.

96.     According to the Financial Crisis Inquiry Commission (FCIC), Countrywide made loans that it knew borrowers could not afford to pay. In its final report, the FCIC noted that "Countrywide recognized that many of the loans they were originating could result in 'catastrophic consequences'" because the borrowers could not afford to pay. FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL INQUIRY REPORT xxii (Public Affairs Reports, 2011). Finally, Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not apply its underwriting standards in accordance with all federal, state, and local laws. Countrywide has entered into agreements to settle charges of violation of predatory lending, unfair competition, false advertising, and banking laws with the Attorneys General of at least 39 states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina,

North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Attorneys General of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing. Eighty-eight percent of the mortgages that were covered by the settlement with the Attorneys General were sold into securitization trusts, like those in which Guaranty purchased certificates.

97. Other evidence also shows that American Home Mortgage Corporation, which originated all of the loans in Securitization No. 8, failed to follow its stated underwriting standards.

98. Plaintiff is informed and believes, and based thereon alleges that, beginning in at least 2005, American Home Mortgage Corporation and its affiliates (referred to in this Petition as **American Home**) substantially relaxed and then disregarded their underwriting standards.

99. Underwriters who refused to approve loans that failed to meet the guidelines were reprimanded. An American Home underwriter from Indiana who objected to American Home's course of conduct said that she was "put on the 'bad girl' list and not listened to," and that "[i]f you stood up and spoke out against any of [American Home's] policies then the managers treated you like dirt." (*See* UWinIN, Comment to Mortgage Lender Implode-O-Meter, Hindsight 20/20??? (Jan.21, 2008), http://forum.ml-implode.com/viewtopic.php?p=37072#37072.) She added that her boss overlooked fraudulent loan applications because "the client sent us lots of business." *Id.*

100. According to an economics reporter for *The New York Times*, who wrote an article about the pitfalls of the mortgage industry in the context of his own credit struggle,

American Home's loan officers viewed themselves as "dream enablers." The reporter explained how American Home extended a mortgage loan to him after looking only at his credit scores and income, choosing to ignore that he spent two thirds of his income on alimony and child support and that he was barely able to afford the mortgage payments:

> Bob [Andrews, a loan officer at American Home] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000."
>
> What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, Bob figured, it was my job to decide whether I could afford it. His job was to make it happen.
>
> "I am here to enable dreams," he explained to me long afterward. Bob's view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage – not mine."

(Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.)

101.    There also is evidence that some American Home officers knowingly inserted false information in loan applications without the borrowers' knowledge. Kourosh Partow, a former American Home branch manager in Anchorage, Alaska, pleaded guilty to wire fraud in 2007. (Plea Agreement at 2, *United States v. Partow*, No. 3:06-cr-00070-08-HRH (D. Alaska filed Apr. 20, 2007)). The plea agreement states that, while Partow was employed by American Home, he "significantly overstated" a borrower's income on a loan application, even though the borrower had provided him with accurate information about his income. On August 31, 2007, Partow was convicted and sentenced to 25 months in prison, and was ordered to pay fines and restitution. (Judgment, *U.S. v. Partow*, No. 3:06-CR-00070-08-HRH (D. Alaska Aug. 24, 2007)). Partow later asserted in a document submitted to the court in connection with his sentencing that his former employers (American Home and Countrywide) were aware that their loan documents "were fraught with inaccuracies" and encouraged manipulation of data. (Glenn R. Simpson, *Loan Data Focus of Probe*, THE WALL STREET JOURNAL, March 11, 2008.)

102.    American Home made the list of the "Worst 10 in the Worst 10" – an analysis by the Office of the Comptroller of the Currency that determined the originators of the most foreclosed loans in the 10 metropolitan areas hardest hit by foreclosures. In the OCC's initial analysis in November 2008, which was based on subprime and Alt-A foreclosures between 2005 and 2007, American Home made the list of "Worst 10" originators in three of the 10 metropolitan areas. When the OCC updated its analysis in November 2009 based on more recent data, American Home made the list in seven of the 10 metropolitan areas, ranking within the top five worst originators in three of them.

103.    In addition, several state and federal authorities have taken action against American Home in connection with its lending practices. The New Jersey Department of Banking and Insurance took steps to revoke American Home's license because of the company's numerous violations of New Jersey's Licensed Lenders Act. (State of New Jersey, Department of Banking and Insurance News Release, *OBI Takes Action To Revoke License of Two New York-Based Mortgage Lenders*, Aug. 3, 2007.) Similarly, the New York State Banking Department suspended American Home's mortgage banking license for 30 days because American Home had failed to fund mortgage commitments. (New York Department of Financial Services Press Release, *New York State Banking Dep't Issues Suspension Order Against American Home Mortgage,* Aug. 3, 2007.)

**D.    The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Guaranty's Certificates Untrue and Misleading.**

104.    In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 104 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 104, and alleges as though fully set forth in this paragraph, the contents of Item 104 of the Schedules.

105.   The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Guaranty, have investment policies that require a certain minimum rating for all investments. The policy of Guaranty was to purchase only certificates that were rated triple-A.

106.   These statements by the defendants about the ratings of the certificates they issued, underwrote, or sold were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a)   loans in which the LTVs were materially understated as shown by the AVM;

(b)   loans in which the LTVs were misleading as a result of undisclosed additional liens;

(c)   loans in which the properties were stated to be owner-occupied, but were not; and

(d)   loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

107.   In Securitization No. 1, there were 363 loans in which the LTVs were materially understated as shown by the AVM, 186 loans in which the LTVs were misleading because of undisclosed additional liens, 170 loans in which the properties were stated to be owner-occupied but were not, and 14 loans that suffered EPDs. Eliminating duplicates, there were 509 loans (or 75.1% of the loans that backed the certificate that Guaranty purchased) about which GMAC made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 107 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 107, and alleges as though fully set forth in this paragraph, the contents of Item 107 of the Schedules.

108.   Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

109.    By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

## STATUTES OF LIMITATIONS

110.    All of the claims in this Petition are timely. Plaintiff became receiver for Guaranty on August 21, 2009. Under 12 U.S.C. § 1821(d)(14), the statutes of limitations on all of Guaranty's claims asserted in this Petition that had not expired as of August 21, 2009, are extended to no less than three years from that date. Plaintiff filed its original Petition less than three years from August 21, 2009.

111.    The statutes of limitations applicable to the claims asserted in this Petition had not expired as of August 21, 2009, because a reasonably diligent plaintiff would not have discovered until later than August 21, 2008, facts that show that the particular statements referred to in Items 28, 38, 63, 69, 80, and 104 of the Schedules to this Petition were untrue or misleading. Those are statements about the 14,862 specific mortgage loans in the collateral pools of the securitizations involved in this action, not about residential mortgage loans or any type of residential mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent plaintiff did not have access until after August 21, 2008, to facts about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originators of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees do not make those files available to certificate holders. Moreover, on and prior to August 21, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010. A reasonably

37

diligent plaintiff thus could not have brought a Petition, before August 21, 2008, that would have withstood a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

112.    All of the claims asserted in this Petition are timely for an additional reason. When Guaranty purchased the certificates involved in this action, all of them were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations (**NRSROs**) accredited by the SEC. Sponsors of securitizations submitted to the NRSROs the same information about the loans in the collateral pools of proposed securitizations that they included in the prospectus supplements for those securitizations, including in particular statements of the type referred to in Items 28, 38, 63, 69, 80, and 104 of the Schedules to this Petition. The NRSROs used and relied on that information in rating the certificates to be issued in each securitization.

113.    The NRSROs monitored the certificates that they rated after those certificates were issued. If an NRSRO discovers facts that show that there was an untrue or misleading statement about a material fact in the information submitted to it for its use in rating a certificate, then the NRSRO will withdraw its rating of that certificate while it considers the impact of the untrue or misleading statement, or it will downgrade the rating of the certificate, usually to a rating below investment grade.

114.    As noted above, all of the certificates involved in this action were rated triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not one of those NRSROs withdrew any of those ratings, or downgraded any of them to below investment grade, before August 21, 2008. The date on which each certificate was first downgraded below investment grade is stated in Item 28 of the Schedules.

115.    If a reasonably diligent plaintiff would have discovered before August 21, 2008, facts that show that the particular statements referred to in Items 28, 38, 63, 69, 80, and 104 of the Schedules to this Petition were untrue or misleading, then the NRSROs, which were monitoring the certificates and are much more sophisticated than a reasonably diligent plaintiff, would also have discovered such facts and withdrawn or downgraded their ratings on the

certificates to below investment grade. The fact that none of the NRSROs did so demonstrates that, before August 21, 2008, a reasonably diligent plaintiff could not have discovered facts that show that those statements were untrue or misleading.

