## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for GUARANTY BANK, <br><br> *Plaintiff,* <br><br> v. <br><br> RBS SECURITIES INC., <br><br> *Defendant.* | Civil Action No. 14-cv-126-SS |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for GUARANTY BANK, <br><br> *Plaintiff*, <br><br> v. <br><br> DEUTSCHE BANK SECURITIES INC. and GOLDMAN, SACHS & CO., <br><br> *Defendants*. | Civil Action No. 14-cv-129-SS |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ........................................................................ 4

    A.    Guaranty Bank ........................................................................................... 4

    B.    RMBS Certificates .................................................................................... 5

    C.    The Certificates At Issue.......................................................................... 6

    D.    The FDIC's Alleged Sale of the Certificates ........................................... 7

    E.    The FDIC's Damages Theory.................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    DETERMINING PREJUDGMENT INTEREST IS A QUESTION OF LAW
    APPROPRIATE TO DECIDE ON SUMMARY JUDGMENT NOW. ............................ 9

II.    THE FDIC IS NOT ENTITLED TO AN AWARD OF PREJUDGMENT
    INTEREST ON PRINCIPAL REPAID TO GUARANTY BANK................................. 11

    A.    The Declining Principal Balance Method Furthers The Purposes Of The
        TSA And Prejudgment Interest, And Avoids A Windfall. ................................. 11

    B.    The FDIC's Pursuit Of Prejudgment Interest On Amounts That Have
        Already Been Repaid Is Contrary To a Consistent Line of Precedent. ............... 14

III.    PREJUDGMENT INTEREST UNDER THE TSA SHOULD BE CALCULATED
    AT THE RATE SPECIFIED IN THE CERTIFICATES. ................................................. 17

CONCLUSION.................................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aegis Ins. Holding Co., L.P.* v. *Gaiser*,
  2007 WL 906328 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied) .......................13, 20

*Arete Partners, L.P.* v. *Gunnerman*,
  643 F.3d 410 (5th Cir. 2011) ...............................................................................................18

*Bank of Am., N.A.* v. *Fulcrum Enterprises, LLC*,
  20 F. Supp. 3d 594 (S.D. Tex. 2014) .....................................................................................9

*Battaglia* v. *Alexander*,
  177 S.W.3d 893 (Tex. 2005)................................................................................................13

*Brainard* v. *Trinity Universal Ins. Co.*,
  216 S.W.3d 809 (Tex. 2006)................................................................................................13

*Bridgestone/Firestone, Inc.* v. *Glyn-Jones*,
  878 S.W.2d 132 (Tex. 1994)................................................................................................11

*The Charles Schwab Corp.* v. *Banc of America Sec. LCC*,
  2014 WL 9865537 (Cal. Super. Ct. San Francisco Cnty. Nov. 10, 2014).......................14, 17

*Clayton* v. *Asset Plus Cos., LP*,
  2014 WL 6388430 (S.D. Tex. Nov. 14, 2014) ......................................................................19

*Covenant Capital Partners* v. *Soil Savers, Inc.*,
  2008 WL 2941125 (N.D. Tex. July 30, 2008) ......................................................................19

*Duperier* v. *Texas State Bank*,
  28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) ...............................20

*Emiabata* v. *Nat'l Capital Mgmt., LLC*,
  2011 WL 4924124 (Tex. App.—Austin Oct. 13, 2011, no pet.) ...........................................18

*Fed. Home Loan Bank of Seattle* v. *Bear, Stearns & Co., Inc.*,
  No. 09-2-46298-4 SEA, slip op. (Wa. Super. Ct. King Cty. Nov. 9, 2015) ....................10, 16

*Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*,
  2015 WL 640875 (S.D.N.Y. Feb. 16, 2015).........................................................................16

*Fluor Daniel, Inc.* v. *Travis Cnty.*,
  2002 WL 2003718 (W.D. Tex. Mar. 14, 2002) (Sparks, J.).................................................18

*Formosa Plastics Corp., USA* v. *Kajima Int'l, Inc.*,
  216 S.W.3d 436 (Tex. App.—Corpus Christi 2006, pet. denied)............................................17

*Garza* v. *Smith Int'l, Inc.*,
  2011 WL 338819 (S.D. Tex. Feb. 2, 2011) .........................................................................10

*Greater Houston P'ship* v. *Paxton*,
  468 S.W.3d 51 (Tex. 2015)...............................................................................................11

*Harrison* v. *Wells Fargo Bank, N.A.*,
  2015 WL 5547495 (N.D. Tex. Sept. 21, 2015)...................................................................10

*Herrmann Holdings Ltd.* v. *Lucent Techs. Inc.*,
  302 F.3d 552 (5th Cir. 2002) ............................................................................................15

*Highland Capital Mgmt., L.P.* v. *Ryder Scott Co.*,
  402 S.W.3d 719 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ...................................15, 16

*Johnson & Higgins of Texas, Inc.* v. *Kenneco Energy, Inc.*,
  962 S.W.2d 507 (Tex. 1998)..............................................................................................13

*Nat'l Credit Union Admin. Bd.* v. *UBS Sec. LLC*,
  2016 WL 1179203 (S.D.N.Y. Mar. 24, 2016) ............................................................. *passim*

*Summers* v. *WellTech, Inc.*,
  935 S.W.2d 228 (Tex. App.—Houston [1st Dist.] 1996, no writ).........................................16

*Texas Capital Sec., Inc.* v. *Sandefer*,
  58 S.W.3d 760 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)................................13, 20

*In re Texas EZPawn Fair Labor Standards Act Litig.*,
  633 F. Supp. 2d 395 (W.D. Tex. 2008)...............................................................................10

*Transworld Leasing Corp.* v. *Wells Fargo Auto Fin., LLC*,
  2012 WL 4578591 (Tex. App.—San Antonio Oct. 3, 2012, pet. denied) .............................18

