IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 14-cv-126 |
| RBS SECURITIES INC., | § § | |
| Defendants. | § § § | |
| | | |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 14-cv-129 |
| GOLDMAN, SACHS & CO. AND DEUTSCHE BANK SECURITIES INC., | § § § | |
| Defendants. | § | |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Background ............................................................................................................... 2

    A.     Deutsche Bank ........................................................................................ 3

    B.     Goldman Sachs ....................................................................................... 5

    C.     RBS .......................................................................................................... 7

I.     The TSA Provides a Straightforward Approach to Calculating Damages. ........................ 8

    A.     To Achieve the TSA's Purposes, Article 581-33 Pegs the Interest Calculation to the Actual Consideration Paid by the Investor to Purchase the Security............................ 9

        1.     Article 581-33(D)(3) provides for a simple calculation of damages based on the "consideration paid" for the security when purchased.................... 9

        2.     Under Texas law, the TSA is to be enforced according to its plain text... 10

    B.     Defendants' New Approach Ignores the TSA's Text, Disregards its Purposes, and Seeks an Unjustified Special Rule for RMBS. ............................... 11

        1.     Defendants' proposed interpretation seeks to re-write Article 581-33..... 11

        2.     Defendants' "windfall" argument disregards the TSA's purposes and the Legislature's indications that a special rule was not intended................. 12

        3.     Defendants request a special RMBS rule, not reflected in the TSA's text, even though amortizing bonds have long existed in Texas. .................... 13

    C.     Defendants' Article 581-33 Interpretation is Unprecedented. .............................. 14

        1.     There is no controlling Texas authority to support a departure from the TSA's plain text. .................................................................................. 14

        2.     *NCUA* errs in its application of Texas law and is not controlling. ........... 15

        3.     Decisions interpreting the laws of other states cannot override the TSA's plain text and are not instructive on the TSA damages calculation.......... 18

II.    The Rate for the Interest Component of Damages on a Claim for the Sale of a Security in Violation of the TSA Is the Legal Rate, Not the Coupon Rate.................................... 18

Conclusion ............................................................................................................. 20

INDEX OF AUTHORITIES

Page(s)

**Cases**

*Aegis Ins. Holding Co., L.P. v. Gaiser,*
   No. 04-05-00938-CV, 2007 WL 906328 (Tex. App.—San Antonio Mar. 28,
   2007, pet. denied) ...................................................................................................................14

*Anheuser-Busch Companies, Inc. v. Summit Coffee Co.,*
   934 S.W.2d 705 (Tex. App.—Dallas 1996, writ dism'd) ..................................................16, 17

*Battaglia v. Alexander,*
   177 S.W.3d 893 (Tex. 2005) .............................................................................................14, 15

*Bishop Abbey Homes, Ltd. v. Hale,*
   2015 WL 4456209 (Tex. App.—Dallas July 21, 2015) .........................................................14

*Borneman v. Steak & Ale of Texas, Inc.,*
   22 S.W.3d 411 (Tex. 2000) ...................................................................................................10

*Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.,*
   896 S.W.2d 807 (Tex. App.—Texarkana 1995, writ denied) .................................................19

*Caton v. Leach Corp.,*
   896 F.2d 939 (5th Cir. 1990) .................................................................................................19

*Citizens Ins. Co. of Am. v. Daccach,*
   217 S.W.3d 430 (Tex. 2007) .................................................................................................12

*City of Houston v. Bates,*
   406 S.W.3d 539 (Tex. 2013) .................................................................................................12

*Combs v. Health Care Servs. Corp.,*
   401 S.W.3d 623 (Tex. 2013) .................................................................................................12

*Duperier v. Texas State Bank,*
   28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) .................................17

*Entergy Gulf States, Inc. v. Summers,*
   282 S.W.3d 433 (Tex. 2009) .................................................................................................10

*Exxon Mobil Pipeline Co. v. Coleman,*
   2017 WL 727274 (Tex. Feb. 24, 2017) ..................................................................................10

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.,*
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ..........................................................................7, 15, 18

*Flowers v. Dempsey–Tegeler & Co.*,
  472 S.W.2d 112 (Tex. 1971)................................................................................12

*In re Ford Motor Co.*,
  442 S.W.3d 265 (Tex. 2014)................................................................................10

*Greater Houston P'ship v. Paxton*,
  468 S.W.3d 51 (Tex. 2015)..................................................................................16

*Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*,
  18 N.E.3d 884 (Ill. 2014).............................................................................10, 17

*Guitar Holding Co., v. Hudspeth Cnty. Underground Water Conservation Dist.
  No. 1*,
  263 S.W.3d 910 (Tex. 2008)................................................................................15

*Hebner v. Reddy*,
  498 S.W.3d 37 (Tex. 2016)..................................................................................10

*INEOS USA, LLC v. Elmgren*,
  505 S.W.3d 555 (Tex. 2016)................................................................................10

*Janvey v. Golf Channel, Inc.*,
  487 S.W.3d 560 (Tex. 2016).........................................................................10, 12

*Jaster v. Comet II Constr., Inc.*,
  438 S.W.3d 556 (Tex. 2014)................................................................................10

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*,
  962 S.W.2d 507 (1998).........................................................................................13

*Molinet v. Kimbrell*,
  356 S.W.3d 407 (Tex. 2011)................................................................................10

*Moody v. San Saba County Water Control & Improvement Dist. No. 1*,
  293 S.W. 845 (Tex. Civ. App.—Austin 1927, writ ref'd) ....................................13

