# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK,<br><br>Plaintiff,<br><br>-v.-<br><br>RBS SECURITIES INC.,<br><br>Defendant. | Civil Action No. 14-cv-126-SS |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR GUARANTY BANK,<br><br>Plaintiff,<br><br>-v.-<br><br>GOLDMAN, SACHS & CO. and DEUTSCHE BANK SECURITIES INC.,<br><br>Defendants. | Civil Action No. 14-cv-129-SS |

## PLAINTIFF'S OPPOSITION TO DEFENDANT RBS SECURITIES INC.'S AND DEFENDANT DEUTSCHE BANK SECURITIES INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

STATEMENT OF FACTS ........................................................................................................ 2

    A.  Guaranty's purchase of the certificates from RBS and Deutsche Bank ...................... 2

    B.  Defendants' representations in the prospectus supplements ....................................... 4

        1.  Defendants' representations about compliance with appraisal standards ............. 4

        2.  Defendants' representations about LTVs ............................................................. 6

        3.  Defendants' representations about compliance with underwriting guidelines..... 7

    C.  Defendants' representations were untrue or misleading ............................................ 7

        1.  Defendants' representations about compliance with USPAP were untrue or misleading. ...................................................................................................... 7

        2.  Defendants' representations about LTVs were untrue or misleading. ................. 9

        3.  Defendants' representations about compliance with underwriting guidelines were untrue or misleading. ........................................................................... 11

    D.  Facts relating to the FDIC-R's retention of its securities claims.............................. 13

ARGUMENT ...................................................................................................................... 14

   I.  THE FDIC-R IS THE REAL PARTY IN INTEREST ON ITS CLAIMS AGAINST DEFENDANTS FOR VIOLATIONS OF THE TSA....................................................... 14

    A.  Claims for violation of the securities laws do not "travel" with the security when it is sold. ............................................................................................................... 15

    B.  The language in the Trust Agreement demonstrates that the FDIC-R did not assign its securities law claims to the Trust. .................................................................. 16

  II.  RBS AND DEUTSCHE BANK SOLD THE CERTIFICATES "BY MEANS OF" UNTRUE OR MISLEADING STATEMENTS OF MATERIAL FACT IN THE PROSPECTUS SUPPLEMENTS. ................................................................................. 21

  III.  THE FDIC-R'S LTV AND APPRAISAL-BASED CLAIMS ARE LEGALLY SUFFICIENT........................................................................................................... 26

    A.  The FDIC does not have to prove subjective falsity. ............................................. 26

    B.  Even if the FDIC-R had to prove the subjective falsity of the appraisals, there is enough evidence for a jury to find that either the appraisers or the defendants or both did not believe them.................................................................................... 27

    C.  There are genuine issues of material fact about whether the appraisals were inflated. .............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Activision Blizzard, Inc. Stockholder Litig.,*
124 A.3d 1025 (Del. Ch. 2015)....................................................................15, 17

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,*
920 F. Supp. 2d 475 (S.D.N.Y. 2013)..................................................................28

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*
57 F.3d 146 (2d Cir. 1995)...................................................................................20

*In re Bear Stearns Mortg. Pass–Through Certificates Litig.,*
851 F. Supp. 2d 746 (S.D.N.Y. 2012)..................................................................27

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975).............................................................................................16

*Bluebird Partners, L.P. v. First Fidelity Bank,*
896 F. Supp. 152 (S.D.N.Y. 1995) ......................................................................16

*CMFG Life Ins. Co. v. RBS Secs., Inc.,*
799 F.3d 729 (7th Cir. 2015) ...............................................................................23

*Commonwealth of Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.,*
25 N.Y.3d 543 (2015)...........................................................................................18

*Dexia SA/NV v. Morgan Stanley,*
22 N.Y.S.2d 833 (N.Y. Sup. Ct. 2016) ..........................................................17, 18

*Ensley v. Cody Res., Inc.,*
171 F.3d 315 (5th Cir. 1999) ...............................................................................14

*FDIC as Receiver for Amtrust Bank v. Burke,*
No. 12-7398 (MAS)(LGH), 2015 WL 404513 (D.N.J. Jan. 29, 2015) ............19, 20

*FDIC as Receiver for Guaranty Bank v. Citibank, N.A.,*
No. 1:15-cv-6574, 2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016) ........................18

*FDIC v. Wheat,*
970 F.2d 124 (5th Cir. 1992) ...............................................................................21

*Fed. Hous. Fin. Agency v. Bank of Am. Corp.,*
No. 11 Civ. 6195 DLC, 2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012).........2, 23, 24

*Fed. Hous. Fin. Agency v. Nomura Holding Am.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015).............................................................26, 28

*Fed. Hous. Fin. Agency v. Nomura Holding Am.*,
  68 F. Supp. 3d 499 (S.D.N.Y. 2014), *aff'd*, 873 F.3d 85 (2d Cir. 2017) .......................2, 23, 24

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  No. 11CV6201, 2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) ...................................27

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*,
  No. 11 Civ. 5201, 2012 WL 2400263 (S.D.N.Y. June 26, 2012)..............................22

*Flowers v. Dempsey-Tegeler & Co.*,
  472 S.W.2d 112 (Tex. 1971).......................................................................24

*Geodyne Energy Income Prod. P'ship. I-E v. Newton Corp.*,
  97 S.W.3d 779 (Tex. App. 2003), *rev'd in part on other grounds*, 161 S.W.3d
  482 (Tex. 2005)......................................................................................25

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
  302 F.3d 552 (5th Cir. 2002) ......................................................................25

*Indep. Investor Protection League v. Saunders*,
  64 F.R.D. 564 (E.D. Pa. 1974).................................................................15, 16

*Int'l Design Concepts v. Saks Inc.*,
  486 F. Supp. 2d 229 (S.D.N.Y. 2007)............................................................20

*In re Nucorp Energy Secs. Litig.*,
  772 F.2d 1486 (9th Cir. 1985) ....................................................................16

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)..........................................................................26, 27

*Rose v. Arkansas Valley Envtl. & Utility Auth.*,
  562 F. Supp. 1180 (W.D. Mo. 1983) ..........................................................15, 16

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004) ...............................................................23

*Royal Park Investments SA/NV v. Morgan Stanley*,
  57 N.Y.S.3d 677 (N.Y. Sup. Ct. 2017) .......................................................17, 18

*RTC Mortgage Trust v. Fidelity National Title Insurance Co.*,
  16 F. Supp. 2d 557 (D.N.J. 1998) ..........................................................18, 19, 20

*Sch. Bd. of Avoyelles Parish v. U.S. Dep't of the Interior*,
  647 F.3d 570 (5th Cir. 2011) ......................................................................14

*Schultz v. Ginsburg*,
    965 A.2d 661 (Del. 2009) .......................................................................17

*Sealink Funding Ltd. v. UBS AG*,
    997 N.Y.S.2d 101, 2014 WL 3408569 (N.Y. Sup. Ct. July 9, 2014) .....................................18

*Smith v. Ayres*,
    977 F.2d 946 (5th Cir. 1992) .................................................................16

*Soderberg v. Gens*,
    652 F. Supp. 560 (N.D. Ill. 1987) ..........................................................16

*In re Viking Pump, Inc.*,
    148 A.3d 633 (Del. 2016) .....................................................................17

*In re Whittington*,
    530 B.R. 360 (Bankr. W.D. Tex. 2014) ...................................................15

*Wood v. Combustion Eng'g, Inc.*,
    643 F.2d 339 (5th Cir. 1981) .................................................................25

**Statutes and Other Authorities**

12 U.S.C. § 1821(d)(2)(A) ...........................................................................13, 20

15 U.S.C. § 77e(b)(2) .................................................................................21, 22

6 Del. Code § 8-302(a) ..................................................................................17

Fed. R. Civ. P. 17(a) .....................................................................................14

H.R. Rep. 101-54(I) ......................................................................................20

TEX. REV. STAT. ART. 581-33(A)(2) ...................................................1, 2, 16, 21

The FDIC as Receiver for Guaranty Bank ("FDIC-R") has sued RBS and Deutsche Bank for selling five residential mortgage-backed securities ("RMBS") to Guaranty by means of untrue and misleading statements of material fact in violation of article 581-33(A)(2) of the Texas Securities Act ("TSA"). RBS and Deutsche Bank have moved for summary judgment on three grounds.[1] Because their motion is factually and legally insufficient on all grounds, it should be denied.