116.    The claims on Securitizations Nos. 1 and 2 are also timely for another reason. As a purchaser of the certificates, Guaranty was, and Plaintiff as Receiver for Guaranty is, a member of the proposed class in *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, United States District Court for the Southern District of New York, No. 08-CV-8781. The pendency of *New Jersey Carpenters* has tolled the running of the statutes of limitations on the claims in this Petition.

117.    Securitization No. 1 was included in the original class action Petition filed in *New Jersey Carpenters* on September 22, 2008, in New York Supreme Court and removed on October 14, 2008. Securitization No. 2 was included in the Consolidated First Amended Securities Class Action Petition filed in *New Jersey Carpenters* on May 18, 2009. These securitizations were dismissed from that action on March 31, 2010.

118.    One or more of the named plaintiffs in *New Jersey Carpenters* purchased certificates that were issued pursuant to the same registration statement as the certificates that Guaranty purchased in Securitizations Nos. 1 and 2. The certificates purchased by Guaranty and by the named plaintiffs in *New Jersey Carpenters* were backed in part by mortgage loans originated by Homecomings Financial, LLC.

## CAUSES OF ACTION

A.    **Untrue or Misleading Statements in the Sale of Securities Under Article 581-33 of the TSA**

119.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 118.

120.    GMAC sold two certificates in Securitizations Nos. 1 and 2 that Guaranty purchased when they were initially offered to the public. GMAC sent communications and solicitations to Guaranty in Texas for the purpose of inducing Guaranty to purchase the

certificates. The sale of these certificates occurred in Texas because employees or agents of GMAC directed communications about the certificates and solicitations to purchase the certificates to Guaranty there, and because Guaranty received those communications and solicitations there.

121.   In doing the acts alleged in the sale to Guaranty of the two certificates in Securitizations Nos. 1 and 2, GMAC violated Article 581-33 of the TSA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

122.   Goldman sold a certificate in Securitization No. 3 that Guaranty purchased when it was initially offered to the public. Goldman sent communications and solicitations to Guaranty in Texas for the purpose of inducing Guaranty to purchase the certificate. The sale of this certificate occurred in Texas because employees or agents of Goldman directed communications about the certificate and solicitations to purchase the certificate to Guaranty there, and because Guaranty received those communications and solicitations there.

123.   In doing the acts alleged in the sale to Guaranty of the certificate in Securitization No. 3, Goldman violated Article 581-33 of the TSA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

124.   Deutsche sold three certificates in Securitizations Nos. 4, 5, and 6 that Guaranty purchased when they were initially offered to the public. Deutsche sent communications and solicitations to Guaranty in Texas for the purpose of inducing Guaranty to purchase the certificates. The sale of these certificates occurred in Texas because employees or agents of Deutsche directed communications about the certificates and solicitations to purchase the certificates to Guaranty there, and because Guaranty received those communications and solicitations there.

125.   In doing the acts alleged in the sale to Guaranty of the three certificates in Securitizations Nos. 4, 5, and 6, Deutsche violated Article 581-33 of the TSA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

126.   Bear Stearns sold two certificates in Securitizations Nos. 7 and 8 that Guaranty purchased when they were initially offered to the public. Bear Stearns sent communications and solicitations to Guaranty in Texas for the purpose of inducing Guaranty to purchase the certificates. The sale of these certificates occurred in Texas because employees or agents of Bear Stearns directed communications about the certificates and solicitations to purchase the certificates to Guaranty there, and because Guaranty received those communications and solicitations there.

127.   In doing the acts alleged in the sale to Guaranty of the two certificates in Securitizations Nos. 7 and 8, Bear Stearns violated Article 581-33 of the TSA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

128.   Plaintiff has disposed of all of the certificates.

129.   Under Article 581-33 of the TSA, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date on which it recovers the purchase price, minus the amount of income received on the certificate, minus the greater of the value of the security when the plaintiff disposed of it or the consideration that the plaintiff received for the security.

**B.      Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act**

130.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 129.

41

131.     Guaranty purchased two certificates in Securitizations Nos. 1 and 2 that GMAC sold to Guaranty when they were initially offered to the public.

132.     GMAC solicited Guaranty to purchase the certificates, and sold the certificates to Guaranty, by means of the prospectus supplements and other written offering materials and oral communications.

133.     The prospectus supplements and other written offering materials and oral communications that GMAC sent to Guaranty contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

134.     Guaranty did not know when it purchased the certificates that the statements in the prospectus supplements and other written offering materials and oral communications that GMAC sent to Guaranty were untrue or misleading.

135.     In doing the acts alleged in the sale to Guaranty of the certificates in Securitizations Nos. 1 and 2, GMAC violated Section 12(a)(2) of the 1933 Act.

136.     Guaranty purchased one certificate in Securitization No. 8 that Bear Stearns sold to Guaranty when it was initially offered to the public.

137.     Bear Stearns solicited Guaranty to purchase the certificate, and sold the certificate to Guaranty, by means of the prospectus supplement and other written offering materials and oral communications.

138.     The prospectus supplement and other written offering materials and oral communications that Bear Stearns sent to Guaranty contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

139.     Guaranty did not know when it purchased the certificate that the statements in the prospectus supplement and other written offering materials and oral communications that Bear Stearns sent to Guaranty were untrue or misleading.

140.     In doing the acts alleged in the sale to Guaranty of the certificate in Securitization No. 8, Bear Stearns violated Section 12(a)(2) of the 1933 Act.

141.     SAMI was the depositor of Securitization No. 8, and therefore is the issuer of one certificate that Guaranty purchased.

142.     SAMI prepared and signed the registration statement for the certificate for the purpose of soliciting investors, including Guaranty, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

143.     This sale was in the initial offering of the certificates and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), SAMI is considered to have offered or sold the certificate to Guaranty.

144.     In doing the acts alleged in the offer or sale to Guaranty of the certificate in Securitization No. 8, SAMI violated section 12(a)(2) of the 1933 Act.

145.     Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

146.     When it failed on August 21, 2009, Guaranty had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

147.     Plaintiff has suffered a loss on each of these certificates.

148.     Plaintiff is entitled to recover damages.

**C.     Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

149.     Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 148.

150.    SAMI is the depositor of Securitization No. 8, and therefore is the issuer of one certificate that Guaranty purchased. In doing the acts alleged, SAMI violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 8.

151.    GMAC underwrote Securitizations Nos. 1 and 2. In doing the acts alleged, GMAC violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1 and 2.

152.    Bear Stearns underwrote Securitization No. 8. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 8.

153.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 28 of the Schedules.

154.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 33 through 109.

155.    Guaranty purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months. Plaintiff therefore is not required to plead reliance on the untrue or misleading statements.

156.    In the alternative, Guaranty relied on the untrue or misleading statements that defendants made in the registration statements, as amended by the prospectus supplements, in deciding to purchase the certificates.

157.    Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

158.    Guaranty did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

159.    When it failed on August 21, 2009, Guaranty had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

160.    Plaintiff has suffered a loss on each of these certificates.

161.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

**D.      Liability as a Controlling Person Under Section 15 of the 1933 Act**

162.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 161.

163.    Bear Stearns Companies, by or through stock ownership, agency, and as otherwise described above, controlled SAMI within the meaning of Section 15 of the 1933 Act.

164.    In doing the acts alleged, SAMI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling one certificate.

165.    Bear Stearns Companies is therefore jointly and severally liable with and to the same extent as SAMI.

### REQUEST FOR A JURY TRIAL

166.    Plaintiff requests trial of its claims by jury to the extent authorized by law.

### ATTORNEYS' FEES, COSTS, AND INTEREST

167.    Plaintiff is entitled to recover reasonable and necessary attorneys' fees in accordance with Article 581-33 of the TSA.

168.    Plaintiff further prays that the court award it all costs of court and expenses. Plaintiff further prays that the court award Plaintiff all pre- and post-judgment interest under the applicable legal rates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants as set forth in this Petition and for damages in an amount to be determined at trial, but not less than $900.6 million, plus attorneys' fees, costs of court, and pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff may show itself to be justly entitled.