**Statutes**

15 U.S.C. § 77l(a) .................................................................................................................16

Cal. Corp. Code § 25501..........................................................................................................17

D.C. Code § 31-5606.05(b)(1)(A) ...........................................................................................16

Ill. Comp. Stat. 5/13(A)(1).......................................................................................................16

Tex. Bus. & Com. Code Ann. § 2.713 .......................................................................................20

Tex. Fin. Code Ann. § 301........................................................................................................19

Tex. Fin. Code Ann. § 302 ............................................................................................4, 19

Tex. Fin. Code Ann. § 304 ................................................................................... *passim*

Tex. Fin. Code Ann. § 393.204 ...........................................................................................20

Tex. Gov't Code Ann. § 312 ...............................................................................................11

Tex. Gov't Code Ann. § 2260.003 ......................................................................................20

Tex. Rev. Civ. Stat. art. 581 § 33(D) ...........................................................................11, 16

Va. Code § 13.1-522(A) .....................................................................................................16

Wash. Rev. Code § 21.20.430(1) ........................................................................................17

Defendants Goldman, Sachs & Co. ("Goldman Sachs") and Deutsche Bank Securities Inc. ("DBSI") (which, along with Goldman Sachs, is defendant in Case No. 14-cv-129), and RBS Securities Inc. ("RBS") (which is defendant in Case No. 14-cv-126) (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for partial summary judgment on the proper method by which to calculate prejudgment interest under the Texas Securities Act, Tex. Rev. Civ. Stat. art. 581 § 33(D) ("TSA").[1]  This motion addresses a fundamental dispute between the parties as to the maximum amount Plaintiff could recover if it prevails on its claims under the TSA.  Prompt resolution of this issue will streamline the action, limit excessive discovery and provide an informed basis for the parties to evaluate their claims and, if appropriate, discuss settlement.

## PRELIMINARY STATEMENT

The method and rate used to calculate prejudgment interest dramatically affects the amount of damages Plaintiff potentially could recover in these actions.  Although Defendants believe Plaintiff cannot meet its burden of proving that the relevant offering documents contained material misstatements or omissions, a fundamental dispute exists between the parties as to the maximum amount Plaintiff could recover if it prevails on its claims under the TSA. Defendants bring this motion now to resolve this purely legal dispute concerning the appropriate method and rate for calculating prejudgment interest under the TSA.[2]

In providing the remedy of rescission, the TSA seeks to put the plaintiff in the position it would have been in had it never purchased the security.  The TSA's prejudgment

---

[1]     Citations to  "Oakley Ex. _" or "Exs. _" refer to exhibits to the Declaration of Bruce D. Oakley, dated March 24, 2017.  Citations to "Ratliff Ex. _" or "Exs. _" refer to the exhibits to the Declaration of Shannon H. Ratliff dated March 29, 2017.

[2]     Defendants do not concede that the FDIC's Amended Petition states a valid claim under the TSA, or that the FDIC's method of calculating damages is correct in any other respect.

interest component is designed to compensate a prevailing plaintiff for the *lost use* of its investment capital, not to make the plaintiff better off than if it had never invested in the securities.  Nonetheless, Plaintiff takes the position that it should be entitled to an award of excessive prejudgment interest calculated on the entire purchase price of the securities at issue, including amounts that have already been *returned* to Plaintiff through repayments of principal. This position is contrary to precedent and the purposes of prejudgment interest and rescission under the TSA, and would provide the FDIC with an enormous unjustified windfall.

As discussed below, every published decision addressing this issue has held that awards of prejudgment interest should account for the return of principal to the purchaser over time.  As principal has been returned to the investor, the investor no longer has lost use of those funds and remains free to reinvest the returned principal along with any interest income it received.  The amount from which prejudgment interest is calculated, therefore, declines as the consideration paid has been repaid, so that a prevailing plaintiff is compensated for its lost use of funds.  Accordingly, consistent with the language and purposes of the TSA, maximum recoverable damages are calculated as (1) return of any unpaid principal, plus (2) prejudgment interest calculated on a simple basis on the outstanding monthly principal balance from the date of purchase through the judgment date, less (3) the value of the security when it was sold and coupon interest earned on the security.  Any other result would allow a plaintiff to recover interest on money that has already been returned with agreed interest and on top of the interest or other income the investor was free to earn on those amounts.

If the FDIC were to prevail on its claim against Goldman Sachs, for example, the highest potential recovery it could be awarded using the appropriate method for calculating prejudgment interest would not exceed $6.6 million.  That method is the one adopted by every

court that has considered this issue under the TSA and parallel provisions of the federal securities laws and other states' "blue sky" statutes.  The FDIC nonetheless argues that the TSA entitles it to damages and prejudgment interest in excess of $67 million—*ten* times the maximum amount arguably authorized under the TSA and nearly *fourteen* times the losses conceivably incurred by the FDIC when it purportedly sold the certificate at a discount.  Similarly, the FDIC seeks hundreds of millions of dollars in connection with its claims against DBSI and RBS, the bulk of which, as with its claims against Goldman Sachs, reflects prejudgment interest on hundreds of millions of dollars in principal that had already been returned to Guaranty Bank—with interest.  This position is contrary to precedent and the purposes of prejudgment interest and the TSA, and would provide the FDIC with an enormous, unjustified windfall.

Not surprisingly, courts have uniformly rejected this position, recognizing that "awarding prejudgment interest on the initial consideration paid without reductions for principal repayments would provide a windfall to [the plaintiff]" and be contrary "to the purpose of the remedy of rescissory damages . . . [u]nder [the TSA and] Texas law . . . ."  *Nat'l Credit Union Admin. Bd. v. UBS Sec. LLC*, 13-cv-6731 (DLC), 2016 WL 1179203, at *3 (S.D.N.Y. Mar. 24, 2016) ("*NCUA*").