*Nat'l Credit Union Admin. Bd. v. UBS Sec. LLC*,
  2016 WL 1179203 (S.D.N.Y. Mar. 24, 2016) ......................................15, 16, 17, 18

*St. Luke's Episcopal Hosp. v. Agbor*,
  952 S.W.2d 503 (Tex. 1997).........................................................................10, 16

*Texas Capital Sec., Inc. v. Sandefer*,
  58 S.W.3d 760 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)................12, 14

*The Charles Schwab Corp. v. Banc of America Sec. LCC*,
  2014 WL 9865537, *3 (Cal. Super. Ct. San Francisco Cnty. Nov. 10, 2014)........18

*Wright v. Ford Motor Co.*,
508 F.3d 263 (5th Cir. 2007) ................................................................8

**Statutes & Rules**

15 U.S.C.A. §77*l*.............................................................................15, 16, 17

Tex. Fin. Code §302.001.........................................................................19

Tex. Fin. Code §304.1045........................................................................13

Tex. Ins. Code §542.060(a).......................................................................13

Tex. Civ. Stat. art. 581-33(D)(3)..................................................................9

Tex. Rev. Civ. Stat. art. 581-33—cmt. (Background 1977) ....................................11, 12

**Other Authorities**

DOJ Press Release dated Apr. 11, 2016, "Goldman Sachs Agrees to Pay More
than $5 Billion in Connection with Its Sale of Residential Mortgage Backed
Securities," at https://www.justice.gov/opa/pr/goldman-sachs-agrees-pay-
more-5-billion-connection-its-sale-residential-mortgage-backed............................................6

DOJ Press Release dated Jan. 17, 2017, "Deutsche Bank Agrees to Pay $7.2
Billion for Misleading Investors in its Sale of Residential Mortgage-Backed
Securities," at https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-
billion-misleading-investors-its-sale-residential-mortgage-backed...........................................4

*Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment* .........................18

*Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts &
Workers Compensation*............................................................................18

Texas State Securities Board, Texas Securities Act and Board Rules, Legal Rate
of Interest, at https://www.ssb.texas.gov/texas-securities-act-board-rules/legal-
rate-interest ......................................................................................20

Plaintiff Federal Deposit Insurance Corporation as Receiver for Guaranty Bank (FDIC) respectfully opposes Defendants' motion for partial summary judgment (Dkt. #90 in Case No. 14-cv-129; Dkt. #71 in Case No. 14-cv-126), as follows:

## INTRODUCTION

Defendants seek to lower their exposure in this litigation in two ways: by changing how Texas Securities Act (TSA) damages are calculated and by using an interest rate not provided by the Texas Finance Code. The Court should reject both attempts.

<u>First</u>, the TSA tells courts and juries in simple terms how to compute damages for a buyer of securities victimized by a statutory violation. One component of damages is the "consideration paid" for the security when it was purchased, plus "interest thereon." That part of the formula is then reduced by what the buyer received in selling the security. So the TSA formula is simple:

**Consideration paid + interest thereon – sale proceeds = damages**

Defendants want a different formula. By their motion, they seek to have the jury compute interest *not* on the consideration paid, but on an expert's calculation of a "declining balance" that reflects return of principal over time. Their proposed new formula is not found in the TSA.

Of course, residential mortgage-backed securities (RMBS) do return principal over time, as mortgages are paid or refinanced. This is true with most bonds, not just RMBS. But nothing in the TSA says that return of principal affects how a jury is to compute statutory damages. Rather, the TSA provides a single, simple formula to apply to all securities, including common stock, bonds, and other amortizing securities like RMBS, which have long existed and were known to the Legislature before its last major amendments to the TSA. There is no unique damages formula for RMBS, or for massive TSA violations, which effectively is what the motion seeks.

As the reason to disregard the TSA formula, Defendants complain that there would be an "unjustified windfall" here to victims of their conduct. The point rings particularly hollow in this

1

case. The purposes of the TSA, as the Texas Supreme Court emphasizes, include encouraging private enforcement and deterring conduct of the sort here. Defendants hid and misrepresented the risks inherent in hundreds of millions of dollars of RMBS that they sold to Guaranty Bank. Indeed, since these cases were filed, two of the three defendants have publicly admitted the same misconduct alleged by the FDIC here, as well as their role in the financial crisis that injured countless members of the public.

Second, Defendants try to limit their exposure by convincing the Court to calculate statutory interest by applying the coupon rate in the RMBS. But the TSA requires that the "legal rate" of interest be used, and in Texas the legal rate is 6%. Defendants refer to the state's 6% rate as a "Usurious Interest Rate." Given that 6% is the non-usurious rate specified in the Texas statute that bars usurious rates, Defendants' label is both ironic and specious. Their mischaracterization of the state-dictated rate also is further evidence that Defendants would have the Court ignore Texas law in order to limit the potential liability for their significant securities violations.

In short, the motion relies upon non-statutory approaches for both calculating damages and assessing interest, supposedly justified by an imaginary "windfall" to TSA victims. While they certainly would lower Defendants' exposure in this case, these approaches have no basis in the TSA, but instead would contradict and distort the plain language of the statute and defeat two of the three statutory purposes for TSA remedies. Nothing in Texas law supports the approaches and relief sought by the motion, and the FDIC respectfully submits that it should be denied.