First, defendants have not demonstrated any defect in standing. The FDIC-R has standing to pursue its claims against defendants for violations of the TSA because securities law violations are personal claims that do not "travel" with a security when it is sold. To defeat the FDIC-R's standing, defendants would have to show an unambiguous intent on the part of the FDIC-R to transfer its securities law claims when it sold the RMBS to the trust. The agreement governing the sale contains no such language, so defendants' motion should be denied.

Second, defendants have not demonstrated any basis for summary judgment on the FDIC-R's claims that they sold RMBS to Guaranty "by means of" untrue and misleading statements, including statements in the prospectus supplements. RBS and Deutsche Bank filed those supplements with the Securities and Exchange Commission. RBS and Deutsche Bank could not legally sell an RMBS to Guaranty without providing those disclosures, which were of critical importance to investors like Guaranty because they contained detailed information about the underlying mortgage loans. Thus, the Court should reject defendants' argument that these

---

[1] With respect to two of those grounds, RBS and Deutsche Bank also "incorporate by reference" the arguments and evidence presented by Goldman, Sachs & Co. (a defendant in action No. 14-cv-129) in its motion for summary judgment. *See* Defendant RBS Securities Inc.'s and Defendant Deutsche Bank Securities Inc.'s Motion for Summary Judgment ("RBS/DB Br.") at n. 29. The FDIC-R therefore incorporates by reference here its opposition to Goldman's motion.

sales were not "by means of" the untrue and misleading statements in those documents, as courts uniformly have done when interpreting section 12 of the Securities Act of 1933, upon which article 581-33(A)(2) of the TSA was modeled. *See, e.g., Fed. Hous. Fin. Agency v. Nomura Holding Am.,* 68 F. Supp. 3d 499, 507 (S.D.N.Y. 2014), *aff'd*, 873 F.3d 85 (2d Cir. 2017); *Fed. Hous. Fin. Agency v. Bank of Am. Corp.*, No. 11 Civ. 6195 DLC, 2012 WL 6592251, at *5 (S.D.N.Y. Dec. 18, 2012).

Third, the FDIC-R's claims based on statements by RBS and Deutsche Bank about appraisals and loan-to-value ratios ("LTVs")[2] are legally sufficient. The FDIC-R is not required to prove that those statements were subjectively false. But even if the FDIC-R were required to do so, there is sufficient evidence in the record from which a reasonable jury could conclude that either the appraisers or defendants, or both, did not believe that the appraisals reflected an objective assessment of the value of the properties that served as collateral for the mortgage loans that backed these RMBS. Defendants' motion for summary judgment should be denied.

**STATEMENT OF FACTS**

**A. Guaranty's purchase of the certificates from RBS and Deutsche Bank**

Guaranty bought two certificates from RBS: HVMLT 2005-8 2A3 on July 29, 2005,[3] and HVMLT 2005-16 4A1B on December 30, 2005.[4] Guaranty bought three certificates from Deutsche Bank: INDX 2005-AR16IP A3 on July 11, 2005;[5] RALI 2005-QO1 A4 on August 31,

---

[2] The LTV is the principal balance of a mortgage loan as a percentage of the mortgaged property's value.

[3] Ex. 1. References to "Ex. __" are to the exhibits to the Declaration of Kathryn E. Matthews, dated March 30, 2018.

[4] Ex. 2.

[5] Ex. 3.

2005;[6] and RALI 2005-QO5 A3 on December 30, 2005.[7] These are the "settlement dates," on which Guaranty's purchases were finalized. The "trade dates," in contrast, are when Guaranty made an initial, non-binding decision to purchase the certificates.[8] For each of these transactions, the prospectus supplement was issued before the settlement date; for one, the prospectus supplement was also issued before the trade date.[9]

Jack Falconi, Guaranty's Chief Investment Officer, was primarily responsible for deciding which RMBS the bank would buy.[10] For four of the five certificates (all except HVMLT 2005-16), he made an initial decision to invest before the prospectus supplement was available, using information that RBS and Deutsche Bank provided in preliminary offering materials, such as term sheets, stratification tables, and responses to a "questionnaire" that he prepared and required securities dealers to complete.[11] This was a common practice in the market for new RMBS issuances. In making an initial decision to invest based on preliminary offering materials, investors expected that the information in the prospectus supplement would not vary materially and would be consistent with market custom and standards, as well as any prior dealings with the same depositor or its affiliates.[12]

---

[6] Ex. 4.

[7] Ex. 5.

[8] Ex. 6 at 101:22-102:15, 608:21-609:17.

[9] Ex. 7 (HVMLT 2005-8 prospectus supplement, dated July 27, 2005); Ex. 8 (HVMLT 2005-16 prospectus supplement, dated Nov. 28, 2005); Ex. 9 (HVMLT 2005-16 Ex. 99.2 to Form 8K, supplementing previously filed prospectus supplement, dated Dec. 28, 2005); Ex. 10 (INDX 2005-AR16IP prospectus supplement, dated July 8, 2005; Ex. 11 (RALI 2005-QO1 prospectus supplement, dated Aug. 29, 2005; Ex. 12 (RALI 2005-QO5 prospectus supplement, dated Dec. 27, 2005). The prospectus supplement and subsequent Form 8K and Exhibit 99.2 for HVMLT 2005-16 were filed before the trade date of December 29, 2005. Ex. 9; Ex. 2.

[10] Ex. 6 at 17:3-18:15.

[11] Ex. 6 at 33:4-21, 34:4-35:21, 53:24-55:24.

[12] Ex. 13 at n.42.

When Guaranty received a prospectus supplement, it typically would review the information it contained and compare it to the information that the dealer had provided in the preliminary offering materials to make sure it was consistent.[13] The information in the prospectus supplement could not differ materially from the information in the preliminary offering materials. If it did, investors – including Guaranty – understood that they had the right to refuse to settle the trade.[14] As a result, Guaranty did not consider these transactions to be final (because they were not final) until the settlement date.[15]

**B.  Defendants' representations in the prospectus supplements**

### 1.  Defendants' representations about compliance with appraisal standards

In 2005, it was customary and standard for underwriting guidelines to require that appraisals of the properties that would secure the loans be done in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).[16]

In the prospectus supplements for the HVMLT certificates, RBS stated that "[a]ll appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in

---

[13] Ex. 6 at 55:9-16, 610:25-611:10.

[14] Ex. 6 at 611:11-612:3; Ex. 14 at 37-39, 45 (SEC Comment letter from American Securitization Forum describing "general view" in MBS industry that "the final condition to the contract of sale entered into at pricing for an ABS offering is only satisfied at the time of availability of the final prospectus"); Ex. 15 at 6-7 (SEC Comment letter from Mortgage Bankers Association describing market participants' understanding of right to decline purchase prior to settlement if information in prospectus supplement differs materially from information in preliminary offering materials or is inconsistent with market standards and prior dealings with same counterparty); Ex. 16 at 8-9 (SEC comment letter from Bond Markets Association making similar points); Ex. 17 at 60:2-62:23 (RBS salesperson who sold Guaranty the HVMLT certificates testifying that clients had the right to cancel the transaction if information in prospectus supplement did not match the information given in preliminary offering materials or if RBS "tr[ied] to deliver something that they didn't agree to or know").

[15] Ex. 6 at 101:21-102:18, 608:21-609:17.