Dated:  January 17, 2013

*Farrell A Hochmuth - by permission nnc*

Dean D. Hunt
State Bar No. 10283220
Farrell A. Hochmuth
State Bar No. 24041107
BAKER & HOSTETLER LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002-5018
Telephone: 713.751.1600
Facsimile: 713.751.1717
Email: DHunt@bakerlaw.com
Email: FHochmuth@bakerlaw.com

ATTORNEYS FOR PLAINTIFF
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
GUARANTY BANK

Of Counsel:

David J. Grais (*pro hac vice* pending)
Mark B. Holton (*pro hac vice* pending)
Mary G. Menge (*pro hac vice* pending)
Siobhan M. Stewart (*pro hac vice* pending)
Lourdes M. Slater (*pro hac vice* pending)
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 755-0100
Facsimile: (212) 755 0052

46

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of January, 2013, a copy of the foregoing was sent to the following counsel of record in accordance with the Texas Rules of Civil Procedure via certified mail return receipt requested.

Mark K. Glasser
Kate E. Hill
Sidley Austin LLP
JPMorgan Chase Tower
600 Travis Street, 31st Floor
Houston, Texas 77002
Fax: (713) 315-9199
**CMRRR/7008 3230 0000 9869 9751**

A. Robert Pietrzak
Dorothy J. Spenner
Alex J. Kaplan
787 Seventh Avenue
New York, New York 10019
Fax: (212) 839-5599
**CMRRR/7008 3230 0000 9869 9775**

Patton G. Lochridge
William H. Daniel
McGINNIS, LOCHRIDGE & KILGORE,
L.L.P.
600 Congress Ave., Suite 2100
Austin, TX 78701
Tel. (512) 495-6000
Fax (512) 495-6093
**CMRRR/7008 3230 0000 9869 9799**

Bruce D. Oakley
HOGAN LOVELLS US LLP
700 Louisiana St., Suite 4300
Houston, Texas 77002
Tel: (713) 632-1420
Fax: (713) 632-1401
**CMRRR/7008 3230 0000 9869 9812**

Andrew T. Frankel
Alexandra C. Pitney
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954
Fax: (212) 455-2502
**CMRRR/7008 3230 0000 9869 9768**

Shannon H. Ratliff
Lisa A. Paulson
Ratliff Law Firm PLLC
600 Congress Avenue, Suite 3100
Austin, TX 78701-2984
Fax: 512.493.9625
**CMRRR/7008 3230 0000 9869 9782**

Mark S. Hanchet
Michael O. Ware
Charles S. Korschun
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910
**CMRRR/7008 3230 0000 9869 9805**

Richard H. Klapper
Theodore Edelman
Tracy Richelle High
Kamil Redmond
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel: (212) 558-4000
Fax: (212) 558-3588
**CMRRR/7008 3230 0000 9869 9508**

_Farrell A. Hochmuth_

Farrell A. Hochmuth                    with permission
                                        MIC

47

## SCHEDULE 1 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant GMAC.

**Item 28.        Details of trust and certificate(s).**

(a)        **Dealer that sold the certificate(s) to Guaranty:** GMAC.

(b)        **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO5 was a securitization in August 2007 of 678 mortgage loans, in one pool. RALI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were purchased by RALI through its affiliate Residential Funding Company, LLC. Homecomings Financial LLC, a wholly owned subsidiary of Residential Funding Company, LLC, originated approximately 27.6% by principal amount of the mortgage loans in the collateral pool. RALI 2007-QO5 Pros. Sup. S-4, S-34. No unaffiliated seller sold more than approximately 12.5% of the mortgage loans to Residential Funding Company, LLC. RALI 2007-QO5 Pros. Sup. S-33 to S-34.

(c)        **Description of the certificate(s) that Guaranty purchased:** GMAC was the underwriter of the security that Guaranty purchased. GMAC offered and sold to Guaranty a senior certificate in this securitization, in class A, for which Guaranty paid $211,418,000 plus accrued interest on August 30, 2007.

(d)        **Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(e)        **Current ratings of the certificate(s):** Moody's: Ca; Standard & Poor's: CCC.



**SCHEDULE 1 OF THE AMENDED PETITION**                                                      Page 1

(f)     **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(g)     **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1410212/000089109207003772/e28383_424b5.txt

(h)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on February 12, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement entitled "Mortgage Loan Statistical Information," GMAC presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 23 such tables in the "Mortgage Loan

Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 35. Thus, in the "Mortgage Loan Statistical Information" section, GMAC made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QO5 Pros. Sup. I-1 through I-10.

(b)      "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 76.70%." RALI 2007-QO5 Pros. Sup. I-3.

(c)      None of the mortgage loans in the collateral pool had an original loan-to-value ratio greater than 95%. RALI 2007-QO5 Pros. Sup. I-3.

**Item 48.      Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 678 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 363 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $39,584,959 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 24 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,974,847 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 225 |
| Weighted-average LTV, as stated by the defendant | 76.70% |
| Weighted-average LTV, as determined by the model | 100.8% |

**Item 54.      Undisclosed additional liens:**

(a)      **Minimum number of properties with additional liens:** 186

(b)      **Weighted average CLTV with additional liens:** 81.3%

**SCHEDULE 1 OF THE AMENDED PETITION**                                    **Page 3**

**Item 69.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, GMAC made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In the section of the prospectus supplement entitled "Mortgage Loan Statistical Information," described in Item 38, GMAC presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RALI 2007-QO5 Pros. Sup. I-5.

(b)      In the "Occupancy Types of the Mortgage Loans" table, GMAC stated that of the 678 mortgage loans in the collateral pool, 531 were secured by primary residences and 147 were not. RALI 2007-QO5 Pros. Sup. I-5.

**Item 77.      Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 61**

(b)      **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 85**

(c)      **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 78**

(d)      **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 170**

**Item 80.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-45 of the prospectus supplement, GMAC made statements about the underwriting standards of the originators of the mortgage loans. All of those statements are incorporated herein by reference.

One of those statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2007-QO5 Pros. Sup. S-43.

Another one of those statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QO5 Pros. Sup. S-44.

Another one of those statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QO5 Pros. Sup. S-45.

**Item 87.**      **Early payment defaults:**

    **(a)**      **Number of the mortgage loans that suffered EPDs:** 14

    **(b)**      **Percent of the mortgage loans that suffered EPDs:** 2.1%

Item 88.        90+ days delinquencies:

    (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 428

    (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 63.1%

Item 89.        30+ days delinquencies:

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 397

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 58.6%

Item 104.       **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-6, S-13 and S-106 of the prospectus supplement, GMAC made statements about the ratings assigned to the certificates issued in this securitization. GMAC stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. RALI 2007-QO5 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

GMAC also stated: "When issued, the offered certificates will receive ratings which are not lower than those listed on the table on page S-6 of this prospectus supplement." RALI 2007-QO5 Pros. Sup. S-13. The table referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2007-QO5 Pros. Sup. S-6.

GMAC also stated: "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement . . . ." RALI 2007-QO5 Pros. Sup. S-106. The page of the prospectus supplement referred to in this

statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2007-QO5 Pros. Sup. S-6.

**Item 107.**     **Summary of loans about which the defendant made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated as shown by the AVM:** 363

    **(b)**     **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 186

    **(c)**     **Number of loans for which the properties were stated to be owner-occupied but were not:** 170

    **(d)**     **Number of loans that suffered EPDs:** 14

    **(e)**     **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 509

    **(f)**     **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 75.1%

## SCHEDULE 2 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant GMAC.

**Item 28.**    **Details of trust and certificate(s).**

      **(a)**    **Dealer that sold the certificate(s) to Guaranty:** GMAC.

      **(b)**    **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH8 was a securitization in September 2007 of 1,454 mortgage loans, in one pool. RALI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were purchased by RALI through its affiliate Residential Funding Company, LLC. Homecomings Financial LLC, a wholly owned subsidiary of Residential Funding Company, LLC, originated approximately 42.5% of the mortgage loans in the collateral pool. RALI 2007-QH8 Pros. Sup. S-4, S-32.

      **(c)**    **Description of the certificate(s) that Guaranty purchased:** GMAC was the underwriter of the security that Guaranty purchased. GMAC offered and sold to Guaranty a senior certificate in this securitization, in class A, for which Guaranty paid $491,164,900 plus accrued interest on September 7, 2007.