In addition to the method for calculating prejudgment interest, the parties also disagree as to the appropriate rate of interest.  Texas law expressly provides the proper rate at which prejudgment interest should be calculated if the FDIC were to succeed on its claims. Texas Finance Code section 304.002 states that for prejudgment interest calculated "on a contract that provides for interest," the appropriate rate is "the rate specified in the contract." Tex. Fin. Code. Ann (West  2016).  Because the FDIC's claim is "on a contract," as it "would not exist but for the existence of a contractual relationship," *NCUA*, 2016 WL 1179203, at *7,

the Court should calculate prejudgment interest using the contractually defined coupon rate (the "Coupon Rate"). This is the rate that Guaranty Bank agreed to receive when it purchased the Certificates, which Guaranty Bank agreed would fairly compensate it for the time-value of its capital. Applying the Coupon Rate would "restore plaintiff[] to [its] original position." *Id*.

The FDIC's position that this Court should disregard the rate specified in the contract and instead use the 6% per year rate specified in Texas Finance Code section 302.002, which is located within a subchapter of the Texas Finance Code labeled "Usurious Interest" (the "Usurious Interest Rate") and applies only when "a creditor has not agreed with an obligor to charge the obligor any interest," is unsupportable. It does not apply here, where the parties have no creditor-obligor relationship (and the FDIC's Amended Petition makes no such allegation). Because the contract establishes the interest rate, that agreed rate controls under Texas Finance Code section 304.002.

## STATEMENT OF UNDISPUTED FACTS

### A.    Guaranty Bank

Guaranty Bank was a sophisticated investor with significant experience with RMBS. By the end of 2007, Guaranty Bank's total assets exceeded $16 billion ($5.5 billion in mortgage-backed securities) and its parent company, Guaranty Financial Group, was the second largest publicly traded financial institution in Texas.[3] By its own depiction, Guaranty Bank was

---

[3]    Ratliff Ex. 1 at 2 (*Letter to Stockholders*, *Guaranty Financial Group 2007 Annual Report*) ("With over 150 banking centers, our subsidiary, Guaranty Bank, now has more than $16 billion in assets. Today, we are the second largest publicly-traded financial institution headquartered in Texas ranked by asset size."); 20 (*Form 10-K*, *Guaranty Financial Group 2007 Annual Report*).

"discipline[d]" in the investment decisions it made, and focused on the risk of the underlying collateral as well as trends in the overall market.[4]

   **B.**   **RMBS Certificates**

Residential mortgage-backed securities ("RMBS") offer investors, including sophisticated financial institutions such as Guaranty Bank, an opportunity to obtain cash flows in scheduled amounts over a specified period of time.  The RMBS securitization process begins when a sponsor obtains mortgage loans from an originator, assembles them and transfers them to a depositor, which aggregates the pool of loans into a trust.  The trust then issues certificates in tranches, with the returns for each certificate calculated according to an agreed interest rate, referred to as the "Coupon Rate."  *See, e.g.*, Oakley Ex. 1 at S-2 (Prospectus Supplement for the GSR Mortgage Loan Trust, Series 2004-11).

RMBS certificates amortize over time.  Guaranty Bank's purchase of the at-issue certificates entitled it to two forms of monthly distributions:  (1) repayment of its principal, derived from principal payments made by homeowners on the underlying mortgage loans collateralizing the certificate, and (2) interest income based on the outstanding principal balance of the certificate at the end of each payment cycle.  Guaranty Bank thus received a return each month of a portion of its principal investment, which reduced the outstanding principal balance of the certificate, in addition to contractually agreed monthly interest payments.  If all principal

---

[4]      *Id.* at 4 (*Letter to Stockholders, Guaranty Financial Group 2007 Annual Report*) ("At Guaranty, we are aware of the importance of good credit discipline and effective risk management . . . We have processes in place to analyze and evaluate on a regular basis our exposure to industries, products, markets, and economic trends.").

repayments are made as specified in the contract, the certificate's principal balance eventually would reach zero and the certificate would have performed in full.[5]

C.    **The Certificates At Issue**

Plaintiff's claim against Goldman Sachs relates solely to Guaranty Bank's purchase of a single certificate ("GS Certificate") from Goldman Sachs in August 2004 for $100,684,375[6] (a slight premium over the original principal balance of $100 million, plus accrued interest).  The contractually agreed interest rate for the GS Certificate before June 2009 was "the lesser of (a) 4.500% and (b) the weighted average of the net rates for the mortgage loans in loan group 2"; after June 2009, the interest rate was "the weighted average of the net rates for the mortgage loans in loan group 2."  Oakley Ex. 1 at S-2.  The GS Certificate has not missed a single payment of principal or interest promised in its offering documents since its issuance more than 12 years ago.  Despite this extraordinary performance, the FDIC alleges it disposed of the GS Certificate on March 11, 2010, when the GS Certificate had repaid approximately $71.9 million of the original principal balance of $100 million, in addition to $13.4 million in coupon interest.  (Appendix A)  There is no reason today to believe that the GS Certificate will not perform fully.  As of February 27, 2017, the GS Certificate has repaid $93,612,123 of the original principal balance of $100 million, leaving an outstanding principal balance of only $6,387,877,[7] which prior performance suggests will be paid as agreed.

---

[5]    *See, e.g.*, Oakley Ex. 1 at S-40 ("[T]he Available Distribution Amount . . . will be distributed . . . until the Class Principal Balance of each such Class has been reduced to zero.").

[6]    Oakley Ex. 2 (FDIC-GTY-000001583).

[7]    Oakley Ex. 3 (February 27, 2017 monthly distribution report entitled "GSR 2004-11 Investor Report").