## BACKGROUND

The FDIC alleges that Defendants violated the TSA by making untrue statements and omissions of material fact in the offering documents for six RMBS certificates they offered and

sold to Guaranty Bank.[1] Defendants' misrepresentations concerned key characteristics of the mortgage loans that provided the sole basis for payment on Guaranty's investments, including the loan-to-value ratios of the underlying mortgage loans and the extent to which the entities that made the loans violated their own underwriting standards. Two of the Defendants – Deutsche Bank and Goldman Sachs – have publicly admitted engaging in precisely the sort of misconduct that the FDIC alleges here, and those Defendants have paid billions of dollars to resolve claims asserted against them by the U.S. Department of Justice (DOJ) and other federal and state entities. And evidence produced thus far in these cases already shows that Defendants engaged in the same improper practices with respect to the certificates they sold to Guaranty.[2]

### A.     Deutsche Bank

Deutsche Bank underwrote and sold three certificates to Guaranty in 2005 for a total of $494,148,180, plus accrued interest. *See* Callahan Decl. Exs. 2, 3, and 4. Guaranty bought each certificate at a price above par, but when the FDIC sold them in March 2010 their market value had declined to a fraction of that, according to Interactive Data Corporation (IDC), the same service that Defendants rely upon in their Motion. Callahan Decl. Ex. 5. There have been significant cumulative principal losses on these certificates. For example, one certificate sustained cumulative principal losses of more than $75 million to date and has no current market value.

---

[1] The FDIC includes the following brief discussion of Defendants' wrongdoing because it is relevant to the TSA's purposes of encouraging compliance (and deterring wrongdoing) and creating an incentive for private enforcement, which in turn inform the discussion about Defendants' proposed interpretation of the TSA that ignores those purposes.

[2] Although it has yet to reach a settlement, RBS currently is under investigation by the DOJ relating to its RMBS practices. *See* Callahan Decl. Ex. 1 (January 26, 2017 RBS Press Release, "Additional Provision for U.S. RMBS Investigations and Litigation").

In January 2017, the DOJ announced a $7.2 billion settlement that "holds Deutsche Bank responsible for its illegal conduct and irresponsible lending practices, which caused serious and lasting damage to investors and the American public . . . . Deutsche Bank did not merely mislead investors: it contributed directly to an international financial crisis."[3] The settlement incorporates a Statement of Facts, in which Deutsche Bank acknowledged engaging in the same misconduct that underlies the FDIC's claims. Callahan Decl. Ex. 6. For example, Deutsche Bank acknowledged in the Statement of Facts that it:

- "represented to investors that loans securitized in its RMBS were originated generally in accordance with mortgage loan originators' underwriting guidelines . . . . But Deutsche Bank knew . . . that significant numbers of loans did not meet those underwriting guidelines" (*Id.* ¶9);

- "misrepresented to investors the value of the properties securing the loans . . . . Deutsche Bank concealed from investors that it knew that the value of the properties . . . was far below the value reflected by the originator's appraisal" (*Id.* ¶10);

- "concealed from investors and rating agencies the true risk of losses of its RMBS. In doing so, Deutsche Bank deprived investors of their right to make an informed decision about whether they should invest in those RMBS" (*Id.* ¶12); and

- "was more lenient when conducting due diligence in third-party transactions.[4] Indeed, Deutsche Bank conducted due diligence on even smaller samples of loans in third-party transactions. Deutsche Bank also cleared more loans to be securitized that it knew would not likely meet its representations to investors" (*Id.* ¶29).

Documents produced thus far in this case show that Deutsche Bank's conduct here was consistent with the unlawful practices described in the Statement of Facts. For example, when Deutsche conducted due diligence on one securitization, it selected a sample of 50 loans on

---

[3] DOJ Press Release dated January 17, 2017, "Deutsche Bank Agrees to Pay $7.2 Billion for Misleading Investors in its Sale of Residential Mortgage-Backed Securities" at https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage-backed (last visited May 8, 2017).

[4] The deals underlying the FDIC's claims in this case were third-party transactions, in which Deutsche Bank underwrote but did not sponsor the securitizations.

4

which to obtain Broker Price Opinions to verify appraisal values. For more than half, those opinions came back with values significantly lower than the appraised values. But instead of excluding those loans from the securitization and conducting a broader appraisal review, Deutsche Bank ignored the results and allowed every loan with an inflated appraisal to remain in the pool. In an internal email, Deutsche Bank made clear that because this was a securitization and not a purchase of loans for its own books, valuation due diligence was unnecessary and irrelevant. Callahan Decl. Exs. 7, 8, 9. Similarly, for another securitization, Deutsche Bank knew that many loans had not yet funded at the time of Deutsche Bank's due diligence, and the loan files for those loans were not available because they were "too new." Instead of excluding those loans from the securitization, Deutsche Bank reduced its due diligence sample at the request of the loan originator and sponsor of the securitization. Callahan Decl. Exs. 10, 11, 12.

### B.     Goldman Sachs

Goldman Sachs underwrote and sold one certificate to Guaranty Bank, for $100,359,375, plus accrued interest. Callahan Decl. Ex. 13. Guaranty paid slightly more than par (100.3%), but when the FDIC sold the certificate, its market value had fallen to 84.8%. Callahan Decl. Ex. 5.