[16] Ex. 13 at 10-11, 13-15; Ex. 18 at 10-11, 13-14.

effect."[17] Both Fannie Mae and Freddie Mac require that appraisals be performed in accordance with USPAP.[18] And because the underwriting guidelines of the originators of loans in the three Deutsche Bank securitizations required compliance with USPAP, those prospectus supplements also incorporated statements about compliance with professional standards.[19] RBS and Deutsche Bank did not disclose any information that would lead a reasonable investor to distrust their statements. Had Guaranty known that the appraisals did not comply with USPAP, that information would have been important to it in deciding whether to buy the certificates (as it would have been important to any reasonable investor) because it would have significantly altered the total mix of information available to Guaranty.[20]

Investors like Guaranty could not test defendants' statements about the credit quality of the underlying mortgage loans because they had no access to (and, in fact, were legally barred from accessing due to privacy laws[21]) the loan files for mortgage loans that backed the RMBS they bought, which contained the appraisals and other documents used to underwrite those loans.[22] Based on representations that RBS and Deutsche Bank made, Guaranty had every reason to believe, and did believe, that RBS and Deutsche Bank conducted due diligence investigations to ensure that the statements they made in the prospectus supplements about the credit quality of

---

[17] Ex. 7 at S-94; Ex. 8 at S-70.

[18] Ex. 18 at 14; Ex. 19 at 4, 9; Ex. 20 at 458:21-459:5. Moreover, the underwriting guidelines of Countrywide, which originated 100% of the loans in the HVMLT securitizations, expressly required that appraisals comply with USPAP. Ex. 18 at 14, n.38.

[19] Ex. 13 at 14, n.37, n.38 (discussing guidelines of IndyMac and GMAC-RFC); Ex. 11 at S-41 ("The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide.") Ex. 12 at S-31 (same).

[20] Ex. 6 at 95:4-97:12; Ex. 21 at 103:13-104:23; Ex. 22 at 224:17-225:4; Ex. 13 at 15; Ex. 18 at 14-15.

[21] Ex. 13 at 48, n.138.

[22] Ex. 21 at 35:16-36:12.

the mortgage loans were true and not misleading.[23] For the certificates that RBS underwrote, an officer represented in documents filed with the SEC that she had reviewed the statements in the offering documents, and that they did not contain any untrue or misleading statements of material fact.[24] And Deutsche Bank represented directly to Guaranty that it was making "due diligence kickouts" and "replacements" – *i.e.*, that it was removing non-complying loans from the pools.[25]

### 2. Defendants' representations about LTVs

Each of the prospectus supplements stated the weighted average LTV of the underlying loan pool that backed the certificate RBS or Deutsche Bank had offered for sale to Guaranty.[26] They also provided the distribution of loans within various LTV ranges, including whether there were any loans with LTVs over 95% or 100%.[27] RBS and Deutsche Bank did not disclose any information that would lead a reasonable investor to distrust their statements. Had Guaranty known that the LTV ratios reported by RBS and Deutsche Bank in the prospectus supplements were inaccurate, that information would have been important to it in deciding whether to buy the certificates (as it would have been important to any reasonable investor) because it would have significantly altered the total mix of information available to Guaranty.[28]

---

[23] Ex. 6 at 82:6-87:22, 612:9-619:22; Ex. 21 at 36:5-37:3, 120:23-121:22.

[24] Ex. 23; Ex. 24.

[25] Ex. 25; Ex. 6 at 83:10-86:12.

[26] Ex. 7 at S-84 (74.12%); Ex. 9 at 26 (78.15%); Ex. 10 at S-22 (69.44%); Ex. 11 at S-33 (74.19%); Ex. 12 at I-3 (75.06%).

[27] Ex. 7 at S-84 (no loans with LTV over 95%); Ex. 9 at 26 (no loans with LTV over 95%); Ex. 10 at S-22 (6 loans with LTV over 80%; no loans with LTV over 100%); Ex. 11 at S-33 (no loans with LTV over 95%); Ex. 12 at I-3 (no loans with LTV over 95%).

[28] Ex. 6 at 43:18-44:5, 92:3-93:3, 93:13-95:2, 117:9-121:3, 128:8-129:4; Ex. 21 at 102:14-24; Ex. 22 at 223:19-224:6; Ex. 13 at 12, 15-16; Ex. 18 at 11-12, 14-15.

**3.** **Defendants' representations about compliance with underwriting guidelines**

All of the loans that backed the two HVMLT certificates were originated by Countrywide.[29] In the prospectus supplements for those deals, RBS stated that "[a]ll of the mortgage loans originated or acquired by Countrywide were originated in accordance with its credit, appraisal, and underwriting standards."[30] In the prospectus supplement for the two RALI certificates and the INDX certificate, Deutsche Bank also made statements about the underwriting of the mortgage loans that backed the certificates it was selling to Guaranty.[31] RBS and Deutsche Bank did not disclose any information that would lead a reasonable investor to distrust their statements. Had Guaranty known that the loans had not been originated in compliance with the underwriting guidelines, that information would have been important to it in deciding whether to buy the certificates (as it would have been important to any reasonable investors) because it would have significantly altered the total mix of information available to Guaranty.[32]

**C.** **Defendants' representations were untrue or misleading**

**1.** **Defendants' representations about compliance with USPAP were untrue or misleading.**

Before they sold the certificates to Guaranty, RBS and Deutsche Bank each hired Clayton, a due diligence vendor, to review samples of the underlying loans. But Clayton was not instructed to and did not review the appraisals for compliance with USPAP.[33] RBS credit officers

---

[29] Ex. 7 at S-35; Ex. 8 at S-28.

[30] Ex. 7 at S-92; Ex. 8 at S-69.

[31] *See* Ex. 10 at S-26 to S-28; Ex. 11 at S-40 to S-41; Ex. 12 at S-30 to S-31.

[32] Ex. 6 at 136:7-138:5, 139:24-141:11; Ex. 21 at 102:25-103:12; Ex. 22 at 224:7-16; Ex. 13 at 20-21; Ex. 18 at 19-20.

[33] Ex. 26 at 32:21-34:14 (Clayton did not review appraisals for compliance with USPAP, Fannie Mae, or Freddie Mac appraisal standards).

were not familiar with what USPAP required.[34] And the Deutsche Bank due diligence manager did not recall ever reviewing USPAP himself or discussing appraisal standards with Clayton.[35]

The FDIC-R asked Dr. Charles Cowan, an expert statistician, to select statistically significant samples of the loans from which he could make reliable conclusions about the entire pools of loans that back the certificates that Guaranty purchased.[36] The FDIC-R asked Dawn Molitor-Gennrich, an appraisal expert, to review the appraisals from those loans to determine whether they complied with USPAP.[37] For each of the samples, she found that at least 50% of them did not. For example, one appraisal valued a house at $990,000 but failed to report that the house had sold for $140,000 just a year earlier.[38] The same appraisal also neglected to mention that the house was 200 feet away from a national laboratory that conducted nuclear weapons research and had a plutonium facility.[39] Another appraisal valued a house at $700,000, even though the house had sold for $80,000 just five months earlier.[40] Dr. Cowan extrapolated Ms. Molitor-Gennrich's findings on appraisals in the samples to determine that the following percentages of the appraisals departed from USPAP to such an extent that they could not be considered credible: 52.2% for HVMLT 2005-8, 59.5% for HVMLT 2005-16, 63.3% for INDX 2005-AR16IP, 50% for RALI 2005-QO1, and 54.2% for RALI 2005-QO5.[41]

---

[34] Ex.18 at 91; Ex. 27 at 69:5-12, 112:25-113:5, 113:6-11.

[35] Ex. 28 at 93:3-16.

[36] Ex. 29 at ¶¶ 1-3.

[37] Ex. 19 at 3.

[38] Ex. 19 at 26 (addressing loan no. 101862741).

[39] *Id.*

[40] *Id.* at 28 (addressing loan no. 105419427).

[41] Ex 29 at ¶¶ 74-78, App. 8, 8A.