      **(d)**    **Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

      **(e)**    **Current ratings of the certificate(s):** Moody's: Ca; Standard & Poor's: D.

      **(f)**    **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

**SCHEDULE 2 OF THE AMENDED PETITION**                                    **Page 1**

(g)     URL     of     prospectus     supplement     for     this     securitization:
http://www.sec.gov/Archives/edgar/data/1410213/000095013607006284/file1.htm

(h)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on February 12, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement entitled "Mortgage Loan Statistical Information," GMAC presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 21 such tables in the "Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 1 to 42. Thus, in the "Mortgage Loan Statistical Information" section, GMAC made many untrue or

**SCHEDULE 2 OF THE AMENDED PETITION**                                      **Page 2**

misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QH8 Pros. Sup. I-1 through I-11.

(b)     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 75.96%." RALI 2007-QH8 Pros. Sup. I-4.

(c)     None of the mortgage loans in the collateral pool had an original loan-to-value ratio greater than 95%. RALI 2007-QH8 Pros. Sup. I-4.

**Item 48.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,454 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 763 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $97,961,295 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 69 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,684,148 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 513 |
| Weighted-average LTV, as stated by the defendant | 75.96% |
| Weighted-average LTV, as determined by the model | 101.2% |

**Item 54.     Undisclosed additional liens:**

(a)     **Minimum number of properties with additional liens:** 414

(b)     **Weighted average CLTV with additional liens:** 80.2%

**Item 69.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, GMAC made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 2 OF THE AMENDED PETITION**                                        **Page 3**

(a)      In the section of the prospectus supplement entitled "Mortgage Loan Statistical Information," described in Item 38, GMAC presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RALI 2007-QH8 Pros. Sup. I-6.

(b)      In the "Occupancy Types of the Mortgage Loans" table, GMAC stated that of the 1,454 mortgage loans in the collateral pool, 1,201 were secured by primary residences and 253 were not. RALI 2007-QH8 Pros. Sup. I-6.

**Item 77.**      **Details of properties that were stated to be owner-occupied, but were not:**

**(a)**      **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 84**

**(b)**      **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 178**

**(c)**      **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 174**

**(d)**      **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 371**

**Item 80.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-44 of the prospectus supplement, GMAC made statements about the underwriting standards of the originators of the mortgage loans. All of those statements are incorporated herein by reference.

**SCHEDULE 2 OF THE AMENDED PETITION**                                    **Page 4**

One of those statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. . . ." RALI 2007-QH8 Pros. Sup. S-43.

Another one of those statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QH8 Pros. Sup. S-43.

Another one of those statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QH8 Pros. Sup. S-44.

**Item 87.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs:** 40

    **(b)**     **Percent of the mortgage loans that suffered EPDs:** 2.8%

**Item 88.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 995

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 68.4%

**Item 89.**      **30+ days delinquencies:**

   **(a)**      **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 935

   **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 64.3%

**Item 104.**      **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-6, S-13 and S-92 through S-93 of the prospectus supplement, GMAC made statements about the ratings assigned to the certificates issued in this securitization. GMAC stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. RALI 2007-QH8 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

GMAC also stated: "When issued, the offered certificates will receive ratings which are not lower than those listed on the table on page S-6 of this prospectus supplement." RALI 2007-QH8 Pros. Sup. S-13. The table referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2007-QH8 Pros. Sup. S-6.

GMAC also stated: "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement." RALI 2007-QH8 Pros. Sup. S-92. The page of the prospectus supplement referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2007-QH8 Pros. Sup. S-6.

**Item 107.**      **Summary of loans about which the defendant made untrue or misleading statements:**

   **(a)**      **Number of loans whose LTVs were materially understated as shown by the AVM:** 763

(b)    **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 414

(c)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 371

(d)    **Number of loans that suffered EPDs:** 40

(e)    **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 1,058

(f)    **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 72.8%

## SCHEDULE 3 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant Goldman.

**Item 28.        Details of trust and certificate(s).**

(a)        **Dealer that sold the certificate(s) to Guaranty:** Goldman.

(b)        **Description of the trust:** GSR Mortgage Loan Trust, Series 2004-11 was a securitization in August 2004 of 2,737 mortgage loans, in five groups. GS Mortgage Securities Corp. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were acquired by Goldman Sachs Mortgage Company from Countrywide Home Loans, Inc., IndyMac Bank, F.S.B., National City Mortgage Co., and Wells Fargo Bank, N.A. GSR 2004-11 Pros. Sup. S-8.

(c)        **Description of the certificate(s) that Guaranty purchased:** Goldman was the underwriter of the security that Guaranty purchased. Goldman offered and sold to Guaranty a senior certificate in this securitization, in class 2-A-1, for which Guaranty paid $100,359,375 plus accrued interest on August 27, 2004. Guaranty's certificate was primarily paid by the 1,245 mortgage loans in loan group 2.

(d)        **Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(e)        **Current ratings of the certificate(s):** Moody's: Ba2; Standard & Poor's: BBB.

(f)        **Date on which the certificate(s) were downgraded below investment grade:** April 21, 2011.

(g)     **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/807641/000112528204004174/b400568_424b5.txt

(h)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by GS Mortgage Securities Corp. with the SEC on form S-3 on July 19, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Goldman made the following statements about the LTVs of the mortgage loans in loan group 2 of this securitization.

(a)     "As of the Cut-Off Date, approximately 97.9% of the Mortgage Loans in Loan Group 2 had current amortized loan-to-value ratios of less than or equal to 80%, while approximately 2.1% of the Mortgage Loans in Loan Group 2 had amortized loan-to-value ratios greater than 80%." GSR 2004-11 Pros. Sup. S-29.

(b)     The weighted average current LTV for the mortgage loans in loan group 2 was 74.2%. GSR 2004-11 Pros. Sup. S-30.

(c)     In Appendix B of the prospectus supplement, Goldman presented a table entitled "Original Loan-to-Value Ratios of the Group 2 Loans." This table divided the loans in loan group 2 into eight categories of original LTV (for example, below or equal to 50.00%, 50.01% to 60.00%, 60.01% to 70.00%, etc.). The table contained untrue or

misleading statements about the number of mortgage loans, the aggregate scheduled principal balance of the mortgage loans as of the cut-off date, and the percentage of the aggregate scheduled principal balance of the group 2 loans in each of these categories. GSR 2004-11 Pros. Sup. S-B-20.

(d)    "At origination, the weighted average loan-to-value ratio of all the Group 2 Loans was approximately 74.302%." GSR 2004-11 Pros. Sup. S-B-20.

(e)    None of the mortgage loans in loan group 2 had an original loan-to-value ratio greater than 95%. GSR 2004-11 Pros. Sup. S-B-20.

(f)    In Appendix B of the prospectus supplement, Goldman presented another table entitled "Current Loan-to-Value Ratios of the Group 2 Loans." This table divided the loans in loan group 2 into eight categories of current LTV (for example, below or equal to 50.00%, 50.01% to 60.00%, 60.01% to 70.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate scheduled principal balance of the mortgage loans as of the cut-off date and the percentage of aggregate scheduled principal balance of the group 2 loans in each of these categories. GSR 2004-11 Pros. Sup. S-B-20.

(g)    "As of the Cut-off Date, the weighted average original loan-to-value ratio of all of the Group 2 Loans was approximately 74.198%." GSR 2004-11 Pros. Sup. S-B-20.

(h)    As of the Cut-Off Date, none of the mortgage loans in loan group 2 had a loan-to-value ratio greater than 95%. GSR 2004-11 Pros. Sup. S-B-20.

**SCHEDULE 3 OF THE AMENDED PETITION**                                          **Page 3**

**Item 48.**    **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (group 2) | 1,245 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 324 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $44,060,359 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 197 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,610,750 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 91 |
| Weighted-average LTV as of the Cut-Off Date, as stated by the defendant | 74.198% |
| Weighted-average LTV, as determined by the model | 84.0% |

**Item 54.**    **Undisclosed additional liens in loan group 2:**

    **(a)**    **Minimum number of properties with additional liens:** 663

    **(b)**    **Weighted average CLTV with additional liens:** 82.1%

**Item 63.**    **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Goldman made the following statement about the appraisals of the properties that secured the mortgage loans: "[T]he appraisal and the appraiser both satisfy the applicable requirements of Fannie Mae or Freddie Mac, as applicable[.]" GSR 2004-11 Pros. Sup. S-36.

**Item 69.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Goldman made the following statements about the occupancy status of the properties that secured the mortgage loans in loan group 2 of this securitization.