Guaranty Bank purchased three certificates (collectively, the "DBSI Certificates"), totaling approximately $494.2 million, from DBSI, as an underwriter in the relevant securitizations for, respectively:  (1) $113.1 million; (2) $204 million; and (3) $177.1 million.[8]  As of March 11, 2010, when the FDIC alleges it disposed of the DBSI Certificates, the DBSI Certificates had repaid approximately $307.1 million in principal plus $67.6 million in coupon interest.  (Appendix A)

Guaranty Bank purchased two certificates (collectively, the "RBS Certificates," and with the GS Certificates and the DBSI Certificates, collectively, the "Certificates") from RBS, as underwriter, totaling approximately $248.6 million for, respectively:  (1) $204 million, and (2) approximately $44.6 million.[9]  As of March 11, 2010, when the FDIC alleges it disposed of the RBS Certificates, the RBS Certificates had repaid approximately $160.8 in principal plus $33.9 million in coupon interest.  (Appendix A)  As with the GS Certificate, the DBSI Certificates and RBS Certificates specified contractual rates of coupon interest that investors would be paid on outstanding principal.

### D.      The FDIC's Alleged Sale of the Certificates

The FDIC claims that it disposed of all of the Certificates through a transaction that closed on or around March 11, 2010, whereby the Certificates were re-securitized and purportedly sold.  Ratliff Ex. 2 at 8, 11.  Defendants assume solely for purposes of this motion that the FDIC has disposed of the Certificates as it claims.  Ratliff Exs. 2 and 3 at 11.  Based on the publicly available "IDC prices" of the Certificates from the Intercontinental Exchange, Inc.

---

[8]      Ratliff Ex. 2 at 9 (Plaintiff's Responses and Objections to Defendants' First Set of Joint Interrogatories, dated February 11, 2016).

[9]      Ratliff Ex. 3 at 9 (Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories, dated February 11, 2016).

on March 11, 2010, the FDIC appears to have received approximately $82 million in connection with the disposition of the Certificates.  (Appendix A)

      **E.**     **The FDIC's Damages Theory**

      Texas law assesses prejudgment interest to compensate a party for the loss of use of money, not to punish a defendant or put the plaintiff in a better position than if he had never entered into the transaction.  As discussed below, every published decision addressing this issue has determined that awards of prejudgment interest should be calculated based on the declining principal balance method ("Declining Principal Balance Method"), rather than on the full principal amount of the certificate at the time of purchase (the "Full Principal Method"), to account for the return of principal to the purchaser over time.  Further, where the plaintiff sues under an investment that provides an agreed rate of interest, the relevant Texas statutes and case law confirm that the rate of prejudgment interest should be based on the interest rate agreed to by the parties.

      The FDIC, however, seeks an award of prejudgment interest in which it would recover prejudgment interest on the entire principal invested, including principal that had already been returned to Guaranty Bank.  The FDIC also asks this Court to apply the statutory Usurious Interest Rate of 6% rather than the agreed contractual rate.

      Even assuming the certificates at issue were sold on the dates and for the amounts alleged by Plaintiff, the FDIC's approach would do far more than make it whole.  Appendix B contains a graphical illustration of the windfall sought by the FDIC, based on the results of Defendants' calculations of prejudgment interest and damages under Defendants' and the FDIC's theories, as set forth in Appendix A.  As the comparison in Appendix B indicates, the FDIC's proposed method of calculating prejudgment interest would allow it to recover more than $1.4 billion on Guaranty Bank's investment of $843.6 million, even though Guaranty Bank (or

8

the FDIC as receiver) had already received more than 85% of its investment before the FDIC

filed suit.[10]  During that time, Guaranty Bank was free to invest those returned amounts as it saw

fit.  Such a recovery would amount to a 70% return *before* taking into account the interest or

other income Guaranty Bank earned on the $737 million in principal repayments that it had

received years prior to filing this action.  This includes a staggering $75.7 million in interest on

Guaranty Bank's $100 million investment in the GS Certificate, which has not missed a single

payment of interest or principal during a 12-year period, but on which the FDIC claims it

recognized a loss of $4.9 million because it elected to dispose of the GS Certificate at a discount

in early 2010.  In contrast, the Declining Principal Balance Method would restore the FDIC to

the position Guaranty Bank would have been in had it not purchased the certificates, including

by awarding it a recovery (in the event the FDIC prevailed at trial) that would reflect the full

return of the amounts Guaranty Bank invested, along with prejudgment interest on any lost use

of funds.

## **ARGUMENT**

## I.    **DETERMINING PREJUDGMENT INTEREST IS A QUESTION OF LAW APPROPRIATE TO DECIDE ON SUMMARY JUDGMENT NOW.**

The proper method and rate for calculating prejudgment interest are ripe for

adjudication now because they are purely questions of law.  *See Bank of Am., N.A.* v. *Fulcrum*

*Enterprises, LLC*, 20 F. Supp. 3d 594, 601 (S.D. Tex. 2014) (quoting *New Orleans Pub. Serv.,*

---

[10]    $692.7 million in damages plus the $737 million previously paid to Guaranty Bank
(including $654.7 million in principal and interest and $82.3 million in alleged sales proceeds)
equals approximately $1.43 billion.  As noted above, these numbers are illustrative only, as
Defendants do not seek a ruling on this motion as to whether or when a sale occurred, or the
appropriate value of the securities at the time of the alleged sale.  The figures representing sales
proceeds here are based on publicly available market data at the time of the transaction alleged
by the FDIC to have resulted in a sale of the Certificates.