Goldman also paid several billion dollars to resolve potential claims for federal and state law violations in connection with the marketing, structuring, underwriting, issuance, and sale of RMBS before January 1, 2009, including the certificate sold to Guaranty.[5] In its press release on the settlement, the DOJ emphasized that the settlement "holds Goldman Sachs accountable for its

---

[5] Callahan Decl. Ex. 29 (Settlement Agreement) at ¶ 3 and Annex 3 (listing GSR 2004-11 among the securitizations that comprise the settlement's "Covered Conduct").

serious misconduct in falsely assuring investors that securities it sold were backed by sound mortgages, when it knew that they were full of mortgages that were likely to fail."[6]

Like Deutsche Bank, Goldman admitted to precisely the sort of misconduct alleged by the FDIC. For example, in the settlement's Statement of Facts, Goldman acknowledged that:

- "[I]n the due diligence process, Goldman received information indicating that, for certain loan pools, significant percentages of the loans reviewed did not conform to the representations made to investors . . . , and Goldman also received certain negative information regarding the originators' business practices." Callahan Decl. Ex. 29 (Statement of Facts, Annex 1 to Settlement Agreement, at p. 1);

- Even when the results of due diligence on samples of loans "indicated that the unsampled portions of the [loan] pools likely contained additional loans with credit exceptions, Goldman typically did not . . . identify and eliminate any additional loans with credit exceptions." Goldman further acknowledged that it "failed to do this even when the samples included significant numbers of loans with credit exceptions" (*Id.* at 6); and

- "In many cases, 80 percent or more of the loans in the loan pools . . . were not sampled for credit and compliance due diligence." And, in certain instances, "the large number of loans dropped from the due diligence samples for non-compliance with underwriting guidelines suggested that other loans in those pools that were not subjected to due diligence may not have complied with underwriting guidelines." (*Id.*).

The documents Goldman has produced thus far in discovery confirm that its conduct here was consistent with these admissions. It performed only limited due diligence to evaluate the quality of the mortgage loans at the time it purchased the pools of loans underlying the certificate it sold to Guaranty[7] and none at the time of securitization.[8] There is no evidence that Goldman

---

[6] DOJ Press Release dated April 11, 2016, "Goldman Sachs Agrees to Pay More than $5 Billion in Connection with Its Sale of Residential Mortgage Backed Securities," at https://www.justice.gov/opa/pr/goldman-sachs-agrees-pay-more-5-billion-connection-its-sale-residential-mortgage-backed (last visited May 5, 2017).

[7] Of the 1,155 Countrywide and National City loans that backed the certificate, Goldman re-underwrote only 105 at the time it purchased them. Callahan Decl. Exs. 14, 15, and 16. Only 11 of those were randomly selected for review; the rest were selected based on specific criteria. *Id.* Absent review of a robust random sample, Goldman had no reasonable basis to determine the pools of loans it purchased from Countrywide and National City were not materially defective.

analyzed any loans outside of the small samples it selected, attempted to estimate the rate of underwriting defects among the loans that were not reviewed, or attempted to estimate the rate of underwriting defects among the loans it ultimately selected for securitization from the various pools that it purchased.

C.    RBS

RBS underwrote and sold to Guaranty two certificates for a total of $248,269,057, plus accrued interest. Callahan Decl. Exs. 18, 19. Guaranty purchased both certificates for more than par value (approximately 102%), but their market value had fallen precipitously by the time the FDIC sold them——HVMLT 2005-8 2A 3 to 41% and HVMLT 2005-16 4A1B to 28%. Callahan Decl. Ex. 5. These certificates also have sustained significant cumulative principal losses.

RBS's due diligence and related practices with respect to RMBS that it underwrote in 2006 and 2007 already have been found critically deficient by a federal court. The court concluded that RBS had no written due diligence procedures; typically conducted due diligence on a sample of the loans but had no reliable basis for extrapolating the results to the entire population from which the sample was drawn, and never made any attempt to do so; and that RBS's due diligence team had no role in reviewing the accuracy of representations in prospectus supplements and did not understand that its work was connected to the representations that would be made in the prospectus supplements. *See Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 104 F. Supp. 3d 441, 483-84 (S.D.N.Y. 2015) (Cote, J.).

---

[8]  *See* Callahan Decl. Ex. 17 (Deposition of Stephanie Larson, *Federal Hous. Fin. Ag. v. Goldman, Sachs & Co.*, 11 Civ. 6198 (SDNY Oct. 24, 2013) at 70:24-71:10 (Goldman manager stating she did not recall Goldman conducting loan-level due diligence at the securitization stage)). There is no evidence of Goldman performing additional due diligence at the securitization stage in this case.

The evidence produced thus far here is consistent with these findings. For example, documents produced by RBS show that it was aware that loans originated by Countrywide and securitized by RBS were experiencing early defaults. Callahan Decl. Ex. 20 (email attaching spreadsheet of Countrywide EPD loans securitized in HVMLT deals). Countrywide was also refusing to repurchase loans RBS believed were originated outside of the applicable guidelines. Callahan Decl. Ex. 21 (RBS email stating that Countrywide is "impossible to get to repurchase any loans"); *see also* Exs. 22, 23, 24, 25 (emails in which Countrywide asked RBS to rescind repurchase requests based on issues including underwriting discrepancies, misrepresentation of employment, and fraud).Yet RBS continued to purchase loans from Countrywide and securitize them into RMBS, including the two certificates in issue. Internal emails produced by RBS's due diligence vendor on the loan pools underlying the two certificates reflect the vendor's view that RBS purchased loans indiscriminately. Callahan Decl. Exs. 26, 27.

## ARGUMENT AND AUTHORITIES

Defendants' motion for partial summary judgment turns on the interpretation of Article 581-33 of the TSA. Of course, the final arbiter of the meaning of Texas statutes is the Texas Supreme Court. *See, e.g.*, *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007) ("[W]e follow the same rules of construction that a Texas court would apply . . . ."). Defendants' motion gets Texas law wrong on both issues it addresses: (1) the appropriate method for calculating the interest component of damages in Article 581-33; and (2) the rate of interest to apply in that calculation. The motion also ignores core TSA purposes that would be undermined if the Defendants' proposed interpretation of Article 581-33 were accepted.