### 2.   Defendants' representations about LTVs were untrue or misleading.

In light of Ms. Molitor-Gennrich's findings, it is not surprising that the LTVs of the

relevant loan pools were grossly understated. Deutsche Bank's due diligence manager, Joseph

Swartz, repeatedly expressed concerns about appraisal inflation during the period when it was

selling these certificates to Guaranty, and those concerns were borne out in the limited valuation

review that Deutsche Bank conducted on the loans that backed the certificates it sold to

Guaranty. For example, in May of 2005 Mr. Swartz wrote that ███████████

███████████████████████████████████████

███████████████████████████████████████████

███████[42] Despite these concerns, and Deutsche Bank's unique position that enabled it to

perform reasonable due diligence and its obligation to do so,[43] it was the policy of Deutsche

Bank not to conduct valuation due diligence by means of commonly used methods such as

automated valuation models ("AVMs") or broker price opinions ("BPOs") in connection with

securitizations.[44] Consistent with its policy, for INDX 2005-AR16IP and RALI 2005-QO5,

Deutsche Bank conducted no such valuation due diligence.[45] Apparently under the mistaken

impression that the RALI 2005-QO1 loan pool was a whole loan purchase rather than a



[42] Ex. 30. *See also* Ex. 28 at 132:14-133:10 ████████████████████
████████████████████, 147:16-148:14 ████████
████████████████████████████████████████
████████████████████████████████████
██████████████████████████; Ex. 31 ██████████████
██████████████; Ex. 31 ██████████████████
██████████████████████████; Ex. 32 ████████████████
██████████████████████████████; Ex. 13 at 85-86.
[43] Ex. 13 at 47-48.
[44] Ex. 13 at 86. In contrast, when buying whole loan pools, where its own money was at stake,
Deutsche Bank did conduct valuation due diligence. *Id.*
[45] Ex. 13 at 86, 89.

securitization,[46] Deutsche Bank initially ran an AVM on a preliminary pool and ordered BPOs

on a sample of 50 appraisals. Deutsche Bank's internal analysis indicated that 337 properties

were overvalued by more than 15% relative to the appraised values,[47] and 27 of the 50 BPO

values were lower than the original appraisal by more than 15%, which was Deutsche Bank's

own threshold.[48] After receiving these alarming results, and realizing that the loans were part of a

securitization, Deutsche Bank simply stopped all work on valuation due diligence for RALI

2005-QO1 and securitized 24 of the 27 out-of-tolerance loans.[49]

Despite its awareness of problems with appraisals, including on Countrywide loans,[50]

RBS chose not to use any tools commonly employed by other securities firms, such as BPOs or

AVMs, to test the reasonableness of the appraised values that it used to calculate the LTVs in the

prospectus supplements.[51]

The FDIC-R asked Dr. Norm Miller, an expert on AVMs, to opine on the use of an AVM

to test the accuracy of the statements in the prospectus supplements about the LTVs, and to

compare the weighted average LTV of the loans in the pool that backed each certificate against

---

[46] Ex. 33.

[47] Ex. 13 at 87, App. B n.17.

[48] *Id*. at 89, App. B n.27.

[49] Ex. 13 at 89; Ex. 33 (email from Mr. Swartz stating ████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████).

[50] In 2005, RBS requested that Countrywide repurchase a number of loans, including for
misrepresentations relating to appraisals. *See* Ex. 34 ████████████████████████████
████████████████████████████████████████; Ex. 35 ████
████████████████████████████████████████████████████████████
████████████████████████; Ex. 36 ████████████████████████████████████████
████████████████████████████. Countrywide routinely rejected these requests and
refused to repurchase the affected loans. Ex. 37 ████████████████████████████████████
████████████████████ Ex. 38 ██████████████████████████████████████████
████████████████████████████████; Ex. 18 at 94.

[51] Ex. 18 at 55-56, 102.

the weighted average LTV determined by the AVM.[52] Dr. Miller chose DataQuick's AVM based

on his experience in the AVM industry and the quality of DataQuick's data. Using the

DataQuick AVM, and together with the FDIC-R's expert statistician, Dr. Charles Cowan, he

found that the weighted average LTVs for the pools that backed these certificates were: 83.11%

for HVMLT 2005-8, 87.76% for HVMLT 2005-16, 75.24% for INDX 2005-AR16IP, 80.03%

for RALI 2005-QO1, and 81.30% for RALI 2005-QO5.[53] These LTVs were between 5.84% and

10.39% higher than stated in the prospectus supplements.[54] And, while four of the prospectus

supplements stated that there were no loans with LTVs over 95% and the fifth stated that there

were none over 100% (and only eight over 80%),[55] Dr. Miller and Dr. Cowan found that there

were many more of these high LTV loans: in HVMLT 2005-8, 13% and 9% of the loans had

LTVs over 95% and 100%, respectively; in HVMLT 2005-16, 21% and 13.5% of the loans had

LTVs over 95% and 100%, respectively; in INDX 2005-AR16IP, 32% and 4% of the loans had

LTVs over 80% and 100%, respectively; in RALI 2005-QO1, 12% and 8% of the loans had

LTVs over 95% and 100%, respectively; and in RALI 2005-QO5, 14% and 9% of the loans had

LTVs over 95% and 100%, respectively.[56]

### 3. Defendants' representations about compliance with underwriting guidelines were untrue or misleading.

RBS hired Clayton to review samples of the underlying loans to determine whether they

complied with underwriting guidelines and applicable law and to grade them accordingly.[57] A

---

[52] Ex. 39 at ¶¶ 1-5.

[53] Ex 39 at 15, Table 1; Ex. 29 at App. 18.

[54] *See supra* at n.26.

[55] *See supra* at n.27.

[56] Ex. 29 at App. 22.

[57] Ex. 18 at 100-101.

grade of 3 meant that "[s]ubstantial deviations from the guidelines exist, with no apparent

compensating factors to offset the overall risk."[58] Clayton initially gave a grade of 3 to

approximately 33% of the loans in the relevant samples.[59] RBS nevertheless included in HVMLT

2005-8 and HVMLT 2005-16 approximately 16% of the loans that Clayton had initially graded

3, and did not look at any of the loans outside the samples.[60]

Deutsche Bank also hired Clayton to review samples of loans from initial loan pools that

backed its three securitizations.[61] In general, Deutsche Bank's "credit posture" was to accept

non-compliant loans if the originator approved the exception at origination.[62] Clayton therefore

instructed its staff to be "flexible" on securitization reviews for Deutsche Bank, including with

regard to key guideline requirements such as verification of the borrower's funds to close and

cash reserves.[63] Even with such instructions, Clayton initially gave a grade of 3 to 22.5% of the

loans in the samples from the INDX 2005-AR16IP, RALI 2005-QO1, and RALI 2005-QO5

securitizations.[64] Deutsche Bank nevertheless securitized approximately half of the loans that

received an initial grade of 3 and did not look at any loans outside the samples.[65]

The FDIC-R asked James Johnson, an underwriting expert, to review the samples of

loans that Dr. Cowan selected to determine whether those loans were originated in compliance

with the applicable underwriting guidelines.[66] Dr. Cowan extrapolated Mr. Johnson's findings to

---

[58] Ex. 18 at 85, n.236; Ex. 40 at -838.

[59] Ex. 18 at 97-98, 101, App. B (reporting percentage of initial grade 3's for pools that contributed the most loans to HVMLT 2005-8 and HVMLT 2005-16).

[60] Ex. 18 at 80-81, 101, App. B.

[61] Ex. 13 at 80-81.

[62] *Id.* at 99.

[63] *Id.* at 99; Ex. 28 at 197:25-199:8.

[64] Ex. 13 at 84, App. B.

[65] *Id.* at 75-76, 84, App. B.

[66] Ex. 41 at 1-2.

determine that the following percentages of the loans did not comply with the applicable underwriting guidelines because they violated the detailed underwriting standards and had no factors to compensate for the violation of those standards: 55.4% for HVMLT 2005-8, 64.8% for HVMLT 2005-16, 74% for INDX 2005-AR16IP, 31.3% for RALI 2005-QO1, and 40.6% for RALI 2005-QO5.[67]

In sum, defendants made no fewer than three material misstatements – about underwriting, appraisal compliance, and LTVs – each of which individually is material to investors, but when considered cumulatively demonstrate that defendants seriously misrepresented the credit quality of the underlying loans.

**D. Facts relating to the FDIC-R's retention of its securities claims**

The FDIC was appointed as receiver for Guaranty when it failed on August 21, 2009.[68] By statute, the FDIC-R succeeded to "all rights, titles, powers, and privileges of the insured depository institution [Guaranty] . . . with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A).