    (a)    In Appendix B of the prospectus supplement, Goldman presented a table entitled "Occupancy Status of the Group 2 Loans." This table divided the mortgage loans

**SCHEDULE 3 OF THE AMENDED PETITION**                    **Page 4**

in loan group 2 into the categories "Primary Residence," "Second Home," and "Investment." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate scheduled principal balance of the mortgage loans as of the cut-off date, and the percentage of the aggregate scheduled principal balance of the group 2 loans in each of these categories. GSR 2004-11 Pros. Sup. S-B-22.

(b)     In the "Occupancy Types of the Mortgage Loans" table, Goldman stated that of the 1,245 mortgage loans in loan group 2, 1,183 were secured by primary residences and 62 were not. GSR 2004-11 Pros. Sup. S-B-22.

**Item 77.     Details of properties in loan group 2 that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 147

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 278

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 10

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 354

**Item 80.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On page S-36 of the prospectus supplement, and pages 22 through 25 of the prospectus, Goldman made statements about the underwriting standards of the originators of the mortgage loans. All of those statements are incorporated herein by reference.

One of those statements was that: "The Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time of origination

with exceptions thereto exercised in a reasonable manner . . . ." GSR 2004-11 Pros. Sup.
S-36.

Another one of those statements was that: "The lender or an agent acting on the
lender's behalf applies the underwriting standards to evaluate the borrower's credit
standing and repayment ability, and to evaluate the value and adequacy of the mortgaged
property as collateral." GSR 2004-11 Pros. 23.

**Item 88.     90+ days delinquencies in loan group 2:**

    **(a)     Number of the mortgage loans that suffered 90+ days delinquencies:**
122

    **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:**
9.8%

**Item 89.     30+ days delinquencies in loan group 2:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on
March 31, 2012:** 81

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on
March 31, 2012:** 6.5%

**Item 104.     Statements about the ratings of the certificate(s) that Guaranty
purchased:**

On pages S-15, S-38, and S-82 through S-83 of the prospectus supplement,
Goldman made statements about the ratings assigned to the certificates issued in this
securitization. Goldman stated that Guaranty's certificate was rated AAA by Standard &
Poor's and Aaa by Moody's. GSR 2004-11 Pros. Sup. S-82. These were the highest
ratings available from these two rating agencies.

Goldman also stated that: "In order to be issued, the offered certificates must have
the rating or ratings by Standard & Poor's Ratings Services and/or Moody's Investors
Service, Inc., indicated under 'Certificate Ratings' in this prospectus supplement." GSR

2004-11 Pros. Sup. S-15. The section referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. GSR 2004-11 Pros. Sup. S-82.

Goldman also stated that: "The Offered Certificates will not be issued unless they receive the rating or ratings from Standard & Poor's Ratings Services . . . and Moody's Investors Service, Inc. . . . indicated under 'Certificate Ratings' in this prospectus supplement." GSR 2004-11 Pros. Sup. S-38. The section referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. GSR 2004-11 Pros. Sup. S-82.

Goldman also stated that: "It is a condition to the issuance of the Offered Certificates that they receive ratings from S&P and/or Moody's, as indicated below . . . ." GSR 2004-11 Pros. Sup. S-82. The table following this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. GSR 2004-11 Pros. Sup. S-82.

**Item 107.     Summary of loans in loan group 2 about which the defendant made untrue or misleading statements:**

    **(a)     Number of loans whose LTVs were materially understated as shown by the AVM:** 324

    **(b)     Number of loans whose LTVs were misleading because of undisclosed additional liens:** 663

    **(c)     Number of loans for which the properties were stated to be owner-occupied but were not:** 354

    **(d)     Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 967

    **(e)     Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 77.7%

**SCHEDULE 4 OF THE AMENDED PETITION**

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant Deutsche.

**Item 28.**      **Details of trust and certificate(s).**

    **(a)**      **Dealer that sold the certificate(s) to Guaranty:** Deutsche.

    **(b)**      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Series 2005-AR16IP was a securitization in July 2005 of 1,708 mortgage loans, in one pool. IndyMac MBS, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B., Residential Mortgage Capital, and Commercial Capital Bank, FSB. INDX 2005-AR16IP Pros. Sup. S-18, S-20, S-26. Residential Mortgage Capital originated approximately 19.94% of the mortgage loans in the collateral pool by cut-off date pool principal balance and Commercial Capital Bank originated approximately 18.03% of the mortgage loans by cut-off date pool principal balance. INDX 2005-AR16IP Pros. Sup. S-20.

    **(c)**      **Description of the certificate(s) that Guaranty purchased:** Deutsche was the underwriter of the security that Guaranty purchased. Deutsche offered and sold to Guaranty a senior certificate in this securitization, in class A-3, for which Guaranty paid $113,143,384 plus accrued interest on July 11, 2005.

    **(d)**      **Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

    **(e)**      **Current ratings of the certificate(s):** Moody's: C; Standard & Poor's: D.

    **(f)**      **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

**SCHEDULE 4 OF THE AMENDED PETITION**                                        **Page 1**

(g)     **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1090295/000112528205003691/b407648_424b5
.txt

(h)     **Registration statement pursuant or traceable to which the**
**certificate(s) were issued:** Certificates in this trust, including the certificate that
Guaranty purchased, were issued pursuant or traceable to a registration statement filed by
IndyMac MBS, Inc. with the SEC on form S-3 on September 29, 2004. Annexed to the
registration statement was a prospectus. The prospectus was amended from time to time
by prospectus supplements whenever a new series of certificates was issued pursuant or
traceable to that registration statement.

**Item 38.     Untrue or misleading statements about the LTVs of the mortgage**
**loans:**

In the prospectus supplement, Deutsche made the following statements about the
LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of
100.00% or less." INDX 2005-AR16IP Pros. Sup. S-20.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool,"
Deutsche presented a table entitled "Original Loan-to-Value Ratios for the Mortgage
Loans." This table divided the loans in the collateral pool into 18 categories of original
LTV (for example, 10.01% to 15.00%, 15.01% to 20.00%, 20.01% to 25.00%, etc.). The
table contained untrue or misleading statements about the number of mortgage loans, the
aggregate principal balance outstanding, and the percent of aggregate principal balance
outstanding of the mortgage loans in each of these categories. INDX 2005-AR16IP Pros.
Sup. S-22.

(c)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 69.44%." INDX 2005-AR16IP Pros. Sup. S-22.

**Item 48.       Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,708 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 474 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $54,685,497 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 265 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $23,820,854 |
| Number of loans with LTVs over 100%, as stated by the defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 60 |
| Weighted-average LTV, as stated by the defendant | 69.44% |
| Weighted-average LTV, as determined by the model | 78.6% |

**Item 54.       Undisclosed additional liens:**

**(a)       Minimum number of properties with additional liens:** 457

**(b)       Weighted average CLTV with additional liens:** 74.5%

**Item 69.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)       In the section of the prospectus supplement entitled "The Mortgage Pool," described in Item 38, Deutsche presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Home," "Second Home," and "Investment." This table contained untrue or misleading

statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding of the mortgage loans in each of these categories. INDX 2005-AR16IP Pros. Sup. S-23.

(b)     In the "Occupancy Types of the Mortgage Loans" table, Deutsche stated that of the 1,708 mortgage loans in the collateral pool, 1,439 were secured by primary residences and 269 were not. INDX 2005-AR16IP Pros. Sup. S-23.

**Item 77.     Details of properties that were stated to be owner-occupied, but were not:**

**(a)     Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 102**

**(b)     Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 222**

**(c)     Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 184**

**(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 401**

**Item 80.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-28 of the prospectus supplement, Deutsche made statements about the underwriting standards of IndyMac Bank. All of those statements are incorporated herein by reference.

One of those statements was that: "IndyMac's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property." INDX 2005-AR16IP Pros. Sup. S-27.

**SCHEDULE 4 OF THE AMENDED PETITION**                                             **Page 4**

Another one of those statements was that: "Exceptions to these underwriting standards are permitted where compensating factors are present or in the context of negotiated bulk purchases." INDX 2005-AR16IP Pros. Sup. S-27.

On pages 24 through 27 of the prospectus, Deutsche made statements about the general underwriting standards applied to the mortgage loans in this securitization. All of those statements are incorporated herein by reference.

One of those statements was that: "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR16IP Pros. 24.