*Inc.* v. *Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)). Federal courts in Texas routinely decide motions for summary judgment on the methodology and applicable interest rate for calculating damages where, as here, the parties do not dispute any material facts.[11]

The Court should address these issues now because its decision would streamline the litigation, help focus discovery, and facilitate informed claims assessment for efficient litigation and/or settlement discussions. In particular, courts have recognized that "there is value . . . [in] the ability of the parties to more meaningfully discuss settlement." *Harrison* v. *Wells Fargo Bank, N.A.*, 2015 WL 5547495, at *4 (N.D. Tex. Sept. 21, 2015) (granting motion to seek partial summary judgment). The method and rate at which prejudgment interest should be applied will have an enormous impact on Plaintiff's maximum potential recovery. The parties' differing methodologies for calculating prejudgment interest have led to vastly different expectations as to the FDIC's maximum recovery in the (unlikely) event that the FDIC were to prevail on its claims. Other courts have not hesitated to address the proper method and rate of calculating prejudgment interest on motions for partial summary judgment. *See, e.g.*, *NCUA*, 2016 WL 1179203, at *7; *Fed. Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc.*, No. 09-2-46298-4 SEA, slip op. at 4 (Wa. Super. Ct. King Cty. Nov. 9, 2015) (Oakley Ex. 4). These rulings have had the effect of facilitating not only informed consideration of the appropriate scope of the litigation, but also possible settlement discussions. The Court should reject the unprecedented methodology urged by Plaintiff, and follow all other courts that have considered the matter in RMBS cases and apply the Declining Principal Balance Method.

---

[11]     *See, e.g.*, *In re Texas EZPawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 397 (W.D. Tex. 2008) (holding that "the fluctuating workweek method of calculating damages is not applicable."); *Garza* v. *Smith Int'l, Inc.*, 2011 WL 338819, at *1 (S.D. Tex. Feb. 2, 2011) (court could rule on damages methodology because "the [p]arties do not dispute the material facts; rather, a purely legal issue is in dispute.").

**II.     THE FDIC IS NOT ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST ON PRINCIPAL REPAID TO GUARANTY BANK.**

In the context of amortizing debt securities like the Certificates, prejudgment interest under the TSA should be calculated based on the Declining Principal Balance Method. "When interpreting a statute, [a Texas court's] primary objective is to ascertain and give effect to the Legislature's intent." *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (citing *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013)); *see also* Tex. Gov't Code Ann. § 312.005 (West 2016) ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent."). Even where the language of a statute is ambiguous, Texas courts "look behind the words . . . to [] determine the *true* purpose of the provision." *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994). As courts have recognized, the FDIC may not recover prejudgment interest on principal payments that have already been repaid to Guaranty Bank or to the FDIC as its receiver.

**A.     The Declining Principal Balance Method Furthers The Purposes Of The TSA And Prejudgment Interest, And Avoids A Windfall.**

The TSA allows a successful plaintiff to obtain either rescission or damages if the buyer no longer owns the security. Tex. Rev. Civ. Stat. art. 581 § 33(A)(2) (West 2010). The damages remedy is intended to provide the substantial equivalent of rescission:

> (3) In damages, a buyer shall recover (a) the *consideration* the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of:
>
> > (i) the value of the security at the time the buyer disposed of it plus the amount of any *income* the buyer received on the security; or
> >
> > (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any *income* the buyer received on the security.

Tex. Rev. Civ. Stat. art. 581 § 33(D)(3) (West 2010) (emphasis added).  By authorizing return of the consideration paid, the statute seeks to make the plaintiff whole, but it also deducts from the original consideration paid any consideration the plaintiff already has received.

Return of *principal* on an RMBS certificate is a return of *consideration*, in contrast to coupon interest *income*, which is addressed by subpart (b) of Section 33(D)(3) of the TSA.  Accordingly, as the consideration paid for the security is *returned* to the buyer (here, with coupon interest), the buyer ceases to lose use of those funds, and the amount on which prejudgment interest is calculated necessarily declines by a corresponding amount.  As the court in *NCUA* recognized, "subpart (b) ensures a plaintiff is put in no better position than had it never purchased the security.  It does not require that prejudgment interest be calculated on the initial principal balance without a reduction for principal repayments."  *NCUA*, 2016 WL 1179203, at *3.  Thus, under the Declining Balance Method, damages are calculated as (1) return of any unpaid principal, plus (2) prejudgment interest calculated on a simple basis on the outstanding monthly principal balance from the date of purchase through the judgment date, less (3) the value of the security when it was sold and coupon interest earned on the security.  *See, e.g.*, *id.* at *2.

The FDIC's proposed calculation of prejudgment interest on the full principal amount of the certificates, without any reduction for principal repayments to Guaranty Bank, would massively inflate the FDIC's claimed damages and result in a windfall.  As Guaranty Bank received principal repayments (along with the contractual rate of interest), it recovered a portion of the consideration it paid, with the opportunity to reinvest those amounts and earn a return elsewhere.  In effect, the FDIC's Full Principal Method would unjustifiably award the FDIC interest to compensate for the lost use of funds that in fact had already been returned with interest.  That approach makes no sense and is unsupported by any legal authority.

Texas courts have made clear that the TSA's rescission-based damages remedy is intended to restore the plaintiff to its original position, *Aegis Ins. Holding Co., L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at \*4 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied); *see also Texas Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet. denied), and prejudgment interest is intended to compensate the plaintiff for its lost use of money.[12]  Here, as Guaranty Bank periodically received principal repayments it was gradually returned to its pre-investment position, and could reinvest its funds and receive returns on its new investments.  *See NCUA*, 2016 WL 1179203, at \*3.  Thus, an award of prejudgment interest based on the Declining Principal Balance Method would return the FDIC, standing in the shoes of Guaranty Bank, to its pre-investment positions, and thereby fulfill the purpose of prejudgment interest by "compensat[ing the FDIC] for the lost time value of money, no more and no less."  *Battaglia*, 177 S.W.3d at 907; *see also NCUA*, 2016 WL 1179203, at \*3.

The FDIC's approach would conflict with the TSA's statutory purpose by putting Plaintiff "in a better position than if [Guaranty Bank] had never purchased the Certificates." *NCUA*, 2016 WL 1179203, at \*4.  Because Guaranty Bank, or the FDIC as receiver, had use of any of the principal returned (with interest) to Guaranty Bank, prejudgment interest calculated on those amounts after they had been repaid would provide a double recovery and place the FDIC in a better position than if Guaranty Bank had never purchased the certificates.  *See The Charles*

---

[12]     *See also Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006) ("Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant."); *Battaglia v. Alexander*, 177 S.W.3d 893, 908–09 (Tex. 2005) (because prejudgment interest compensates a plaintiff for the lost use of money, settlement payments received by plaintiff reduce principal balance from which prejudgment interest is calculated); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998).