## I.     The TSA Provides a Straightforward Approach to Calculating Damages.

Article 581-33 of the TSA makes it unlawful either to sell or buy a security by means of an untrue or misleading statement of material fact. Article 581-33(D) provides four intertwined,

symmetrical formulas for relief that address different situations, including this one. The formulas use an identical component, the consideration paid for the security plus interest thereon on at the legal rate from the date of the buyer's payment. Appendix A reproduces Article 581-33.

### A. To Achieve the TSA's Purposes, Article 581-33 Pegs the Interest Calculation to the Actual Consideration Paid by the Investor to Purchase the Security.

In furtherance of its purposes of protecting and compensating victims of securities violations, deterring future violations, and encouraging private enforcement, the Article 581-33(D) damages formulas are simple, efficient, and generally applicable. Nothing in Article 581-33(D) indicates it could, or should, mean different things to different investors or sellers depending on what securities were bought or sold. Defendants, without any support from the statutory text, ask the Court to change two of those formulas (addressing remedies for buyers of securities) for the specific type of securities they sold.

### 1. Article 581-33(D)(3) provides for a simple calculation of damages based on the "consideration paid" for the security when purchased.

Damages for a buyer of securities are determined by TSA Article 581-33(D)(3):

In damages, a buyer shall recover *(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer*, less (b) the greater of:

> (i)     the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or
>
> (ii)    the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security.

Tex. Civ. Stat. art. 581-33(D)(3) (emph. added).

In this formula, and the other three listed in Article 581-33, the computation starts with "the consideration," not some other figure. The statute also clarifies that "the consideration" is what was "paid for the security." It further explains that this specific amount exchanged, or "paid," is as of a specific date—*i.e.*, "the date of payment by the buyer." The statute's phrase

"plus interest thereon" expressly refers to "the consideration the buyer paid for the security." Further, interest accrues from the "date of payment by the buyer." No other reading is possible. There is no language in the statute that permits recalculation or reduction based on return of principal. The only reduction is plainly stated. The consideration plus interest thereon at the legal rate is reduced only by the income received on the security and the greater of the security's value or what the buyer actually got in selling it. That was the conclusion reached by the Illinois Supreme Court in applying a similar statute. In *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, the Illinois Supreme Court enforced the unambiguous statute as written. 18 N.E.3d 884 (Ill. 2014). The Court held that "the statute unambiguously requires the calculation of interest prior to deducting any amount received by the purchaser of the securities." *Id.*

### 2. Under Texas law, the TSA is to be enforced according to its plain text.

The Texas Supreme Court has repeatedly emphasized it interprets statutes as written:

- Courts must take statutes as they find them. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997).

- Courts enforce statutes according to the ordinary meaning of the plain statutory text. *Exxon Mobil Pipeline Co. v. Coleman*, 2017 WL 727274, at *2 (Tex. Feb. 24, 2017).[9]

- "Enforcing the law as written is a court's safest refuge in matters of statutory construction . . . ." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009).

Even more important for this case, Texas courts must submit statutory causes of action to juries with language that "track[s] the language of the provision as closely as possible." *Borneman v.*

---

[9] *Accord, e.g.*, *Exxon Mobil Pipeline Co. v. Coleman*, 2017 WL 727274, at *2 (Tex. Feb. 24, 2017); *INEOS USA, LLC v. Elmgren*, 505 S.W.3d 555, 563 (Tex. 2016); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016); *Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016); *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014); *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014); *City of Houston v. Bates*, 406 S.W.3d 539, 543 (Tex. 2013); *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).

*Steak & Ale of Texas, Inc.*, 22 S.W.3d 411, 413 (Tex. 2000) (quotes omitted). Thus, the jury in this case should receive the wording of Article 581-33, not the formula that defendants urge.

Nowhere do Defendants plead or prove that Article 581-33's language is ambiguous, nonsensical, or in error. Nor could they.

**B.      Defendants' New Approach Ignores the TSA's Text, Disregards its Purposes, and Seeks an Unjustified Special Rule for RMBS.**

**1.      Defendants' proposed interpretation seeks to re-write Article 581-33.**

Unwilling to accept the consequences of their own misdeeds, Defendants ask the Court to re-write two of the four symmetrical formulas in Article 581-33(D) that address buyers' remedies. First, Defendants would remove the word "thereon." Then Defendants would replace, "the consideration he paid for the security" and "the consideration the buyer paid for the security" with, "unpaid principal balance."[10] Finally, "interest" becomes "interest calculated on the outstanding monthly principal balance of the security." *See* Def. Br. at 2 ("maximum recoverable damages are calculated as (1) return of any unpaid principal, plus (2) prejudgment interest calculated . . . on the outstanding monthly principal balance . . . .').

Here is how Defendants argue the jury should find damages, based on the following computation of the first element of the formulas in Article 581-33:

> a buyer shall recover the unpaid principal balance with interest calculated on the outstanding monthly principal balance

Nothing like that appears in Article 581-33. This is not merely a re-interpretation or modification of the formula. It is a total re-write—not only of the formula applicable to this case but the other

---

[10] The terms "unpaid principal balance" and "consideration" are not synonyms. Beyond differences in ordinary meaning, "consideration" under Article 581-33 includes any "commissions paid" in connection with a security transaction, in situations in which the buyer is suing an issuer that is not also the seller. *See* Tex. Rev. Civ. Stat. art. 581-33—cmt. (Background 1977) (noting that "'Consideration . . . paid' by a buyer . . . includes commissions paid by him").

formula for buyers as well. Texas law prohibits "reworking the words [the Texas] Legislature passed into law." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013).