The FDIC in its capacity as receiver for seven failed financial institutions, including Guaranty ("FDIC-Receiver"[69]), entered into a resecuritization that closed on March 11, 2010.[70] The FDIC-Receiver sold 103 RMBS that the failed banks previously owned to the FDIC Guaranteed Notes Trust 2010-S1 (the "Trust").[71] As consideration for the 103 RMBS sold to the Trust, the FDIC-Receiver received two series of Senior Notes issued by the Trust and two owner

---

[67] Ex 29 at ¶¶ 69-73, App. 7, 7A.
[68] *See* Exhibit 15 to RBS and Deutsche Bank's Mot. for Summ. J.
[69] FDIC-R, in contrast, refers to the FDIC in its capacity as Receiver for Guaranty Bank, the plaintiff in these actions.
[70] Ex. 42.
[71] Ex. 43.

trust certificates ("OTCs").[72] The FDIC-Receiver immediately sold the Senior Notes (which were backed by a guaranty from the FDIC in its corporate capacity) to Barclays Capital,[73] but retained the OTCs.

The sale of the RMBS to the Trust was made pursuant to a Trust Agreement dated March 11, 2010.[74] In the Trust Agreement, the FDIC-Receiver conveyed to the Trust "all its right, title and interest in and to the Underlying Securities, including all interest and principal due on or with respect to the Underlying Securities" after February 2010.[75] The Trust Agreement contains no language transferring claims for violation of the securities laws arising out of the purchase of the RMBS by the failed banks.[76]

## ARGUMENT

### I.   THE FDIC-R IS THE REAL PARTY IN INTEREST ON ITS CLAIMS AGAINST DEFENDANTS FOR VIOLATIONS OF THE TSA.[77]

Defendants do not dispute the authority of the FDIC as Receiver for Guaranty to pursue claims held by Guaranty when it failed. Rather, they assert that language in the Trust Agreement

---

[72] *Id.* at § 2.13(a).

[73] Ex. 44 at 2.

[74] Ex. 43.

[75] *Id.* at § 3.01.

[76] Section 4.06 of the Indenture, which defendants cite (*see* RBS/DB Br. at 7), does not empower the Indenture Trustee to bring securities law claims arising out of the purchase of the RMBS by the failed banks. Commonly referred to as a "no-action clause," that section expresses a limitation on the rights of holders of the Senior Notes to bring suit "with respect to [the] Indenture, or for the appointment of a receiver or trustee, or for any other remedy" under the Indenture.

[77] Defendants improperly refer to this argument as a challenge to the FDIC-R's standing. There is no dispute that the FDIC-R meets the required elements of constitutional standing necessary to invoke a federal court's article III jurisdiction, as it has suffered (1) an injury in fact, (2) fairly traceable to the defendants' actions, and (3) likely to be redressed by a favorable decision. *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999). Rather, defendants' argument is more appropriately characterized as an assertion that the FDIC-R is not the real party in interest under Fed. R. Civ. P. 17(a) because – defendants assert – it transferred its securities claims to the trust. That argument raises, at most, a question of prudential standing. *Sch. Bd. of Avoyelles Parish v.*

– which explicitly transferred and assigned *only* the RMBS and principal and interest due on the

RMBS after February 2010 – somehow also implicitly transferred and assigned to the Trust the

TSA claims asserted by the FDIC-R here. Defendants are wrong. The law is clear that securities

law claims transfer only when the parties explicitly demonstrate an intent to do so, and the Trust

Agreement contains no language expressing such an intent.[78]

   A.   **Claims for violation of the securities laws do not "travel" with the security when it is sold.**

       Claims for violation of the securities laws are personal to the purchaser of the security.

As a result, they do not automatically "travel" with the security when it is sold. *See Rose v.*

*Arkansas Valley Envtl. & Utility Auth.*, 562 F. Supp. 1180, 1189-90 (W.D. Mo. 1983) ("[T]he

cause of action itself is entirely separate and distinct from the security which gave rise to it, and

does *not* automatically follow the ownership of that security"; construing both federal and

Missouri securities law); *Indep. Investor Protection League v. Saunders*, 64 F.R.D. 564, 572

(E.D. Pa. 1974) ("While a security is of course transferred by its sale, the causes of action

belonging to a prior holder do not pass with the transfer of the security."); *In re Activision*

*Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015) (construing Delaware law

and explaining that a claim for violation of the securities laws in connection with purchase or

sale of a security is a "quintessential" example of a personal claim that remains with the

---

*U.S. Dep't of the Interior*, 647 F.3d 570, 577-78 (5th Cir. 2011); *In re Whittington*, 530 B.R. 360, 390-91 (Bankr. W.D. Tex. 2014).

[78] The FDIC-R also submitted a motion for summary judgment on February 28, 2018, which seeks a ruling that it is entitled to damages (as opposed to rescission) because it no longer owns these securities. RBS and Deutsche Bank's concession (RBS/DB Br. at 1) that the FDIC-R "transferred the five certificates to a completely separate trust" establishes that the FDIC-R disposed of the certificates and therefore no longer owns them, because a transfer is a disposition, entitling the FDIC-R to damages if it proves defendants' liability at trial. The FDIC-R will brief this issue further in its reply brief on its motion for summary judgment.

purchaser or seller; "it does not travel with the shares"); *accord In re Nucorp Energy Secs. Litig.*, 772 F.2d 1486, 1490 (9th Cir. 1985); *Bluebird Partners, L.P. v. First Fidelity Bank*, 896 F. Supp. 152, 156 (S.D.N.Y. 1995).

This result stems from the emphasis of the securities laws on "purchaser" (or "seller") status and from policy considerations. Under the TSA, an entity that offers or sells a security by means of an untrue or misleading statement of material fact "is liable *to the person buying the security from him*, who may sue" for damages or rescission. TEX. REV. STAT. ART. 581-33(A)(2) (emphasis added). Likewise, under section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, only purchasers or sellers of securities have a cause of action, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975), and courts have emphasized that in deciding that Rule 10b-5 claims are not automatically assigned when the security is sold. *See Smith v. Ayres*, 977 F.2d 946, 949-50 (5th Cir. 1992); *see also Soderberg v. Gens*, 652 F. Supp. 560, 564 (N.D. Ill. 1987) (because seller's liability under Section 12 of the Securities Act of 1933 Act runs "to the person purchasing such security from him," a holder who did not purchase the security from the entity that violated section 12 has no standing to sue); *Rose*, 562 F. Supp. at 1189-90 (expressing same rationale with respect to claims for violation of state securities laws).[79]

   **B.   The language in the Trust Agreement demonstrates that the FDIC-R did not assign its securities law claims to the Trust.**

Under Delaware law, which governs the Trust Agreement,[80] "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to

---

[79] *See also In re Nucorp*, 772 F.2d at 1490; *Indep. Inv'r Prot. League*, 64 F.R.D. at 572 ("The provisions of the securities acts relied upon here create rights of action on the part of investors who have been harmed by the misconduct of others. Those rights belong to the *persons* who have suffered injury. They do not attach for all eternity to the security itself, to pass forever from the person who has been harmed to be asserted by others who have not.").
[80] Ex. 43 § 10.13.

transfer." 6 Del. Code § 8-302(a). However, Delaware law is clear that "[t]he phrase 'all rights in the security' means" only "rights in the security itself as opposed to personal rights." *Schultz v. Ginsburg*, 965 A.2d 661, 667 n.12 (Del. 2009) (quoting *In re Sunstates Corp. S'holder Litig.*, No. Civ. A. 13284, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001)). Claims for violation of the securities laws are personal and do not adhere to the security itself. *Activision*, 124 A.3d at 1056. As a result, there must be a specific, explicit act demonstrating an intent to transfer any claims for a violation. A general assignment of all "right, title and interest" in and to the security does not suffice; there must be some additional language that expresses an intent to transfer securities law claims. The Trust Agreement expresses no such intent.

As defendants note, under Delaware law, the scope of an assignment is based on the intent of the parties, which is determined from the plain language of the contract if it is unambiguous. *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016). It is undisputed that the Trust Agreement does not include any language that explicitly assigns securities claims. Rather, defendants argue that an assignment should be inferred from language that transfers to the Trust all "right title, and interest" in and to only the RMBS and principal and interest from February 2010 forward. (RBS/DB Br. at 9-10). But that is not enough to show an assignment of the FDIC-R's TSA claims because, as explained above, claims for violation of the securities laws are not a right, title or interest in the RMBS themselves. *See Activision*, 124 A.3d at 1056.