**Item 87.**      **Early payment defaults:**

  (a)      **Number of the mortgage loans that suffered EPDs:** 6

  (b)      **Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 88.**      **90+ days delinquencies:**

  (a)      **Number of the mortgage loans that suffered 90+ days delinquencies:** 318

  (b)      **Percent of the mortgage loans that suffered 90+ days delinquencies:** 18.6%

**Item 89.**      **30+ days delinquencies:**

  (a)      **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 271

  (b)      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 15.9%

**Item 104.**      **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-3 and S-68 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificates issued in this securitization. Deutsche stated

**SCHEDULE 4 OF THE AMENDED PETITION**                                                    **Page 5**

that Guaranty's certificate was rated AAA by Standard & Poor's, and Aaa by Moody's. INDX 2005-AR16IP Pros. Sup. S-3. These were the highest ratings available from these two rating agencies.

Deutsche also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . ." INDX 2005-AR16IP Pros. Sup. S-68.

**Item 107.    Summary of loans about which the defendant made untrue or misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as shown by the AVM:** 474

    **(b)    Number of loans whose LTVs were materially misleading because of undisclosed additional liens:** 457

    **(c)    Number of loans for which the properties were stated to be owner-occupied but were not:** 401

    **(d)    Number of loans that suffered EPDs:** 6

    **(e)    Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 1,025

    **(f)    Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 60.0%

## SCHEDULE 5 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant Deutsche.

**Item 28.**     **Details of trust and certificate(s).**

      **(a)**     **Dealer that sold the certificate(s) to Guaranty:** Deutsche.

      **(b)**     **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO5 was a securitization in December 2005 of 3,734 mortgage loans, in one pool. RALI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were purchased by RALI from Homecomings Financial Network, Inc., a wholly owned subsidiary of Residential Funding Corporation, SCME Mortgage Bankers, Inc., MortgageIT, Inc., and various other undisclosed originators. Approximately 35.0% of the mortgage loans in the collateral pool were purchased from Homecomings Financial; approximately 16.7% of the loans were purchased from SCME Mortgage Bankers; and approximately 13.2% of the loans were purchased from MortgageIT. RALI 2005-QO5 Pros. Sup. S-24. No unaffiliated seller sold more than 7.5% of the mortgage loans to Residential Funding. RALI 2005-QO5 Pros. Sup. S-24.

      **(c)**     **Description of the certificate(s) that Guaranty purchased:** Deutsche was the underwriter of the security that Guaranty purchased. Deutsche offered and sold to Guaranty a senior certificate in this securitization, in class A-3, for which Guaranty paid $177,144,420 plus accrued interest on December 30, 2005.

      **(d)**     **Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

**SCHEDULE 5 OF THE AMENDED PETITION**                                        Page 1

(e)      **Current ratings of the certificate(s):** Moody's: Withdrawn; Standard & Poor's: D.

(f)      **Date on which the certificate(s) were downgraded below investment grade:** September 3, 2008.

(g)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1346471/000095011706000040/a41076.txt

(h)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on July 20, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      In Annex I of the prospectus supplement entitled "Mortgage Loan Statistical Information", Deutsche presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000.00 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted

Average Loan-to-Value Ratio." There were 20 such tables in the "Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 100. Thus, in the "Mortgage Loan Statistical Information" section, Deutsche made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2005-QO5 Pros. Sup. I-1 through I-12.

(b)     "The weighted average loan-to-value ratio at origination of all mortgage loans will be approximately 75.06%." RALI 2005-QO5 Pros. Sup. I-3.

(c)     None of the mortgage loans in the collateral pool had an original loan-to-value ratio in excess of 95%. RALI 2005-QO5 Pros. Sup. I-3.

**Item 48.      Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 3,734 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 1,578 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $144,476,659 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 336 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $22,898,603 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 560 |
| Weighted-average LTV, as stated by the defendant | 75.06% |
| Weighted-average LTV, as determined by the model | 87.0% |

**Item 54.      Undisclosed additional liens:**

**(a)     Minimum number of properties with additional liens: 1,008**

**(b)     Weighted average CLTV with additional liens: 78.5%**

**SCHEDULE 5 OF THE AMENDED PETITION**                                    **Page 3**

**Item 69.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In the section of the prospectus supplement entitled "Mortgage Loan Statistical Information," described in Item 38, Deutsche presented a table entitled "Occupancy Types." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RALI 2005-QO5 Pros. Sup. I-6.

(b)     In the "Occupancy Types" table, Deutsche stated that of the 3,734 mortgage loans in the collateral pool, 3,010 were secured by primary residences and 724 were not. RALI 2005-QO5 Pros. Sup. I-6.

**Item 77.**     **Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 205**

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 439**

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 215**

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 709**

**Item 80.        Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-30 through S-31 of the prospectus supplement, and pages 12 through 17 of the prospectus, Deutsche made statements about the underwriting standards of the originators of the mortgage loans. All of those statements are incorporated herein by reference.

One of those statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2005-QO5 Pros. Sup. S-31.

Another one of those statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2005-QO5 Pros. Sup. S-31.

Another one of those statements was that: "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." RALI 2005-QO5 Pros. 14.

**Item 87.        Early payment defaults:**

    **(a)        Number of the mortgage loans that suffered EPDs:** 6

    **(b)        Percent of the mortgage loans that suffered EPDs:** 0.2%

**Item 88.**      **90+ days delinquencies:**

    **(a)**      **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,519

    **(b)**      **Percent of the mortgage loans that suffered 90+ days delinquencies:** 40.7%

**Item 89.**      **30+ days delinquencies:**

    **(a)**      **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 1,377

    **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 36.9%

**Item 104.**      **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-6, S-12 through S-13, and S-82 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificates issued in this securitization. Deutsche stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. RALI 2005-QO5 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

Deutsche also stated: "When issued, the offered certificates will receive ratings which are not lower than those listed on the table on page S-6 of the prospectus supplement." RALI 2005-QO5 Pros. Sup. S-12. The table referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2005-QO5 Pros. Sup. S-6.

Deutsche also stated: "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement." RALI 2005-QO5 Pros. Sup. S-82. The page of the prospectus supplement referred to in this statement

**SCHEDULE 5 OF THE AMENDED PETITION**                                        **Page 6**

indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI

2005-QO5 Pros. Sup. S-6.

**Item 107.**   **Summary of loans about which the defendant made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,578

    **(b)**   **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 1,008

    **(c)**   **Number of loans for which the properties were stated to be owner-occupied but were not:** 709

    **(d)**   **Number of loans that suffered EPDs:** 6

    **(e)**   **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 2,427

    **(f)**   **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 65.0%

## SCHEDULE 6 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant Deutsche.

**Item 28.        Details of trust and certificate(s).**

**(a)        Dealer that sold the certificate(s) to Guaranty:** Deutsche.

**(b)        Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO1 was a securitization in August 2005 of 2,208 mortgage loans, in one pool. RALI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were purchased by RALI through its affiliate, Residential Funding Corporation. RALI 2005-QO1 Pros. Sup. S-25. Homecomings Financial Network, Inc. sold approximately 60.3% of the mortgage loans to Residential Funding Corporation. RALI 2005-QO1 Pros. Sup. S-25, S-30. No unaffiliated originator sold more than 4% of the mortgage loans to Residential Funding Corporation. RALI 2005-QO1 Pros. Sup. S-30.

**(c)        Description of the certificate(s) that Guaranty purchased:** Deutsche was the underwriter of the security that Guaranty purchased. Deutsche offered and sold to Guaranty a senior certificate in this securitization, in class A-4, for which Guaranty paid $204,000,000 plus accrued interest on August 31, 2005.

**(d)        Ratings of the certificate(s) when Guaranty purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

**(e)        Current ratings of the certificate(s):** Moody's: C; Standard & Poor's: D.

**(f)        Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(g)     **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/949493/000095011705003505/a40439.txt

(h)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on July 20, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In the section of the prospectus supplement entitled "Characteristics of the Mortgage Loans," Deutsche presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 17 such tables in the "Description of the Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 76. Thus, in the "Description of the Mortgage Pool" section, Deutsche made many untrue or misleading

statements about the original LTVs of the loans in the collateral pool. RALI 2005-QO1 Pros. Sup. S-29 through S-39.

(b)     "The weighted average loan-to-value ratio at origination of all mortgage loans will be approximately 74.19%." RALI 2005-QO1 Pros. Sup. S-33.

(c)     None of the mortgage loans in the collateral pool had an original loan-to-value ratio greater than 95%. RALI 2005-QO1 Pros. Sup. S-33.