*Schwab Corp.* v. *Banc of America Sec. LCC*, 2014 WL 9865537, at *3 (Cal. Super. Ct. San Francisco Cnty. Nov. 10, 2014).

Such a result would be particularly inappropriate here.  For example, applying the Full Principal Method at the Usurious Interest Rate would allow the FDIC to recover from Goldman Sachs more than $75 million in prejudgment interest on a $100 million bond that has never missed a payment of interest or principal, on *top* of the approximately $71 million in principal repayments received starting 12 years ago, as well as the sale proceeds of more than $23 million the FDIC received more than six years ago when the FDIC allegedly disposed of the GS Certificate, and the income that Guaranty Bank or the FDIC as receiver have already earned over the many years by reinvesting the principal and interest payments they received.  It would allow the FDIC to recover more than $510 million in prejudgment interest from RBS and DBSI, despite the fact that the RBS Certificates and DBSI Certificates collectively had repaid more than $569 million in principal and interest by the time the FDIC allegedly disposed of those certificates.  (Appendix A)  If, contrary to Defendants' expectation, Plaintiff were to prevail on its claims, the Declining Principal Balance Method would fully compensate the FDIC, *with interest* through the date of judgment, and avoid the double recovery the FDIC is seeking.[13]

**B.     The FDIC's Pursuit Of Prejudgment Interest On Amounts That Have Already Been Repaid Is Contrary To a Consistent Line of Precedent.**

As noted above (*see* pages 12-13 *supra*), Texas courts repeatedly have held that prejudgment interest should compensate plaintiffs for the lost use of their money, not result in a

---

[13]     Under the Full Principal Method, the *damages* Guaranty Bank allegedly suffered would also be far less significant to the FDIC's recovery than the *time* that has elapsed since Guaranty Bank purchased the Certificates.  This result is rendered even more inequitable in light of the three-year extension provided by the FIRREA extender statute, which has permitted the FDIC to pursue claims on transactions that are now between 11 and 13 years old.

windfall.  The decision in *NCUA*, which addresses the identical damages theory under the same Texas statute, is directly on point.  There, the National Credit Union Administration Board ("NCUA"), as a liquidating agent for two credit unions, brought TSA claims against underwriters and issuers of RMBS that are materially identical to the FDIC's claims in this action.  *NCUA*, 2016 WL 1179203, at *1.  As the FDIC does here, NCUA claimed that prejudgment interest should be calculated based on the full principal amounts invested, without reduction for repayments of principal that had been returned (with interest) on a monthly basis.  The defendants moved for partial summary judgment seeking a ruling that, under the TSA, principal repayments should be deducted from the initial principal balance when calculating prejudgment interest.  *Id.* at *2.  The court agreed, holding that "claims under the TSA shall be calculated using the declining principal balance."  *Id.*  As the court noted, although "[t]he statute does not indicate whether the term 'interest thereon' refers to the initial principal balance without any reduction for principal repayments or rather an amount that is reduced with each principal repayment received by the purchaser," *id.*, the language of the statute, standard methods of statutory interpretation and fundamental common sense required that prejudgment interest be calculated based on the Declining Principal Balance Method.  *See id.* at *2, *3.

*NCUA* recognized that applying the Declining Principal Balance Method would harmonize the prejudgment interest methodology under the TSA with the approach applicable under the parallel provision in Section 12(a)(2) of the federal Securities Act of 1933.  *Id.* at *2. The court noted that "Texas courts look to federal securities law to interpret the TSA where the statutory language is similar."  *Id.* (citing *Herrmann Holdings Ltd. v. Lucent Techs. Inc*., 302 F.3d 552, 563 (5th Cir. 2002); *Highland Capital Mgmt., L.P. v. Ryder Scott Co*., 402 S.W.3d 719, 741 (Tex. App.—Houston [1st Dist.] 2012, no pet.)).  Texas courts uniformly hold that

15

"similar wording" between a federal and state law "allows [Texas courts] to look to federal cases as a guide to interpreting th[e] statute." *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232-33 (Tex. App.—Houston [1st Dist.] 1996, no writ). This is particularly true for the TSA, which the Texas legislature intended "to be interpreted in harmony with federal securities law." *Highland Capital Mgmt.*, 402 S.W.3d at 741.[14] As the *NCUA* court recognized, given that "[u]nder the federal Securities Act, prejudgment interest for RMBS claims is calculated using the declining principal balance," *NCUA*, 2016 WL 1179203, at *2 (citing *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 13-cv-6201 (DLC), 2015 WL 640875, at *2 (S.D.N.Y. Feb. 16, 2015)), the TSA should be interpreted in the same manner.

Every court that has considered the proper method for calculating prejudgment interest under blue sky laws materially identical to the TSA has rejected the FDIC's argument and concluded that prejudgment interest should be calculated based on the Declining Principal Balance Method.[15] *See, e.g.*, *NCUA*, 2016 WL 1179203, at *4 ("prejudgment interest under the [Illinois Securities Act] must . . . be calculated using the declining principal balance") (interpreting Tex. Rev. Civ. Stat. Ann. art. 581 § 33(D) and 815 Ill. Comp. Stat. 5/13(A)(1)); *Fed. Hous. Fin. Agency*, 2015 WL 640875, at *2 (S.D.N.Y. Feb. 16, 2015) (interpreting Va. Code § 13.1-522(A) and D.C. Code § 31-5606.05(b)(1)(A)); *Fed. Home Loan Bank of Seattle*, No. 09-2-46298-4 SEA, slip op. at 3 ("Plaintiff's assertion that [prejudgment interest] should be [based on] the initial purchase price, without adjusting for return on principal over time is not

---

[14]    The TSA and Section 12(a)(2) of the federal Securities Act have almost identical civil remedies provisions:  Section 12 (a)(2) provides that a plaintiff may "recover *the consideration paid for such security with interest thereon*, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. § 77l(a) (emphasis added).