> **2.** **Defendants' "windfall" argument disregards the TSA's purposes and the Legislature's indications that a special rule was not intended.**

Defendants justify transplanting their damages formula into the statute by the purported need to prevent an "unjustified windfall." *See, e.g.*, Def. Br. at 2, 3, 11-17. That self-serving justification ignores two core TSA purposes. The TSA is intended to encourage compliance and deter misconduct in the purchase and sale of securities and to encourage private enforcement of that Act, as well as reimburse investors for their losses. Tex. Rev. Civ. Stat. art. 581-33—cmt. (Background 1977) (noting that the 1977 "revision" to Article 581-33 "retains the same purposes of indemnifying investors . . . , encouraging compliance . . . , and creating incentive for private enforcement").[11] Thus, there is no windfall, but the measure of damages that the Legislature intended as shown by plain text. Exceptions to a plain-text reading arise only when the Legislature has provided a different meaning in the statute, a different meaning is apparent from the disputed provision's context, or applying the plain meaning would lead to an outright absurdity. *E.g.*, *Janvey v. Golf Channel, Inc.*, 487 S.W.3d at 572. The "absurdity doctrine" is reserved for "truly exceptional cases" involving "patently nonsensical results" or an "unthinkable or unfathomable" outcome. *Id.* Given that applying the plain text of Article 581-33 furthers two of the TSA's three core purposes, Article 581-33's text hardly meets that high standard.

---

[11] *Accord Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 440 (Tex. 2007) (citing comment to 1977 Article 581-33 amendments and reiterating the TSA's purposes); *see also Flowers v. Dempsey–Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971) (noting TSA core purpose of protecting the public); *Texas Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ("We are to construe the Texas Securities Act 'to protect investors.'" (quoting TSA Article 581-10-1(b)).

That is especially true since there are other examples of the legislative use of interest to achieve policy goals. The Texas Insurance Code imposes 18% interest on an insurer that fails to timely pay an insurance claim. Tex. Ins. Code §542.060(a). In addition, in 1987 the Texas Legislature allowed prejudgment interest on future damages awarded in a judgment to encourage settlements. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528-31 (1998).[12] And using interest to deter bad conduct is appropriate in the TSA, which has no provisions for exemplary or additional damages.

### 3. Defendants request a special RMBS rule, not reflected in the TSA's text, even though amortizing bonds have long existed in Texas.

Shifting their arguments slightly, Defendants make a type of disparate impact argument—that the TSA's damages formula should be applied in a special way to RMBS because they are different. But amortizing bonds like RMBS existed long before the Legislature significantly amended Article 581-33(D) in 1977 or first adopted its predecessor in 1957. Indeed, the State of Texas and its political subdivisions have issued amortizing bonds since at least the early 20th century. *See, e.g.*, *Moody v. San Saba County Water Control & Improvement Dist. No. 1*, 293 S.W. 845, 846 (Tex. Civ. App.—Austin 1927, writ ref'd). The Legislature obviously intended no different measure of damages for RMBS or any other type of security. Any such special rule, moreover, would confuse and complicate Article 581-33, as threatened in other RMBS cases in which Defendants have asked for further "adjustments" to statutory damages formulas, including a rule that would not only deduct distributions of principal but also of interest. *See, e.g.*, Def. Br. n.16 (citing such a theory and noting "Defendants contend that

---

[12] Prejudgment interest on future damages was later removed. *See* Tex. Fin. Code §304.1045.

approach is correct"). Requests for other special rules would then surely follow, including perhaps for interest-only bonds, or zero-coupon bonds, or dividend-paying stock, and so on.

### C.   Defendants' Article 581-33 Interpretation is Unprecedented.

Defendants cite only scattered decisions, mostly from other jurisdictions, and mostly interpreting other laws. Given the TSA's plain text and purposes, those decisions have no bearing here.

### 1.   There is no controlling Texas authority to support a departure from the TSA's plain text.

There is no controlling opinion by the Texas Supreme Court and no Texas intermediate appellate court opinions deciding this issue,[13] let alone mandating a departure from the TSA's plain meaning. The only Texas state court judge to have addressed this issue denied a similar defense effort, albeit without prejudice. *See* Ex. 28 (*FDIC as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Co.*, No. 2011-67305 (151st Dist. Ct. Tex. Jun. 1, 2015) (order)). Accordingly, the Court should follow the rules of statutory interpretation that Texas courts would follow, as discussed above. Those rules are contrary to Defendants' arguments and require enforcing Article 581-33(D)(3) as it is written.

Defendants cannot support their declining balance approach by their citation to the narrow holding in *Battaglia v. Alexander*, a case about personal injuries rather than violations of securities laws. *Battaglia* held that prejudgment interest should apply to past damages reduced by settlement credits on a declining balance basis. 177 S.W.3d 893, 898, 909 (Tex. 2005). As Justice Owen noted for the *Battaglia* majority, the Supreme Court was free to adopt a declining

---

[13] Both *Aegis Ins. Holding Co., L.P. v. Gaiser*, No. 04-05-00938-CV, 2007 WL 906328, at *4 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied), and *Sandefer*, 58 S.W.3d at 760, cited by Defendants, involve suits seeking rescission—not damages—by buyers still in possession of the securities; they do not address damages and do not purport to interpret Article 581-33(D).

balance approach for *settlement credits* because the text of the relevant statute in that case, Texas Civil Practice & Remedies Code §33.012 (which is not at issue here), is "silent" on how to apply settlement credits. *Battaglia*, 177 S.W.3d at 906. The TSA, in contrast, is not silent; it requires interest on the consideration paid for the security from the date of that payment.