Defendants do not cite a single case that construed similar contractual language in the context of a sale of securities and an alleged transfer of claims for violation of the securities laws. In cases that involve sales of RMBS,[81] courts have refused to find that language that

---

[81] Although *Royal Park* and *Dexia* construed New York law, which does not apply here, they are instructive because New York law, like Delaware law, is clear that claims for fraud or misrepresentation arising out the sale of a contract or note do not automatically transfer with the

assigns all "right, title and interest" in and to the securities included claims for misrepresentation or fraud arising out of the purchase of the securities. *See, e.g., Royal Park Investments SA/NV v. Morgan Stanley*, 57 N.Y.S.3d 677 (N.Y. Sup. Ct. 2017) (agreement transferring "all of the Seller's right, title, and interest in and to" RMBS in seller's portfolio did not include fraud claims where New York law provided that right to assert a fraud claim related to a contract or note did not automatically transfer with the contract or note, and there was "simply no language in the documents evidencing an outward expression of an intent to assign the tort claims at issue"); *Dexia SA/NV v. Morgan Stanley*, 22 N.Y.S.2d 833 (N.Y. Sup. Ct. 2016) (holding that agreement to transfer "all right, title and interest" in RMBS "did not include fraud claims since [assignor] only assigned rights in the subject securities without explicitly referencing any related tort claims or the overall transaction" between the purchaser and defendants); *accord Sealink Funding Ltd. v. UBS AG*, 997 N.Y.S.2d 101, 2014 WL 3408569, at *5 (N.Y. Sup. Ct. July 9, 2014).[82]

Furthermore, the cases defendants cite all involved contracts that contained language from which the court found a clear and unambiguous intent to transfer tort claims. In *RTC Mortgage Trust v. Fidelity National Title Insurance Co.*, 16 F. Supp. 2d 557 (D.N.J. 1998), the language that effected the assignment was "extremely broad." *Id.* at 564. It assigned not only all of the RTC's right, title and interest in and to the relevant mortgage loan, but also "all documents

---

contract or note. *Commonwealth of Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 550 (2015).

[82] Presumably, defendants did not cite *FDIC as Receiver for Guaranty Bank v. Citibank, N.A.* in support of their motion because, even though that case addressed the Trust Agreement at issue here, that court's decision only further supports the FDIC-R's position that, under Delaware law, the securities law claims asserted here do not automatically transfer with the sale of the RMBS. 1:15-cv-6574, 2016 WL 8737356, at *4-5 (S.D.N.Y. Sept. 30, 2016) (concluding that claims against trustees for breach of duties arising out of certain contracts were *property rights* associated with the securities at issue that traveled with the securities when they were sold, in contrast to fraud-based claims like the securities claims here, which are *personal* to the holder and *do not* travel with the security when sold).

related to the [loan]" and "all proceeds derived in any way from any of the foregoing." *Id.* Moreover, that language was followed by a specific and narrow reservation of rights, by which the RTC reserved only the right to sue anyone "who has caused a loss to the [RTC] or any predecessor thereof," and it was uncontested that the defendant was not within the category of persons who had caused a loss to the RTC. *Id.* at 563. The court concluded that, "[g]iven the breadth of this language [of assignment] and the narrow swath of rights retained by the RTC in the Assignment," the agreement reflected "an unambiguous intent on the RTC's behalf to transfer everything that it owned with respect to the …mortgage and loan" (including a claim for negligent misrepresentation against the law firm that provided an opinion letter relating to the first lien status of the loan), except the rights specifically retained. *Id.* at 564.

In contrast, the Trust Agreement assigns only the FDIC-Receiver's right, title and interest in and to the RMBS themselves and only to those payments of principal and interest due on the RMBS in February 2010 and after.[83] Put simply, the Trust Agreement does not evince an intent to transfer tort-based claims. That agreement does not even evince an intent to transfer *any payments* unless they were due on or after February 2010.

Defendants' reliance on *FDIC as Receiver for Amtrust Bank v. Burke,* No. 12-7398 (MAS)(LGH), 2015 WL 404513 (D.N.J. Jan. 29, 2015), is also misplaced. That case involved broader contract language from which the court found a clear intent to assign tort claims. The relevant agreement did not merely assign all "right, title and interest" in a particular asset. It also assigned, for example, "*all other rights, benefits and proceeds arising from or in connection with*

---

[83] Ex. 43 § 3.01.

*such Mortgage Loan.*" *Id.* at *1 (emphasis added). There is no analogous language in the Trust

Agreement that expresses an intent to transfer claims for violation of the securities laws.[84]

Finally, defendants' argument is not helped by their analogy to the statute that authorized

the FDIC to bring suit as receiver for Guaranty. Under 12 U.S.C. § 1821(d)(2)(A), the FDIC

"succeed[ed]" "by operation of law" to "all rights, titles, *powers, and privileges of the insured*

*depository institution [Guaranty] … with respect to the institution and the assets of the*

*institution.*" (emphasis added). Thus, the FDIC-R succeeds not just to the "right, title and

interest" in some defined asset class, but to every power and privilege that belonged to the

institution and every asset that the institution owned.[85] As a result, the statutory grant of power

necessarily includes claims (which are clearly assets) and the power to bring claims for

violations of the securities laws. This is in stark contrast to the Trust Agreement, which grants

only rights, title and interest in the RMBS themselves and only future payment streams. Whether

the FDIC-R *could* have assigned its securities law claims to the Trust through the Trust

---

[84] *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146 (2d Cir. 1995), also involved language broader than that in the Trust Agreement. There, the court found that language transferring "all of [seller's] rights, title and interest in" a loan participation agreement was not itself sufficient to transfer clams for rescission or fraud in the inducement. It was only because the contract contained additional language stating that the transfer was of the seller's rights and interest to the "transaction described," which the court construed to be broader than an interest in the contract itself, that the court found the language sufficient to effect the assignment of fraud claims to the purchaser. *Id.* at 152. In *International Design Concepts v. Saks Inc.*, 486 F. Supp. 2d 229 (S.D.N.Y. 2007), the sale agreement conveyed "all assets" of the seller. The court found the assignment of "all assets" broad enough to include causes of action, particularly because the seller was "a defunct entity and would have had little incentive to reserve transactional rights." *Id.* at 237.

[85] To the extent the language were to be considered ambiguous – which it is not – the legislative history of the statute makes clear that it was "designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." H.R. Rep. 101-54(I) at 330, reprinted in 1989 U.S.C.C.A.N. at 126. As the *RTC* court recognized, "[n]umerous courts have noted the breadth and all-inclusiveness of these powers," which "have been described as 'unprecedented.'" *RTC*, 16 F. Supp. 2d at 566 (quoting *Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 111 (1st Cir. 1994)).

Agreement says nothing about whether it actually did so. That question is determined by the language of the Trust Agreement, which, for the reasons explained above, expresses no intent to assign securities law claims.[86]

## II. RBS AND DEUTSCHE BANK SOLD THE CERTIFICATES "BY MEANS OF" UNTRUE OR MISLEADING STATEMENTS OF MATERIAL FACT IN THE PROSPECTUS SUPPLEMENTS.

The TSA imposes liability on persons who sell securities "by means of" an untrue or misleading statement of material fact. TEX. REV. STAT. ART. 581-33(a)(2).[87] Federal law prohibited the defendants from selling RMBS to the public without providing a prospectus supplement. *See* 15 U.S.C. § 77(e)(b)(2). Defendants filed the prospectus supplements with the SEC, thereby making them available to investors, before the dates on which Guaranty's purchases settled. Thus, defendants sold the certificates to Guaranty "by means of" the prospectus supplements.

Defendants' argument (RBS/DB Br. at 11-13) that, because they did not file the prospectus supplements with the SEC until after the trade dates for four of the five certificates,[88] they did not sell those certificates to Guaranty "by means" of the untrue or misleading statements in the prospectus supplements, has been rejected by every court to consider it and is just as flawed here. First, any sale of the certificates before defendants provided a prospectus

---

[86] In contrast, in *FDIC v. Wheat*, 970 F.2d 124 (5th Cir. 1992), after the FDIC-Receiver succeeded by law to all "rights, titles, powers and privileges" of the failed bank, it expressly assigned all rights, title, interest "*and chose in action . . . against directors*" to the FDIC in its corporate capacity, which gave the FDIC in its corporate capacity the authority to file claims against a former director of the bank for breach of fiduciary duty. *Id.* at 130 (emphasis added).