**Item 48.       Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 2,208 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 701 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $45,020,620 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 259 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,639,184 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 204 |
| Weighted-average LTV, as stated by the defendant | 74.19% |
| Weighted-average LTV, as determined by the model | 83.3% |

**Item 54.       Undisclosed additional liens:**

**(a)       Minimum number of properties with additional liens:** 480

**(b)       Weighted average CLTV with additional liens:** 78.2%

**Item 69.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 6 OF THE AMENDED PETITION**                                           **Page 3**

(a)      In the section of the prospectus supplement entitled "Characteristics of the Mortgage Loans," described in Item 38, Deutsche presented a table entitled "Occupancy Types." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of all mortgage loans in each of these categories. RALI 2005-QO1 Pros. Sup. S-35.

(b)      In the "Occupancy Types" table, Deutsche stated that of the 2,208 mortgage loans in the collateral pool, 1,754 were secured by primary residences and 454 were not. RALI 2005-QO1 Pros. Sup. S-35.

**Item 77.       Details of properties that were stated to be owner-occupied, but were not:**

**(a)      Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 171**

**(b)      Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 298**

**(c)      Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 149**

**(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 469**

**Item 80.       Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-40 through S-41 of the prospectus supplement, and pages 12 through 17 of the prospectus, Deutsche made statements about the underwriting standards of Residential Funding Corporation. All of those statements are incorporated herein by reference.

**SCHEDULE 6 OF THE AMENDED PETITION**                                    **Page 4**

One of those statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2005-QO1 Pros. Sup. S-40.

Another one of those statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2005-QO1 Pros. Sup. S-41.

Another one of those statements was that: "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." RALI 2005-QO1 Pros. 14.

**Item 87.**    **Early payment defaults:**

   **(a)**    **Number of the mortgage loans that suffered EPDs:** 9

   **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 88.**    **90+ days delinquencies:**

   **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 652

   **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 29.5%

**Item 89**        **30+ days delinquencies:**

      **(a)**      **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 602

      **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 27.3%

**Item 104.**     **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-6, S-13, and S-97 through S-98 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificates issued in this securitization. Deutsche stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. RALI 2005-QO1 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

Deutsche also stated: "When issued, the offered certificates will receive ratings which are not lower than those listed on the table on page S-6 of the prospectus supplement." RALI 2005-QO1 Pros. Sup. S-13. The table referred to in this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. RALI 2005-QO1 Pros. Sup. S-6.

Deutsche also stated: "It is a condition of the issuance of the Senior Certificates that they be rated 'AAA' by Standard & Poor's . . . and 'Aaa' by Moody's Investors Service, Inc. . . . ." RALI 2005-QO1 Pros. Sup. S-97.

**Item 107.**     **Summary of loans about which the defendant made untrue or misleading statements:**

      **(a)**      **Number of loans whose LTVs were materially understated as shown by the AVM:** 701

      **(b)**      **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 480

 (c)  **Number of loans for which the properties were stated to be owner-occupied but were not: 469**

 (d)  **Number of loans that suffered EPDs: 9**

 (e)  **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements: 1,270**

 (f)  **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements: 57.5%**

## SCHEDULE 7 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendant Bear Stearns.

**Item 28.      Details of trust and certificate(s).**

   **(a)      Dealer that sold the certificate(s) to Guaranty:** Bear Stearns.

   **(b)      Description of the trust:** Structured Asset Mortgage Investments II Trust, Mortgage Pass-Through Certificates, Series 2005-AR7 was a securitization in November 2005 of 2,717 mortgage loans, in six groups. SAMI was the issuer of the securities in the trust. The mortgage loans in loan group 5 of this securitization were originated by SouthStar Funding, LLC, First Horizon Home Loan Corporation, and various undisclosed originators. Of the 641 mortgage loans in loan group 5, approximately 68.36% were originated by SouthStar Funding, LLC and approximately 1.10% were originated by First Horizon Home Loan Corporation. No other originator originated more than 10% of the mortgage loans in the aggregate. SAMI 2005-AR7 Pros. Sup. S-8, S-61.

   **(c)      Description of the certificate(s) that Guaranty purchased:** Bear Stearns was the underwriter of the security that Guaranty purchased. Bear Stearns offered and sold to Guaranty a senior certificate in this securitization, in class 5-A-2, for which Guaranty paid $59,687,340 plus accrued interest on November 30, 2005. Guaranty's certificate was primarily paid by the 641 mortgage loans in loan group 5.

   **(d)      Ratings of the certificate(s) when Guaranty purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

   **(e)      Current ratings of the certificate(s):** Standard & Poor's: D; Moody's: C.

   **(f)      Date on which the certificate(s) were downgraded below investment grade:** February 23, 2009.

   **(g)      URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1243106/000091142005000521/d113406 3.txt

**SCHEDULE 7 OF THE AMENDED PETITION**                                    **Page 1**

**(h)** **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by SAMI with the SEC on form S-3 on December 1, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) As of the cut-off date, the weighted-average LTV ratio at origination of the mortgage loans in loan group 5 was 77.64%. SAMI 2005-AR7 Pros. Sup. S-12.

(b) "All of the mortgage loans had a Combined Loan-to-Value Ratio as of the date of origination of 100.00% or less." SAMI 2005-AR7 Pros. Sup. S-47.

(c) In Schedule A of the prospectus supplement entitled "Certain Characteristics of the Mortgage Loans", Bear Stearns presented a table entitled "Original Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group V." This table divided the loans in loan group 5 into 12 categories of original LTV (for example, 0.00% to 30.00%, 30.01% to 40.00%, 40.01% to 50.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding as of the cut-off date, and the percent of mortgage loans in each of these categories. SAMI 2005-AR7 Pros. Sup. A-40.

(d) As of the cut-off date, none of the mortgage loans in loan group 5 had an original Loan-to-Value Ratio greater than 95%. SAMI 2005-AR7 Pros. Sup. A-40.

(e) As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 5 was 77.64%. SAMI 2005-AR7 Pros. Sup. A-40.

**Item 48.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 5) | 641 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 254 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $12,829,351 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 48 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,658,293 |
| Number of loans with LTVs over 95%, as stated by the defendant | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 85 |
| Weighted-average LTV, as stated by the defendant | 77.64% |
| Weighted-average LTV, as determined by the model | 87.8% |

**Item 63.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns made the following statement about the appraisals of the properties that secured the mortgage loans originated by First Horizon Home Loan Corporation: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac." SAMI 2005-AR7 Pros. Sup. S-63.

In the prospectus supplement, Bear Stearns also made statements about the appraisals of the properties that secured the mortgage loans originated by SouthStar Funding, LLC: "In determining adequacy of the property as collateral for the loan, a Fannie Mae/Freddie Mac URAR appraisal of the property is performed by an independent appraiser approved by SouthStar." SAMI 2005-AR7 Pros. Sup. S-64.

**Item 69.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 7 OF THE AMENDED PETITION**                                    **Page 3**

(a)    In Schedule A of the prospectus supplement, described in Item 38, Bear Stearns presented a table entitled "Occupancy Status of Mortgaged Properties in Group V." This table divided all of the mortgage loans in loan group 5 into the categories "Owner Occupied," "Investor," and "Second Home." This table made untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding as of the cut-off date, and the percent of the mortgage loans in each of these categories. SAMI 2005-AR7 Pros. Sup. A-42.

(b)    In the "Occupancy Status of Mortgaged Properties in Group V" table, Bear Stearns stated that of the 641 mortgage loans in loan group 5, 576 were secured by primary residences and 65 were not. SAMI 2005-AR7 Pros. Sup. A-42.

**Item 77.    Details of properties in loan group 5 that were stated to be owner-occupied, but were not:**

    **(a)    Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 50**

    **(b)    Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 98**

    **(c)    Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 61**

    **(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 174**

**Item 80.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-61 through S-63 of the prospectus supplement, Bear Stearns made statements about the underwriting guidelines of First Horizon Home Loan Corporation. All of those statements are incorporated herein by reference.

One of those statements was that: "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." SAMI 2005-AR7 Pros. Sup. S-61.

**SCHEDULE 7 OF THE AMENDED PETITION**                                    **Page 4**

Another one of those statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." SAMI 2005-AR7 Pros. Sup. S-62.

On pages S-63 through S-65 of the prospectus supplement, Bear Stearns made statements about the underwriting guidelines of SouthStar Funding, LLC. All of those statements are incorporated herein by reference.

One of those statements was that: "SouthStar Underwriting Guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made by SouthStar." SAMI 2007-AR7 Pros. Sup. S-64.