[15]    Excerpts from the relevant blue sky laws at issue in those decisions are contained in Oakley Ex. 5.

16

logical, and is not supported by any authority.  Such a position would result in an extraordinary

windfall for Plaintiff . . . .   A more reasoned reading of the statute is that consideration changes

over time, as principal is returned to Plaintiff.") (interpreting Wash. Rev. Code § 21.20.430(1))

(Oakley Ex. 4); *Charles Schwab*, 2014 WL 9865537, at *3 ("Not deducting payments made to

[plaintiff] from the balance on which prejudgment interest is calculated would essentially award

prejudgment interest on payments that [plaintiff] *already received*, and would doubly

compensate [plaintiff] by giving it *both* the use and benefit of those payments *and* the additional

compensation of continuing prejudgment interest on the very same funds.") (interpreting Cal.

Corp. Code § 25501) (emphasis in original).[16]  Defendants are not aware of any RMBS decision

that has adopted the Full Principal Method proposed by the FDIC.  That windfall approach

should be rejected here, as well.

## III.   PREJUDGMENT INTEREST UNDER THE TSA SHOULD BE CALCULATED AT THE RATE SPECIFIED IN THE CERTIFICATES.

Under the TSA, prejudgment interest is calculated using the Coupon Rate

specified in the Certificates.  The TSA's damages provision states that interest should be

calculated "at the legal rate," Tex. Civ. Stat. art. 581-33D, which is set by statute in Chapter 304

of the Texas Finance Code ("TFC"), entitled "Judgment Interest."  Tex. Fin. Code Ann. § 304

(West 2016); *see also Formosa Plastics Corp.*, *USA* v. *Kajima Int'l, Inc.*, 216 S.W.3d 436, 465

---

[16]      The court in *Charles Schwab Corp. v. Banc of America Sec. LLC*, held that under this
statute, "prejudgment interest is properly calculated on the remaining principle [sic] balance at
any given time and stops running at the point in time when all investment capital was returned to
Schwab."  2014 WL 9865537, at *4.  The court held that both principal *and interest* should be
deducted from the balance upon which prejudgment interest should be calculated (the "Interest
on the Balance Method"), as this approach is consistent with the theory of rescission.  *Id.*
Although Defendants contend that approach is correct, and if applied here would substantially
reduce the amount of prejudgment interest available to the FDIC, Defendants are not taking the
position for purposes of this motion that this Court should take the same approach under the
TSA.

(Tex. App.—Corpus Christi 2006, pet. denied) (noting that prejudgment interest accrues in accordance with Chapter 304).

The TFC states, in relevant part, as follows:

> A money judgment of a court of this state *on a contract that provides for interest* or time price differential earns postjudgment interest at a rate equal to the lesser of:
>
> > (1) *the rate specified in the contract*, which may be a variable rate; or
> >
> > (2) 18 percent a year.

Tex. Fin. Code Ann. § 304.002 (emphasis added).  Although the TFC does not set prejudgment interest rates, it does set postjudgment interest rates, and under Texas law, "prejudgment interest accrues at the rate for postjudgment interest and [is] computed as simple interest."  *Arete Partners, L.P.* v. *Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011); *see also Fluor Daniel, Inc.* v. *Travis Cnty.*, 2002 WL 2003718, at *2 (W.D. Tex. Mar. 14, 2002), *rev'd on other grounds*, 67 Fed. App'x. 248 (5th Cir. 2003).  Accordingly, under the TSA, the "legal rate" of interest is the postjudgment rate.  Because the Certificates are "contracts that provide[] for interest," prejudgment interest is awarded based on each Certificate's Coupon Rate, which is the rate contractually agreed to by the parties at the time of Guaranty Bank's purchases.  Tex. Fin. Code § 304.002(1); *see also Emiabata* v. *Nat'l Capital Mgmt.*, LLC, 2011 WL 4924124, at *4 (Tex. App.—Austin Oct. 13, 2011, no pet.); *Transworld Leasing Corp.* v. *Wells Fargo Auto Fin.*, LLC, 2012 WL 4578591, at *7 (Tex. App.—San Antonio Oct. 3, 2012, pet. denied).

As the court recognized in the only decision that has directly considered this provision of the TFC in the context of RMBS litigation, applying the Certificates' Coupon Rate effectuates the plain meaning of the statute by applying the rate "specified in the contract."  *NCUA*, 2016 WL 1179203, at *7.  The FDIC's claims relate to a contract and seek damages

equivalent to unwinding the FDIC's purchases of the Certificates, which are governed by the terms of the Offering Documents containing an agreed Coupon Rate of interest.  *See id.*  Those claims would not exist absent a contractual relationship between Guaranty Bank and Defendants. *See id.*  The remedy sought by the FDIC here, rescissory damages, is also inherently contractual in nature.  *See id.*