Further, the context of *Battaglia* was the creditor-debtor scenario that Defendants cite when they argue for what they call the "declining principal approach." *Battaglia* was determining what a judgment debtor owed a judgment creditor. *See Bishop Abbey Homes, Ltd. v. Hale*, 2015 WL 4456209, at *1 (Tex. App.—Dallas July 21, 2015) (mem. op. on motion to review supersedeas bond) (referring to settlement credits as applied to the judgment creditor). The TSA, by contrast, does not address any creditor-debtor relationship; instead, it is providing a formula for damages in a seller-buyer relationship.

## 2.     *NCUA* errs in its application of Texas law and is not controlling.

Defendants' primary authority is *National Credit Union Administration Bd. v. UBS Sec. LLC*, 2016 WL 1179203 (S.D.N.Y. Mar. 24, 2016) (*NCUA*), which exemplifies Defendants' erroneous approach to statutory interpretation in Texas. Although *NCUA* purports to apply Texas law and a plain-text analysis, the court failed to faithfully do either. *NCUA* did not apply the ordinary meaning of "interest thereon" in the context where it appears, as Texas law requires. *See Guitar Holding Co., v. Hudspeth Cnty. Underground Water Conservation Dist. No. 1*, 263 S.W.3d 910, 915 (Tex. 2008) (terms "not otherwise defined are typically given their ordinary meaning"). Instead, Judge Cote, the author of the *NCUA* decision, purports to apply an interpretation of the federal §77l from her separate unreported decision in *Nomura Holding*, 2015 WL 640875, at *2, and fails to consider all the TSA's purposes. *Id*. at *2. The parties in *Nomura Holding*, moreover, did not dispute or brief for the court why the declining-balance approach to §77l damages is contrary to the plain language; rather, the parties simply agreed on that approach

15

in that case. Ultimately, *NCUA* never addresses that Article 581-33's text is clear on its face and is susceptible to interpretation by giving its words their ordinary meaning, without regard to select policy considerations, arguments about only some of the TSA's purposes, or resort to interpretative aids like federal decisions interpreting analogous federal law.

Indeed, even if there were an actual on-point interpretation of analogous federal securities law (and Defendants cite none), this analogy could—at most—serve as an interpretive "guide" for ambiguous TSA text. *See Anheuser-Busch Companies, Inc. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dism'd). Here, any such federal interpretation, assuming there is one, is irrelevant due to the controlling effect Texas courts give to unambiguous plain language like that of Article 581-33. *See Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (interpretive guides serve no role in interpreting clear statutory text); *see also Agbor*, 952 S.W.2d at 505.

Even when a Texas statute is ambiguous, unlike Article 581-33(D), an on-point interpretation of analogous federal law does not qualify as an interpretative guide unless the federal and state provisions "contain virtually the same wording." *Anheuser-Busch*, 934 S.W.2d at 708. For example, *Anheuser-Busch* explains that even though Article 581-33(A)(2) was "lifted *almost verbatim* from 15 U.S.C.A. § 77*l*(2)," interpretations of §77*l*(2) do not trump Article 581-33(A)(2)'s plain meaning because Article 581-33(A)(2) differs from its federal counterpart by omitting the eight-word phrase "by means of a prospectus or oral communication." *Id*. at 708 (emph. added).Thus, even language in the TSA that is taken *almost* verbatim from federal law cannot support, let alone compel, ignoring the TSA's plain meaning.

The multiple differences between Article 581-33 and 15 U.S.C. §77*l* are even more significant than the eight-word difference in *Anheuser-Busch* that compelled the court to enforce

the TSA's plain text over an interpretation based on federal law. Article 581-33(D) includes in four distinct subsections a more comprehensive treatment of remedies than §77*l*, reflecting Texas' "specific methods for determining damages for a claim under the article." *Duperier v. Texas State Bank*, 28 S.W.3d 740, 754 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.). At a more granular level, §77*l* calls for recovery of "consideration paid . . . with interest thereon," while Article 581-33(D)(3), in contrast, calls for recovery of "consideration the buyer paid . . . plus interest thereon at the legal rate from the date of payment." The different, additional words in Article 581-33 impart a different meaning by reinforcing that recoverable interest is applied to the full amount of consideration a buyer paid on the date that payment was made. Moreover, subsections 581-33(D)(3)(i) & (ii) also do not mirror §77*l*, further confirming that the provisions are not the same.

Finally, *NCUA* also improperly discounts the Illinois Supreme Court's *Goldfine* decision. *NCUA* rejects *Goldfine*'s plain-text analysis because the interest at issue was on a payment amount minus settlements, and not on an amortizing security. *NCUA*, 2016 WL 1179203, at *5. Again, that approach does not properly credit the statute's plain text, contrary to the approach followed by Texas courts. In any event, *Goldfine* held that an interest calculation calling for "the full payment amount, paid together with interest from the date of payment for the securities sold, less any amount received" unambiguously "requires the calculation of interest prior to deducting any amounts received by the purchaser." *Goldfine*, 18 N.E.3d at 898. That holding should apply with equal force if the "amounts received by the purchaser" are settlements or returns of principal. The interest calculation in the Illinois statute, as with the TSA, plainly occurs as part of the first step of the calculation, prior to any reductions, in either case.