[87] The statute also makes it unlawful to offer securities by means of untrue or misleading statements of fact, but the FDIC-R's claims focus on defendants' sale of the RMBS to Guaranty.

[88] RBS does not make this argument with respect to the HVMLT 2005-16 certificate. (RBS/DB Br. at 13, n.35). That prospectus supplement was filed and available to Guaranty before both the trade date and the settlement date. *See supra* at n.9.

supplement would have been unlawful. Second, there was no binding sales contract on the trade date; there was only an agreement to purchase conditioned upon the representations in the prospectus supplement.

In offering these RMBS publicly to investors, defendants used the shelf registration process permitted under the 1933 Act:

> The shelf registration process allows certain would-be issuers to file a generic registration statement with the SEC that omits the type of detailed information that must generally be disclosed to purchasers. A qualified registrant commits that, at the time of any offering, it will have made the omitted disclosures in some form or another, including by filing a post-effective amendment to the registration statement, filing a prospectus supplement with the SEC, or filing an annual report pursuant to Section 13(a) or Section 15(d) of the Exchange Act.

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*, No. 11 Civ. 5201, 2012 WL 2400263, at *2 (S.D.N.Y. June 26, 2012) (citing 17 C.F.R. §§ 230.409, 230.415, 230.430A, 230.512). The registration statements that defendants filed included only generic "base" prospectuses that did not describe the specific terms of the offered securities or any of the loans underlying the certificates. Section 5(b) of the 1933 Act required defendants to file a supplemental disclosure that supplied the detailed information missing from the registration statement, including information about the specific mortgage loans that backed each certificate.[89] *FHFA v. UBS,* 2012 WL 2400263, at *5. Defendants did so through the prospectus supplements, which would have been understood to "convey in detail the soundness of the underlying assets" and to provide "the information that was material to investors in deciding whether to purchase the securities."[90] *Id.* at *5. Thus, the

---

[89] *See* 15 U.S.C. §77e(b)(2) ("It shall be unlawful for any person . . . to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.").

[90] Indeed, defendants told investors to rely *only* on information in the prospectus supplements. *See, e.g.,* Ex. 11 (RALI 2005-QO1 Prossup) at S-2 ("If the description of your certificates in this prospectus supplement differs from the related description in the accompanying prospectus, you

very "*lawfulness* of the purchase transactions at issue . . . was contingent on the defendants'
supplementing their shelf registration statements and base prospectuses with the information" in
the prospectus supplements. *FHFA v. Nomura,* 68 F. Supp. 3d at 507 (emphasis added) (internal
punctuation and citations omitted); *FHFA v. Bank of Am.*, 2012 WL 6592251 at *4 ("under
Section 5(b) [of the Securities Act of 1933], the lawfulness of a sale of registered securities is
contingent on the issuer's filing a Final Prospectus [*i.e.*, prospectus supplement]").[91]

      As a result, any decision by an investor to purchase an RMBS before the mandatory,
loan-specific disclosures were made in the prospectus supplement was necessarily conditional
and not final. *See Nomura*, 873 F.3d at 149. In RMBS transactions, once the prospectus
supplement is filed, it "assume[s] the material role of convincing the [investors] to finalize the
transactions." *Id.* at 149-150.[92] If information in the prospectus supplement differs materially
from the information previously provided to the investor, the investor has the right to refuse to
settle the trade. *CMFG Life Ins. Co. v. RBS Secs.*, *Inc.*, 799 F.3d 729, 740-41 (7th Cir. 2015)
(describing RMBS market practices and explaining that investors could break a trade or
renegotiate the price if the prospectus supplement contained terms materially different from

---

should rely on the information in this prospectus supplement."); Ex. 7 (HVMLT 2005-8
prospectus) at 5 ("Although the accompanying prospectus supplement for a particular series of
securities cannot contradict the information contained in this prospectus, insofar as the
prospectus supplement contains specific information about the series that differs from the more
general information contained in the prospectus, you should rely on the information in the
prospectus supplement.").

[91] *See also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 404 (D. Md. 2004)
("It is only after the prospectus supplement is completed that [shelf] securities can be sold.").

[92] Addressing the related question of the materiality of information in prospectus supplements
made available only after the initial trade dates, the Second Circuit noted that "[i]f they were
categorically immaterial because of their dates of transmission, Defendants could be held to
account only for statements made in free writing prospectuses, which may 'omit [ ] in part or
summarize[ ] information,' 15 U.S.C. § 77j(b), and would no longer face the possibility of civil
litigation for failing to satisfy the full disclosure requirements of Section 10(a) [of the 1933 Act].
The Act does not permit such an outcome." *Nomura*, 873 F.3d at 150.

preliminary marketing materials). It is therefore no coincidence, and no defendant denies, that for every one of the certificates in these cases, the prospectus supplement was filed several days *before* the settlement date on which Guaranty completed its purchase.

The only decisions that have addressed the argument defendants make here have rejected it. *See, e.g., Nomura*, 68 F. Supp. 3d at 507 ("Despite the fact that the Prospectus Supplements (or 'Final Prospectus') may have post-dated the [plaintiff's] purchase decisions, sales of the Certificates were still made 'by means of' . . . the Final Prospectus . . ." for purposes of section 12 of the 1933 Act); *FHFA v. Bank of Am.*, 2012 WL 6592251 at *5 (rejecting argument that sale could not be "by means of" untrue and misleading statements in prospectus supplements that were filed after trade date). In *FHFA v. Bank of Am.*, 2012 WL 6592251 at *5, the court held that because the defendants were required by law to supplement their initial disclosures with the detailed prospectus supplements before they could lawfully sell the securities, the prospectus supplements "were thus an essential 'means' through which the defendants offered and sold these securities." *Id.* In a later opinion, the same court again rejected a

> 'temporal interpretation' of the phrase 'by means of' in Section 12(a)(2) that sought to limit Section 12(a)(2) liability to representations made prior to plaintiff's decision to purchase the security…[T]*he sale is still made 'by means of' a later-filed prospectus supplement, which may be the only document including the specific information about the securities required by the Securities Act and SEC regulations.*

*Nomura*, 68 F. Supp. 3d at 507 (emphasis added).

The same result is warranted here. That the FDIC-R's claims are for violation of the TSA, not section 12 of the 1933 Act, is immaterial. The TSA is modeled on section 12,[93] and the relevant language in the two statutes is nearly identical. Under these circumstances, Texas courts

---

[93] *Flowers v. Dempsey-Tegeler & Co.,* 472 S.W.2d 112, 114 (Tex. 1971) (noting that article 581-33 was "lifted almost verbatim" from section 12 of the 1933 Act).

look to interpretations of the federal securities laws for guidance.[94] And federal law is particularly relevant here because defendants' offerings were governed by federal securities law and regulations. There are no Texas cases construing the TSA's "by means of" requirement in the context of sales of RMBS or other securities offered using the shelf registration process employed by defendants here. Rather, the Texas cases defendants cite simply state that the "by means of" clause requires the plaintiff to show that the untrue statements were made before the sale occurred; statements made when a buyer has already purchased a security cannot induce the sale.[95] (RBS/DB Br. at 13). But that authority does not address when a "sale" occurs in the context of RMBS transactions like those involved here. On that issue – which is central to the Court's decision on defendants' motion – federal law is indisputably relevant, if not controlling. The disclosure requirements of the 1933 Act and the cases that interpret them make clear that defendants could not lawfully sell the certificates to Guaranty before making the prospectus supplements available, so the sales occurred "by means of" those documents and the untrue and misleading statements they contained. The Texas cases on which defendants rely do not contravene that conclusion.