**Item 88.      90+ days delinquencies in loan group 5:**

    **(a)      Number of the mortgage loans that suffered 90+ days delinquencies:** 266

    **(b)      Percent of the mortgage loans that suffered 90+ days    delinquencies:** 41.5%

**Item 89.      30+ days delinquencies in loan group 5:**

    **(a)      Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 217

    **(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 33.9%

**Item 104.      Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-5 to S-6, S-29 to S-30, and S-159 to S-160 of the prospectus supplement, Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's Investors Service, Inc. SAMI 2005-AR7 Pros. Sup. S-5, S-29, S-159. These were the highest ratings available from these two rating agencies.

Bear Stearns also stated: "It is a condition to the issuance of the certificates that the offered certificates receive the following ratings from Standard & Poor's . . . and Moody's Investors Service, Inc. . . ." SAMI 2005-AR7 Pros. Sup. S-29. The table following this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. SAMI 2005-AR7 Pros. Sup. S-29.

Bear Stearns also stated: "It is a condition to the issuance of each class of offered certificates that it receives at least the ratings set forth below from S&P and Moody's . . . ." SAMI 2005-AR7 Pros. Sup. S-159. The table following this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. SAMI 2005-AR7 Pros. Sup. S-159.

**Item 107.**     **Summary of loans in loan group 5 about which the defendant made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated as shown by the AVM:** 254

    **(b)**     **Number of loans for which the properties were stated to be owner-occupied but were not:** 174

    **(c)**     **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 358

    **(d)**     **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 55.9%

## SCHEDULE 8 OF THE AMENDED PETITION

To the extent that this Schedule is incorporated by reference into allegations in the Petition, those allegations are made against defendants SAMI, Bear Stearns, and Bear Stearns Companies.

**Item 28.        Details of trust and certificate(s).**

**(a)        Dealer that sold the certificate(s) to Guaranty:** Bear Stearns.

**(b)        Description of the trust:** Structured Asset Mortgage Investments II Trust, Mortgage Pass-Through Certificates, Series 2007-AR6, was a securitization in October 2007 of 3,194 mortgage loans, in one pool. SAMI was the issuer of the securities in the trust. All of the mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corporation. SAMI 2007-AR6 Pros. Sup. S-9, S-45.

**(c)        Description of the certificate(s) that Guaranty purchased:** Bear Stearns was the underwriter of the security that Guaranty purchased. Bear Stearns offered and sold to Guaranty a senior certificate in this securitization, in class A-2, for which Guaranty paid $420,046,000 plus accrued interest on October 31, 2007.

**(d)        Ratings of the certificate(s) when Guaranty purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

**(e)        Current ratings of the certificate(s):** Standard & Poor's: D; Moody's: C.

**(f)        Date on which the certificate(s) were downgraded below investment grade:** February 23, 2009.

**(g)        URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1410924/000138713107000060/q00750_sami07 -ar6.txt

**(h)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Guaranty purchased, were issued pursuant or traceable to a registration statement filed by SAMI with the SEC on form S-3 on January 26, 2007. Annexed to the registration

statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 38.**   **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, SAMI and Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)   As of the cut-off date, the weighted average LTV ratio at origination of all of the loans in the collateral pool was 83.23%. SAMI 2007-AR6 Pros. Sup. S-10.

(b)   In Schedule A of the prospectus supplement entitled "Certain Characteristics of the Mortgage Loans", SAMI and Bear Stearns presented a table entitled "Original Loan-to-Value Ratios in Total." This table divided the loans in the collateral pool into 13 categories of original LTV (for example, 0.00% to 30.00%, 30.01% to 40.00%, 40.01% to 50.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate stated principal balance outstanding as of the cut-off date, and the percent of the mortgage loans in each of these categories. SAMI 2007-AR6 Pros. Sup. A-2.

(c)   As of the cut-off date, none of the mortgage loans in the collateral pool had an original Loan-to-Value ratio greater than 100%. SAMI 2007-AR6 Pros. Sup. A-2.

(d)   As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in the collateral pool was 83.23%. SAMI 2007-AR6 Pros. Sup. A-2.

**SCHEDULE 8 OF THE AMENDED PETITION**                                           **Page 2**

**Item 48.**     **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 3,194 |
| Number of loans for which the stated value was 105% or more of the true market value as determined by the model | 1,563 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $151,179,876 |
| Number of loans for which the stated value was 95% or less of the true market value as determined by the model | 96 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,875,559 |
| Number of loans with LTVs over 100%, as stated by the defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 1,084 |
| Weighted-average LTV, as stated by the defendants | 83.23% |
| Weighted-average LTV, as determined by the model | 109.1% |

**Item 54.**     **Undisclosed additional liens:**

    **(a)**     **Minimum number of properties with additional liens:** 303

    **(b)**     **Weighted-average CLTV with additional liens:** 83.7%

**Item 63.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, SAMI and Bear Stearns made the following statement about the appraisals of the properties that secured the mortgage loans originated by American Home Mortgage Corporation: "Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." SAMI 2007-AR6 Pros. Sup. S-47.

**Item 69.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, SAMI and Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)     In Schedule A of the prospectus supplement, described in Item 38, SAMI and Bear Stearns presented a table entitled "Occupancy Status of Mortgaged Properties in

**SCHEDULE 8 OF THE AMENDED PETITION**                                    **Page 3**

Total." This table divided all of the mortgage loans in the collateral pool into the categories "Owner Occupied," "Investor," and "Second Home." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate stated principal balance outstanding as of the cut-off date, and the percent of the mortgage loans in the collateral pool in each of these categories. SAMI 2007-AR6 Pros. Sup. A-4.

(b)     In the "Occupancy Status of Mortgaged Properties in Total" table, SAMI and Bear Stearns stated that of the 3,194 mortgage loans in the collateral pool, 2,588 were secured by primary residences and 606 were not. SAMI 2007-AR6 Pros. Sup. A-4.

**Item 77.     Details of properties that were stated to be owner-occupied, but were not:**

    **(a)     Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 263

    **(b)     Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 423

    **(c)     Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 566

    **(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 965

**Item 80.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-46 through S-48 of the prospectus supplement, SAMI and Bear Stearns made statements about the underwriting guidelines of American Home Mortgage Corporation. All of those statements are incorporated herein by reference.

One of those statements was that: "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt." SAMI 2007-AR6 Pros. Sup. S-46.

Another one of those statements was that: "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." SAMI 2007-AR6 Pros. Sup. S-48.

**Item 87.**        **Early payment defaults:**

    **(a)**        **Number of the mortgage loans that suffered EPDs:** 35

    **(b)**        **Percent of the mortgage loans that suffered EPDs:** 1.1%

**Item 88.**        **90+ days delinquencies:**

    **(a)**        **Number of the mortgage loans that suffered 90+ days delinquencies:** 2,049

    **(b)**        **Percent of the mortgage loans that suffered 90+ days delinquencies:** 64.2%

**Item 89.**        **30+ days delinquencies in this securitization:**

    **(a)**        **Number of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 1,632

    **(b)**        **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2012:** 51.1%

**Item 104.**        **Statements about the ratings of the certificate(s) that Guaranty purchased:**

On pages S-7, S-16, and S-112 through S-113 of the prospectus supplement, SAMI and Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. SAMI and Bear Stearns stated that Guaranty's certificate was rated AAA by Standard & Poor's and Aaa by Moody's Investors Service, Inc. SAMI 2007-AR6 Pros. Sup. S-7, S-16, S-112. These were the highest ratings available from these two rating agencies.

SAMI and Bear Stearns also stated: "It is a condition to the issuance of the certificates that the offered certificates receive the following ratings from Standard & Poor's Rating Services . . . and Moody's Investors Service, Inc. . . ." SAMI 2007-AR6 Pros. Sup. S-16. The table following this statement indicated that Guaranty's certificate

was rated AAA by Standard & Poor's and Aaa by Moody's. SAMI 2007-AR6 Pros. Sup. S-16.

SAMI and Bear Stearns also stated: "It is a condition to the issuance of each class of Offered Certificates that it receives at least the ratings set forth below from S&P and Moody's . . . ." SAMI 2007-AR6 Pros. Sup. S-112. The table following this statement indicated that Guaranty's certificate was rated AAA by S&P and Aaa by Moody's. SAMI 2007-AR6 Pros. Sup. S-112.

**Item 107.** **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,563

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 303

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 965

    **(d)** **Number of loans that suffered EPDs:** 35

    **(e)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,192

    **(f)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 68.6%