There is no legal support for the FDIC's position that the Usurious Interest Rate of 6% from TFC section 302.002 should apply, because the parties do not satisfy the definitions of the entities subjected to Section 302.002.  That section falls under a subchapter of the TFC related to "Usurious Interest," Tex. Fin. Code Ann. § 302, which is inapplicable to the FDIC's claims under the TSA.  Texas courts have consistently held that that TFC section 302.002 applies only to "creditors" and "obligors."  *See, e.g.*, *Clayton* v. *Asset Plus Cos., LP*, 2014 WL 6388430, at *3 (S.D. Tex. Nov. 14, 2014) (citing *Bufkin* v. *Bufkin*, 259 S.W.3d 343, 357 (Tex. App.— Dallas 2008, pet. denied) (Section 302.002 "does not apply to contracts where there is no extension of credit")).  Under the TFC, a "creditor" is defined as "a person who loans money or otherwise extends credit," and explicitly excludes a "judgment creditor."  Tex. Fin. Code Ann. § 301.002(a)(3).  Similarly, an "obligor" is defined as "a person to whom money is loaned or credit is otherwise extended," and does not include a "judgment debtor."  Tex. Fin. Code Ann. § 301.002(a)(13)(A).  As Defendants are not alleged to have either loaned money or extended credit to Guaranty Bank, Section 302.002 is inapplicable.  Rather, the FDIC is a party to which a money judgment would be payable, assuming the FDIC were successful on its claims.  Thus, the provision specifically relating to "Judgment Interest," Tex. Fin. Code § 304, applies instead. *See, e.g.*, *NCUA*, 2016 WL 1179203, at *5-7; *Covenant Capital Partners* v. *Soil Savers, Inc.*, 2008 WL 2941125, at *10 (N.D. Tex. July 30, 2008) (applying Section 304 to a money

judgment); *Duperier* v. *Texas State Bank*, 28 S.W.3d 740, 754 (Tex. App.—Corpus Christi 2000,

pet. dism'd by agr.) (applying the predecessor to Section 304 to a money judgment).[17]

        Using the Coupon Rate comports with the goals of the TSA and rescission

generally because it would restore the parties to the position they would have held had they never

entered into the contract.  *See, e.g.*, *Aegis Ins. Holding Co.*, 2007 WL 906328, at *4; *Texas

Capital Sec., Inc.*, 58 S.W.3d at 776; *NCUA*, 2016 WL 1179203, at *7.  It also "vindicates the

[plaintiff's] original expectations when purchasing the Certificates," because a plaintiff would be

awarded "the same interest it expected to receive by virtue of purchasing the Certificate."

*NCUA*, 2016 WL 1179203, at *7.  The Coupon Rate is the best measure of what Guaranty Bank

would have done with its capital had it not invested in the Certificates.  Retroactively increasing

that rate would re-write the parties' arrangement and result in a windfall for the FDIC.

## CONCLUSION

        For the foregoing reasons, Defendants respectfully request that the Court enter

partial summary judgment determining that, in the event that the FDIC prevails on its claims, any

prejudgment interest to which the FDIC may be entitled under the TSA should be calculated

using the Declining Principal Balance Method at the Coupon Rate.

---

[17]     Nor does the 5% interest rate specified in TFC section 304.003 apply.  As noted in the title of Section 304.003, "Judgment Interest Rate: Interest Rate or Time Price Differential Not in Contract," that section applies only if "§ 304.002 does not apply."  Section 304.002 explicitly instructs courts to use "the rate specified in the contract" when calculating a judgment "on a contract that provides for interest."  A suit for rescission (or its equivalent in damages) must be "on a contract," because rescission is available only when a contract exists and, as the *NCUA* court recognized, there is no basis to interpret the phrase "on a contract" to apply only to breach of contract claims.  The Texas legislature knows how to use the more specific term, "breach of contract," when that is what it intends.  *See, e.g.*, Tex. Fin. Code Ann. § 393.204; Tex. Gov't Code Ann. § 2260.003; Tex. Bus. & Com. Code Ann. § 2.713.

Dated:  March 29, 2017

DAVIS, GERALD & CREMER, P.C.                HOGAN LOVELLS US LLP

By: /s/ Shannon H. Ratliff                      By: /s/ Bruce D. Oakley

Shannon H. Ratliff                              Bruce D. Oakley
State Bar No. 16573000                          State Bar No. 15156900
Lisa A. Paulson                                 bruce.oakley@hoganlovells.com
State Bar No. 00784732                           700 Louisiana Street, Suite 4300
600 Congress Ave., Suite 3100                   Houston, Texas  77002
Austin, TX  78701                               Tel:  (713) 632-1420
Tel: (512) 493-9600                             Fax:  (713) 632-1401
Fax: (512) 493-9625

SIMPSON THACHER & BARTLETT LLP          SULLIVAN & CROMWELL LLP

Andrew T. Frankel (*pro hac vice*)              Richard H. Klapper (*pro hac vice*)
NY Reg. No. 2409423                             NY Reg. No. 1735612
afrankel@stblaw.com                             klapperr@sullcrom.com
Linton Mann III (*pro hac vice*)                Theodore Edelman (*pro hac vice*)
NY Reg. No. 4575171                             NY Reg. No. 1909332
lmann@stblaw.com                                edelmant@sullcrom.com
425 Lexington Avenue                            Veronica Ip (*pro hac vice*)
New York, New York 10017-3954                   NY Reg. No. 4897617
Tel: (212) 455-2000                             ipvw@sullcrom.com
Fax: (212) 455-2502                             125 Broad Street
                                                New York, New York  10004-2498
*Attorneys for Defendants Deutsche Bank*        Tel:  (212) 558-4000
*Securities Inc and RBS Securities Inc.*        Fax:  (212) 558-3588

                                                *Attorneys for Defendant Goldman, Sachs &*
                                                *Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2017, a copy of the foregoing was sent via e-mail and first class mail to the following counsel of record:

/s/ Shannon H. Ratliff
Shannon H. Ratliff

GRAIS & ELLSWORTH LLP
David J. Grais
dgrais@graisellsworth.com
Mark B. Holton
mholton@graisellsworth.com
Kathryn E. Matthews
kmatthews@graisellsworth.com
1211 Avenue of the Americas
New York, New York  10036
Tel:  (212) 755-0010
Fax:  (212) 755-0052

YETTER COLEMAN LLP
R. Paul Yetter
pyetter@yettercoleman.com
Collin J. Cox
ccox@yettercoleman.com
909 Fannin Street, Suite 3600
Austin, Texas  77010
Tel:  (713) 632-8000
Fax:  (713) 632-8002

*Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for Guaranty Bank*