17

### 3. Decisions interpreting the laws of other states cannot override the TSA's plain text and are not instructive on the TSA damages calculation.

Defendants' reliance on a few other decisions, in addition to *NCUA*, warrants a brief response. Of the decisions Defendants cite, only *NCUA* purports to interpret the TSA and, as discussed, *NCUA* errs in applying Texas law. The other cited decisions address other states' securities laws and so have no bearing on the interpretation of the TSA. *See* Def. Br. at 10, 16 (citing *Nomura Holding*, 2015 WL 640875, at *2 (interpreting Va. Code §13.1-522(A) and D.C. Code §31-5606.05(b)(1)(A)); *Fed. Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc.*, slip op. at 4 (Wa. Super. Ct. King Cty. Nov. 9, 2015) (interpreting Wash. Rev. Code §21.20.430(1)); *The Charles Schwab Corp. v. Banc of America Sec. LCC*, 2014 WL 9865537, *3 (Cal. Super. Ct. San Francisco Cnty. Nov. 10, 2014) (interpreting Cal. Corp. Code §25501)).

## II. The Rate for the Interest Component of Damages on a Claim for the Sale of a Security in Violation of the TSA Is the Legal Rate, Not the Coupon Rate.

Defendants' arguments about the applicable rate of interest are simply misguided. What is at issue here is not *prejudgment* interest imposed by the court on damages found by a jury and awarded in a judgment. In most cases under Texas law, there is no formula for damages that includes interest, so interest in such cases is purely a result of the judgment. That is why Texas juries are instructed not to include interest on any amount of damages they find. *See, e.g.*, Committee on Pattern Jury Charges of the State Bar of Texas, *Texas Pattern Jury Charges— General Negligence, Intentional Personal Torts & Workers Compensation* PJC 29.6 (2016); Committee on Pattern Jury Charges of the State Bar of Texas, *Texas Pattern Jury Charges— Business, Consumer, Insurance & Employment* PJC 115.19 (2016). As the ending Comment to PJC 115.119 specifically says, however, in a case arising from an alleged violation of the TSA,

the trial court must submit the statutory formula in the TSA (*i.e.*, Article 581-33(D)). That formula includes an interest component, which the jury applies to determine damages.

Thus, the mandatory interest included in the TSA's damages formula is not prejudgment interest except in a loose colloquial sense. Instead, the TSA's term "legal interest" means interest that can be lawfully charged under Texas law as stated in the more general provisions on interest, namely Chapter 302 on "Interest Rates." As the title to section 302.001 suggests, Chapter 302 applies broadly to "Contracting For, Charging, *or Receiving* Interest." Tex. Fin. Code §302.001 (emph. added). The issue here is: what rate of interest is the FDIC entitled to "receive"? Since Defendants did not contract for any interest rate in the event of a claim against them for violation of the securities laws, the applicable section is §302.002, entitled "Accrual of Interest When No Rate Specified." That rate is "six percent a year." Defendants ironically refer to this as "the statutory Usurious Interest Rate of 6%." Def. Br. at 8. Of course, 6% per annum is the opposite of a usurious rate; it is a lawful rate above which the prohibition against usury begins to apply. And that "legal rate" applies to determine how much interest the FDIC may "receive."

Finally, Defendants cannot invoke a contractual coupon interest rate for a contract subject to a claim based on misrepresentations in violation of the securities laws, for two reasons. [14]

First, under Texas law, "where the wrongs arise from misrepresentations inducing a party to execute the contract and not from breach of the contract, remedies and limitations specified by the contract do not apply." *Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 813 (Tex. App.—Texarkana 1995, writ denied) (citing *Caton v. Leach Corp.*, 896 F.2d 939, 942-43 (5th Cir. 1990)).

---

[14] It is also unclear how a coupon rate would apply, even if it could apply. The coupon rates on five of the six certificates were variable. The coupon rates on HVMLT 2005-8 2A3, for example, went as low as 2.2%, even though at other times they exceeded 6%.

Second, and more important, the TSA is not referring to interest within the security that is the basis of the claim. As the Texas State Securities Board confirms, citing Finance Code §302.02: "For most purposes under the Texas Securities Act, the legal rate of interest is set by referencing the following provision of the Texas Finance Code." Texas State Securities Board, Texas Securities Act and Board Rules, Legal Rate of Interest, at https://www.ssb.texas.gov/texas-securities-act-board-rules/legal-rate-interest (last visited April 28, 2017). The Securities Board refers to the 6% legal rate because the prejudgment interest section of the Finance Code does not apply here.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion for partial summary judgment. The FDIC prays for all other relief to which it may be entitled.

Dated:  May 8, 2017

Of Counsel:

David J. Grais (pro hac vice)
dgrais@graisellsworth.com
Kathryn E. Matthews (pro hac vice)
kmatthews@graisellsworth.com
GRAIS & ELLSWORTH, LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 755-0100
(212) 755-0052 (Fax)

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Collin J. Cox
State Bar No. 24031977
ccox@yettercoleman.com
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 (Fax)

COUNSEL FOR PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK

**CERTIFICATE OF SERVICE**

I certify that on this 8th day of May, 2017, a true and correct copy of this pleading was served via the Court's CM/ECF notification system on all counsel of record.

*/s/ Bryce L. Callahan*
Bryce L. Callahan