At a minimum, summary judgment is inappropriate because there exist questions of material fact as to whether the sales occurred "by means of" the prospectus supplements within the meaning of the TSA. As Mr. Falconi testified, information in prospectus supplements was

---

[94] *See, e.g., Herrmann Holdings Ltd. v. Lucent Techs. Inc*., 302 F.3d 552, 563 (5th Cir. 2002) ("[B]ecause of the obvious similarities between the TSA and the federal securities acts, Texas courts look to decisions of the federal courts to aid in the interpretation of the TSA.").

[95] The TSA imposes no reliance requirement. *See Wood v. Combustion Eng'g, Inc*., 643 F.2d 339, 345 (5th Cir. 1981); *Geodyne Energy Income Prod. P'ship. I-E v. Newton Corp*., 97 S.W.3d 779, 783 (Tex. App. 2003), *rev'd in part on other grounds*, 161 S.W.3d 482 (Tex. 2005). As a result, the cases defendants cite that refer to "induc[ing] the purchase" do not mean that the plaintiff must have relied on the untrue or misleading statement in making its decision to buy the security.

always important; it was his practice to review information in prospectus supplements against preliminary disclosures to confirm the consistency of the information provided before the trade was finalized; and the purchase was not final until the settlement date.[96]

### III. THE FDIC-R'S LTV AND APPRAISAL-BASED CLAIMS ARE LEGALLY SUFFICIENT.

RBS and Deutsche Bank do not argue that there are no genuine issues of material fact about the truth of their statements about the LTVs of the loans that backed the certificates and about whether the appraisals of the mortgaged properties were done in accordance with professional standards. Rather, they argue that the FDIC-R's claims about those statements should be dismissed as a matter of law because the FDIC-R must prove that those statements were subjectively false, that is, that those who made the statements did not believe them. (RBS/DB Br. at 14-15). But the FDIC is not required to prove subjective falsity and, even if it were, there is enough evidence to enable a reasonable jury to conclude that those statements were indeed subjectively false.

### A. The FDIC does not have to prove subjective falsity.

In *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, the Supreme Court held that if an offering document "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability." 135 S. Ct. 1318, 1329 (2015). In *Nomura*, the court applied *Omnicare* to hold that statements about LTVs were misleading because defendants failed to disclose that the appraisals used to calculate those LTVs did not comply with USPAP. *See Fed. Hous. Fin. Agency v. Nomura Holding Am.*, 104 F. Supp. 3d 441, 566-67 (S.D.N.Y. 2015). This reasoning applies

---

[96] Ex. 6 at 55:12-16, 101:22-102:18, 103:21-104:8, 608:21-609:17.

squarely to the FDIC-R's claims under the TSA, so the FDIC-R may show that statements in the prospectus supplements about LTVs are actionable omissions without having to prove that those who made the statements did not believe them.

As in *Nomura*, the prospectus supplements stated that the appraisals used to calculate the LTVs conformed to USPAP.[97] Ms. Molitor-Gennrich reviewed a statistically significant sample of the appraisals to determine whether they complied with USPAP.[98] Dr. Cowan extrapolated Ms. Molitor-Gennrich's findings to the pools of loans that backed the certificates, and determined that between 50% and 63% of the appraisals in each pool departed so significantly from USPAP as to be not credible, or not worthy of belief.[99] Because the defendants failed to disclose that a material percentage of the appraisals in each pool did not comply with USPAP, their statements about LTVs were misleading and therefore actionable. *See Omnicare*, 135 S. Ct. at 1329.

    **B.**    **Even if the FDIC-R had to prove the subjective falsity of the appraisals, there is enough evidence for a jury to find that either the appraisers or the defendants or both did not believe them.**

"Because the appraisal 'opinions' were expressed by both the originators and [defendants], Plaintiff[] can state a claim by showing that either one disbelieved the appraisal amounts." *In re Bear Stearns Mortg. Pass–Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012). There are genuine issues of material fact about whether either the appraisers or the defendants themselves actually believed that the appraisal values reflected the honestly held beliefs of the appraisers. USPAP requires appraisals to be credible – in other words, to reflect an "objective assessment" of value. *FHFA v. Nomura Holding Am., Inc.*, No. 11CV6201, 2015 WL

---

[97] *See supra* at 4-5.
[98] Ex. 19 at 3.
[99] Ex. 29 at ¶¶ 74-78, App. 8, 8A.

353929, at *6 (S.D.N.Y. Jan. 28, 2015). "[A] showing of an appraisal's non-credibility is strong circumstantial evidence that at the time the appraiser prepared the appraisal she did not believe in the value reflected therein." *Nomura*, 104 F. Supp. 3d at 498. Ms. Molitor-Gennrich's findings of non-credibility provide such circumstantial evidence.

Moreover, as explained above (*see supra* at 7-8, 9-10), documents and testimony that defendants produced show that they knew that the appraisals for loans in these securitizations did not reflect accurate values. Despite its knowledge of widespread problems with appraisals, Deutsche Bank chose not to conduct any valuation due diligence in the form of AVMs or BPOs on two of the securitizations; and on the third, after receiving results from the reviews it conducted indicating serious valuation inflation in the appraisals, Deutsche Bank simply abandoned its valuation due diligence and securitized the majority of the loans with out-of-tolerance appraisals.[100] RBS also was aware of problems with appraisals, including on Countrywide loans, but nonetheless chose not to conduct any valuation due diligence on the loans in these securitizations.[101]

As a result, there are genuine issues of material fact about whether the defendants themselves believed in the accuracy of the appraisals used to calculate the LTVs that they disclosed in the prospectus supplements.

**C.    There are genuine issues of material fact about whether the appraisals were inflated.**

Courts have found that inflation of appraisal values can be reliably demonstrated at trial by automated valuation models run retrospectively as of the dates of the original appraisals. *See Nomura*, 104 F. Supp. 3d at 499, 520; *Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, 920 F.

---

[100]   Ex. 33 (DB_FDIC-GB_03337026); Ex. 45; Ex. 46; Ex. 47; Ex. 13 at 88-89.

[101]   *See supra* at 10.

Supp. 2d 475, 490, 506, 510 (S.D.N.Y. 2013). The FDIC-R asked its expert Dr. Norm Miller to

opine on the use of an AVM to test the accuracy of statements about LTVs and to compare the

weighted average LTVs of the loans that backed the certificates as disclosed in the offering

documents against the weighted average LTVs as determined by the AVM.[102] Based on the

AVM results, Dr. Miller and Dr. Cowan concluded that the weighted average LTVs were

actually between 5.84 and 10.39 percentage points higher than what was stated in the prospectus

supplements.[103] As a result, there is a genuine issue of material fact as to whether the appraisal

values are inflated.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be denied in

its entirety.

---

[102] Courts have regularly found expert testimony about AVMs to be reliable, including Dr.
Miller's testimony about the particular AVM he used in these cases. Ex. 48 (Order, *Fed. Home
Loan Bank of Seattle v. Banc of Am. Secs. LLC, et al.*, Nos. 09-2-46319-1, *et al.* (Sup. Ct. King
Cty., Wash., Mar. 16, 2016)); Ex. 49 (Order, *FDIC as Receiver for Franklin Bank v. Morgan
Stanley & Co. LLC*, No. 201167305 (Dist. Ct. Harris Cty., Tex., Feb. 25, 2015)).

[103] *See supra* at 11.

Dated:  March 30, 2018

Respectfully submitted,

/s/ R. Paul Yetter

Of Counsel:

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Collin J. Cox
State Bar No. 24031977
ccox@yettercoleman.com
Bryce L. Callahan
State Bar No. 24055248
bcallahan@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)

David J. Grais (*pro hac vice*)
dgrais@graisellsworth.com
Kathryn E. Matthews (*pro hac vice*)
kmatthews@graisellsworth.com
GRAIS & ELLSWORTH LLP
950 Third Avenue, 24th Floor
New York, New York 10022
(212) 755-0100
(212) 755-0052 (Fax)

COUNSEL FOR PLAINTIFF FEDERAL DEPOSIT
INSURANCE CORPORATION AS RECEIVER
FOR GUARANTY BANK

**<u>Certificate of Service</u>**

I certify that on the 30th day of March, 2018, a true and correct copy of the foregoing was served by e-service or email on all counsel of record.

<u>/s/ Bryce L. Callahan</u>
Bryce L. Callahan

31